No. 25-5181

**UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT**

CENTRO DE TRABAJADORES UNIDOS, et al.,

Plaintiffs-Appellants,

v.

SCOTT BESSENT, in his capacity as Secretary of the Treasury, et al.,

Defendants-Appellees.

On appeal from an order entered in the U.S. District Court for the
District of Columbia
No. 1:25-cv-00677-DLF
The Hon. Dabney L. Friedrich

**CONSENTED TO BRIEF ON BEHALF OF *AMICI CURIAE* CAMBRIDGE
ECONOMIC OPPORTUNITY COMMITTEE, INC. AND COMMUNITY
ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN
MASSACHUSETTS IN SUPPORT OF APPELLANTS AND REVERSAL**

Leslie K. Dellon
Michelle R. Lapointe
American Immigration Council
PMB2026
2001 L Street NW, Suite 500
Washington DC 20036
Telephone: 202-507-7530 (Dellon)
ldellon@immcouncil.org
mlapointe@immcouncil.org
*Attorneys for Amici Curiae*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PER CIRCUIT RULE 28(a)(1); STATUTES AND REGULATIONS PER CIRCUIT RULE 28(a)(5)**

**A. Parties and *Amici*.**

Except for the following, all parties, intervenors, and *amici* appearing before the district court, and in this Court, are listed in the Brief for Appellant. The Electronic Frontier Foundation filed a notice with this Court on June 27, 2025, that it intends to file an *amicus* brief in support of Appellants and reversal, with the consent of the parties.

**B. Rulings Under Review.**

Reference to the ruling under review is in the Brief for Appellants.

**C. Related Cases.**

This case has not previously been before this Court or any other court other than the district court from which this appeal was taken. The undersigned attorney is not aware of any other case that is related to this case.

**D. Statutes and Regulations.**

All applicable statutes and regulations are contained in the Brief for Appellants.

Dated: July 7, 2025

/s/ Leslie K. Dellon
Leslie K. Dellon (Bar No. 27795)
202-507-7530
ldellon@immcouncil.org

*Attorney for Amici Curiae*

**STATEMENT REGARDING CONSENT TO FILE, AUTHORSHIP AND SEPARATE BRIEFING (CORPORATE DISCLOSURE PREVIOUSLY FILED)**

Pursuant to Circuit Rule 29(b), *amici* filed a Notice to Participate, with Consent, as *Amici Curiae* in Support of Appellants with this Court on July 2, 2025. In their Notice to Participate, *amici* represented that all parties consented, through their respective counsel, to the filing of this brief. Their Notice to Participate also included the separate Corporate Disclosure Statement required by Circuit Rule 26.1, which Rule 29(b) states must accompany a written representation of consent to participate.

Pursuant to Fed. R. App. P. 29(a)(4)(E), this brief has not been authored, in whole or in part, by counsel to any party in this case. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No person contributed money that was intended to fund preparation or submission of this brief.

Pursuant to Circuit Rule 29(d), *Amici* certify that this separate *amici* brief is necessary and do not believe it duplicates any other brief that may be submitted. With their extensive experience participating in the Internal Revenue Service's Volunteer Income Tax Assistance, *amici* offer the Court a real-world perspective of the impact to *amici* and their clients of the agreement between the IRS and U.S.

Immigration and Customs Enforcement to share taxpayer information for the purpose of immigration enforcement.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PER CIRCUIT RULE 28(A)(1); STATUTES AND REGULATIONS PER CIRCUIT RULE 28(A)(5) ..................................................................................... I

**STATEMENT REGARDING CONSENT TO FILE, AUTHORSHIP AND SEPARATE BRIEFING (CORPORATE DISCLOSURE  PREVIOUSLY FILED)** ........................................................................................... **II**

TABLE OF AUTHORITIES ............................................................... VI

GLOSSARY .................................................................................... X

I. INTEREST OF AMICI CURIAE ..................................................... 1

II. ARGUMENT ............................................................................. 3

    A.    Summary ....................................................................... 3

    B.    Absent an Injunction, the MOU Will Break Decades of Promises on Which Immigrant Taxpayers Have Relied ........................................... 5

        1.    The IRS has Consistently Encouraged Immigrant Workers to File Tax Returns with Reassurance That Information Would not be Shared for Immigration Enforcement .......................................................... 5

        2.    The IRS Enlisted Trusted Community Organizations to Echo Its Confidentiality Promises and Encourage Tax Filing Among Immigrant Communities ............................................................................. 8

        3.    Taxpayers have Relied on these Privacy Promises ........................ 12

    C.    The MOU Threatens to Undermine the Agency's Own Interests ............. 14

    D.    The MOU Facilitates the Improper Use of Confidential Taxpayer Information For Civil Immigration Enforcement ............................................. 16

    E.    If This Court Permits Information-Sharing, The IRS and ICE are likely to Make Errors that Subject Taxpayers to Dire Consequences ........................... 21

        1.    The MOU will Likely Lead to Errors Based on Name Misidentification ....................................................................... 22

2. The MOU will Likely Lead to Errors Based on Incomplete Immigration History ..................................................................23

III. CONCLUSION ................................................................25

CERTIFICATE OF COMPLIANCE.......................................................27

CERTIFICATE OF SERVICE ...........................................................28

MOTION HEARING TRANSCRIPT ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Arizona v. United States*, 567 U.S. 387 (2012)................................................17

*D.V.D. v. U.S. Dep't of Homeland Sec.,* No. CV 25-10676-BEM, 2025 WL
    1142968 (D. Mass. Apr. 18, 2025)...............................................25

*De La Cruz v. Garland*, 86 F.4th 1236 (9th Cir. 2023) ..........................................17

*In re Sealed Search Warrant Application*, No. CV 3:25-MC-05067, ---
    F. Supp. 3d ---, 2025 WL 1499054 (S.D. Tex. May 27, 2025)......................19

*INS v. Lopez Mendoza*, 468 U.S. 1032 (1984)....................................................17

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ...............................................17

## STATUTES AND REGULATIONS

8 U.S.C. § 1231(b)(3).....................................................................24

8 U.S.C. § 1253(a)(1)....................................................................17

8 U.S.C. § 1306..........................................................................18

8 U.S.C. § 1325..........................................................................18

26 U.S.C. § 6103(i)(2) ..................................................................17

26 U.S.C. § 7803(a)(2)(A) ...............................................................14

42 U.S.C § 2000d.........................................................................11

Protecting Americans from Tax Hikes Act of 2015, Pub. L. No. 114-113, § 203,
    129 Stat. 2242 (2015) ...............................................................7

Taxpayer First Act, Pub. L. 116–25, title I, § 1401(a), 133 Stat. 981 (2019)...........9

26 CFR § 301.6109–1(d)(3)(iii)............................................................6

## FEDERAL REGISTER

60 Fed. Reg. 30211 (June 8, 1995) (codified at 26 CFR § 301.6109–1)...................5

61 Fed. Reg. 26788 (May 29, 1996) ....................................................6

90 Fed. Reg. 11793 (Mar. 12, 2025).....................................................18

90 Fed. Reg. 8451 (Jan. 30, 2025) ....................................................16

## RULES

Federal Rule of Criminal Procedure 41(d)(1).........................................19

## MEMORANDUM OF UNDERSTANDING

Memorandum of Understanding Between IRS and DHS/ICE .... 3, 4, 12, 15, 16, 17,
    18, 21, 23

## IRS MATERIALS

Internal Revenue Manual, § 1.1.1.4 (07-29-2019) ..................................................15

IRS Pub. 4012, VITA/TCE Volunteer Research Guide, Entering the Last Name Correctly, B-19,-20 (Rev. Oct. 2024), https://www.irs.gov/pub/irs-access/p4012_accessible.pdf ............................................................................22

IRS, *Become an IRS partner to help in your community*, IRS.gov (Apr. 8, 2025), https://www.irs.gov/individuals/become-an-irs-partner-to-help-in-your-community(emphasis added)...............................................................................9

IRS, *Fact Sheet: Becoming a Certified Acceptance Agent (CAA) for SPEC Partners*, IRS.gov (Oct. 2024), https://www.irs.gov/pub/irs-pdf/p5428.pdf.......10

IRS, *Free tax return preparation for qualifying taxpayers*, IRS.gov (June 23, 2025), https://www.irs.gov/individuals/free-tax-return-preparation-for-qualifying-taxpayers ....................................................................................................9

IRS, IRS Moves to Protect Victims of Domestic Violence (Feb. 20, 2001),https://www.taxnotes.com/research/federal/other-documents/irs-news-releases/irs-moves-to-protect-victims-of-domestic-violence/10d8p...................13

IRS, *Non-English speaking or English as a second language*, IRS.gov (Jan. 10, 2025), https://www.irs.gov/individuals/non-english-speaking-or-english-as-a-second-language (emphasis added) .......................................................9

IRS, *Privacy, Confidentiality, and Civil Rights – A Public Trust, Pub. 4299*, IRS.gov (Rev. 2-2025, https://www.irs.gov/pub/irs-pdf/p4299.pdf ...................10

IRS., *Inflation Reduction Act Strategic Operating Plan,* Pub. 3744 1 (2023), https://www.irs.gov/pub/irs-pdf/p3744.pdf.........................................................14

IRS Topic No. 857 (Nov. 7, 2024), https://www.irs.gov/taxtopics/tc857................6

## OTHER AUTHORITIES

Dep't of Justice*, Operation Guardian Angel Launched to Neutralize California's Sanctuary State Policies that Protect Criminal Illegal Aliens* (May 19. 2025), https://www.justice.gov/usao-cdca/pr/operation-guardian-angel-launched-neutralize-californias-sanctuary-state-policies ....................................................20

Gov't Account. Office, Individual Taxpayer Identification Numbers Can Be Improperly Obtained and Used, GAO-04-529 18 (March 2004).........................7

Greg Allen, *ICE Detained the Wrong Peter Brown*, Nat'l Pub. Radio (Dec. 18, 2018), https://www.npr.org/2018/12/18/677780624/ice-detained-the-wrong-peter-brown...........................................................................................................22

Hamed Aleaziz, *Under Pressure from the White House, ICE Seeks New Ways to Ramp Up Arrests*, N.Y. Times (June 13, 2025) .......................................... 19, 21

Jacob Bogage and Jeff Stein, *IRS nears deal with ICE to share addresses of suspected undocumented immigrants*, Wash. Post (Mar. 22, 2025), https://www.washingtonpost.com/us-policy/2025/03/22/ice-irs-immigrants-deport/ ........................................................................................................21

Jennifer Sykes, Katrin Križ, Kathryn Edin, and Sarah Halpern-Meekin, *Dignity and Dreams: What the Earned Income Tax Credit (EITC) Means to Low-Income Families*, 80 Am. Soc. Rev. 243 (2014) .........................................................13

Jory Heckman, *IRS Layoff Notices to Employees Delayed by 'Glitches'*, Fed. News Network (Apr. 23, 2025, 12:52 PM), https://federalnewsnetwork.com/workforce/2025/04/irs-layoff-notices-to-employees-delayed-by-glitches/ ........................................................15

Jose Olivares, The Guardian, *Ice used 'false pretenses' for warrant to hunt for Columbia students, lawyers say* (May 16, 2025, 2:29 PM), *available at* https://www.theguardian.com/us-news/2025/may/16/ice-warrant-false-pretenses-columbia-students ........................................................................................19

Laura Romero, *ICE admits to an 'administrative error' after Maryland man sent to El Salvador prison*, ABC News, (Apr. 1, 2025, 12:53 AM), https://abcnews.go.com/Politics/ice-admits-administrative-error-after-maryland-man-el/story?id=120359991 ..............................................................24

Letter from Gregory F. Jenner, Acting Assistant Sec'y, Dep't of the Treasury, to Marilena Nincapie & Jean Friedland, Nat'l Immigr. Ctr. (Mar. 24, 2004), https://www.taxnotes.com/research/federal/other-documents/treasury-tax-correspondence/treasury-responds-to-groups-concern-over-targeting-itin-users/yqkt ...............................................................................................7

Makena Kelly, *DOGE Is Planning a Hackathon at the IRS. It Wants Easier Access to Taxpayer Data*, Wired (Apr. 5, 2025, 12:03 PM), https://www.wired.com/story/doge-hackathon-irs-data-palantir/ .......................15

Marco Guzman, Instit. on Tax'n & Econ. Pol'y, *IRS Cooperation with ICE Will Damage Public Trust, Putting Tax Revenues in Jeopardy, Institute on Taxation and Economic Policy* (Apr. 10, 2025) https://itep.org/irs-cooperation-with-ice-will-damage-public-trust-putting-tax-revenues-in-jeopardy/ .............................16

Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://www.washingtonpost.com/local/social-issues/undocumented-and-paying-taxes-they-seek-a-foothold-in-the-american-dream/2017/03/11/bc6a8760-0436-11e7-ad5b-d22680e18d10_story.html ...................................................8

Motion Hearing Transcript 46:7-10 .......................................................................18

Shayak Sarkar, *Internal Revenue's External Borders*, 112 Cal. L. Rev. 1645 (2024) ........................................................................................................14

The Budget Lab, *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance* (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance ....................................................16

U.S. Dep't Homeland Security, *Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally: DHS Will Use Every Available Tool to Compel Illegal Aliens to Self-Deport*, (Feb. 25, 2025), https://www.dhs.gov/news/2025/02/25/secretary-noem-announces-agency-will-enforce-laws-penalize-aliens-country-illegally ...................................................20

# GLOSSARY

CEDC      Community Economic Development Center of Southeastern Massachusetts

CEOC      Cambridge Economic Opportunity Committee, Inc.

DHS      U.S. Department of Homeland Security

ICE      U.S. Immigration and Customs Enforcement

INA      Immigration and Nationality Act

IRS      Internal Revenue Service

ITIN      Individual Taxpayer Identification Number

MOU      Memorandum of Understanding between U.S. Treasury Department on behalf of IRS and DHS on behalf of ICE for the Exchange of Information for Nontax Criminal Enforcement

USCIS      U.S. Citizenship and Immigration Services

VITA      Volunteer Income Tax Assistance

## I.  INTEREST OF AMICI CURIAE

*Amici curiae* are local anti-poverty nonprofit organizations that partner with federal, state, and local governments to promote self-sufficiency. Cambridge Economic Opportunity Committee, Inc. ("CEOC") was founded as a Community Action Agency in April 1965 as part of the War on Poverty. The Community Economic Development Center of Southeastern Massachusetts ("CEDC"), established in 1997 as a community development corporation, is located in New Bedford. These organizations work diligently to serve low wage earners, individuals with limited English proficiency, those with disabilities, those living in subsidized housing, and seniors. *Amici* serve clients with a range of immigration statuses, languages, and national origins. Their staff speak nine languages, partially representing the diversity of their communities.

*Amici* provide a comprehensive "bundled services" approach to help people in need access resources and benefits such as housing, food stamps, health insurance. By consolidating services and eliminating barriers to access, participants can gain access to more benefits and support than they would in more siloed organizations.

Tax-filing assistance was a natural fit for these organizations, as they were already serving low-income and economically vulnerable community members. *Amici* began to participate in the Internal Revenue Service's Volunteer Income Tax Assistance ("VITA") program to offer free tax preparation in the 2004 filing season

and have continued ever since. Nearly all of *amici*'s staff have been certified at the Advanced Level, and some have provided tax-preparation assistance for ten or even twenty years. Their Executive Directors further undertook extensive training to allow their organizations to become Certifying Acceptance Agents, which can assist tax filers without eligibility for a Social Security Numbers to apply for an Individual Taxpayer Identification Number ("ITIN").

Alongside these services, the Executive Director of the CEDC of Southeastern Massachusetts is a Department of Justice ("DOJ") Accredited Representative. The DOJ Accredited Representatives are non-attorneys who are trained in immigration law and work for DOJ-recognized non-profit organizations. The Executive Director's accreditation allows her to screen and assist clients in pursuing immigration relief, such as humanitarian visas (U, T, special immigrant juvenile status) and temporary protected status. CEDC works with local law enforcement assisting victims of crime with their immigration cases.

The CEDC of Southeastern Massachusetts devoted particular efforts to build trust with New Bedford's immigrant taxpayers. After a worksite immigration raid in 2007, many immigrants and their families have limited their engagements with government institutions. Because the CEDC spread the word that it was safe and beneficial for families to file their tax returns, the VITA program has taken off.

Now, reports that the IRS and ICE have signed an agreement for the sharing of information about taxpayers have already interfered with the CEDC's ability to serve immigrant taxpayers in their communities. During the 2025 filing season, New Bedford saw the number of filers using ITINs plummet from 221 to 123—a partial measure of the immigrant taxpayers deterred from filing. If the IRS is permitted to disclose information pursuant to the Memorandum of Understanding (MOU), *amici* fear that this trend will continue.

## II.   ARGUMENT

### A.   Summary

For more than twenty years, *amici* have helped low-income taxpayers, including immigrant taxpayers, to file their taxes as part of the IRS's VITA program. By providing this service, among the many offered by each organization, the organizations helped these families both to participate fully in supporting their communities and to receive essential services. Throughout this time, the IRS promised immigrant taxpayers that their personal information would be protected, including from immigration enforcement agencies. The IRS also enlisted *amici* and similar organizations to echo these promises, relying on the trust that the organizations have built with their immigrant clients.

Now, only a few months into a new presidential administration, the Treasury Department has suddenly shifted position, through the MOU and related actions at

issue in this lawsuit. These efforts break from the longstanding, publicly advertised IRS policy to not share taxpayers' data except in very narrow and limited circumstances. If allowed, the Treasury Department's rash decision will destroy the trust in the IRS, and it will send many tax-compliant workers back into the underground economy. The MOU further threatens to undermine the IRS's core revenue-raising and tax-administration functions.

The MOU uses the pretense of conducting criminal investigations, a key statutory requirement to obtain the information sought, for the purpose of deporting unauthorized immigrants—when deportation proceedings are a civil matter. This significant switch in agency policy calls for more judicial scrutiny than the District Court gave it. Finally, the hastily constructed information-sharing apparatus is likely to lead to substantial errors, particularly for people who have common names, or whose names do not fit neatly within IRS information systems. The other group at high risk are immigrants whose immigration history includes a removal order but whose status has since been regularized, or who are no longer removable.

For these reasons, described in further detail below, *amici* urge the Court to recognize that a preliminary injunction to preserve the status quo would strongly serve the public interest.

### B. Absent an Injunction, the MOU Will Break Decades of Promises on Which Immigrant Taxpayers Have Relied

#### 1. The IRS has Consistently Encouraged Immigrant Workers to File Tax Returns with Reassurance That Information Would not be Shared for Immigration Enforcement

Grounded both in the protections of 26 U.S.C. § 6103 and the agency's ethos, the IRS has regularly committed to noncitizen tax filers that their information would be protected—particularly from immigration enforcement agencies. The IRS emphasized that its purpose was to collect revenue and administer the tax code, not to enforce immigration law.

Many of these representations were made during the development of the ITIN program. Although not all immigrant taxpayers have Social Security Numbers and many ITIN filers are not undocumented immigrants, the program still served as a visible indicator of the agency's approach to immigrant taxpayers.

In proposing to create the ITIN, the IRS specifically noted the confidentiality protections that would attach:

> The IRS individual taxpayer identification numbers and the information obtained by the IRS as a result of issuing numbers constitute confidential taxpayer information. Section 6103 strictly prohibits the disclosure of this information to other government agencies, private entities, or citizens. Disclosure in violation of the restrictions under section 6103 may lead to civil or criminal penalties.[1]

---

[1] *See* Taxpayer Identifying Numbers (TIN), 60 Fed. Reg. 30211, 30213 (June 8, 1995) (codified at 26 CFR § 301.6109–1).

During notice and comment, the IRS received comments suggesting that ITINs should be issued by immigration enforcement agencies or the Social Security Administration. The IRS rejected those suggestions:

> The IRS is the most appropriate federal agency to assign the ITIN because the number is intended for tax use only. Having the IRS as the sole issuer of ITINs will facilitate the general public's acceptance of the fact that the assignment of an ITIN creates no inference regarding the immigration status of an alien individual or the right of that individual to be legally employed in the United States.[2]

The IRS reached this conclusion after substantial *interagency* consultation.[3] It continued its commitment to taxpayer confidentiality in publications promoting the ITIN program, explaining that "[t]he ITIN creates no inference concerning your immigration status."[4]

In 2003 and 2004, shortly before *amici* began to serve as VITA sites, there were new discussions about the role of the IRS in immigration enforcement. At that time, the IRS, Department of Homeland Security, Government Accounting Office, and others reaffirmed that "current statutory restrictions on sharing tax data would need to be modified to permit sharing of IRS data with [the Department of Homeland

---

[2] Taxpayer Identifying Numbers (TINs), 61 Fed. Reg. 26788, 26789 (May 29, 1996) (regarding proposed amendment to 26 CFR § 301.6109–1(d)(3)(iii)).
[3] *Id.*
[4] IRS Topic No. 857 (Nov. 7, 2024), https://www.irs.gov/taxtopics/tc857.

Security]."[5] Congress made no such modifications. Around the same time, the Department of Treasury responded to concerns about the privacy of immigrant taxpayers' information, noting "Neither the IRS nor TIGTA [Treasury Inspector General for Tax Administration] has a program or project to investigate unauthorized workers in an effort to have them deported. The core missions of IRS and TIGTA are, and must remain, focused on our tax system."[6] *Amici* moved to develop their VITA programs, relying in part on IRS representations about the security of taxpayers' information.

More recently, during the prior Trump administration, there was renewed anxiety in immigrant communities about the security of tax information. Yet again, the IRS reassured taxpayers, "The IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax

---

[5] *See* Gov't Account. Office, Individual Taxpayer Identification Numbers Can Be Improperly Obtained and Used, GAO-04-529 18 (March 2004). Amid the GAO investigation, the IRS imposed stricter requirements to obtain an ITIN, *id.* at 11, and Congress later codified these and other strictures, Protecting Americans from Tax Hikes Act of 2015, Pub. L. No. 114-113, § 203, 129 Stat. 2242, 3078–81 (2015).

[6] Letter from Gregory F. Jenner, Acting Assistant Sec'y, Dep't of the Treasury, to Marilena Nincapie & Jean Friedland, Nat'l Immigr. Ctr. (Mar. 24, 2004), https://www.taxnotes.com/research/federal/other-documents/treasury-tax-correspondence/treasury-responds-to-groups-concern-over-targeting-itin-users/yqkt.

returns filed using ITINs . . . There is no authorization under this provision to share tax data with ICE."[7]

The current efforts to share information with ICE are fundamentally inconsistent with these years of representations.

     *2.*     **The IRS Enlisted Trusted Community Organizations to Echo Its Confidentiality Promises and Encourage Tax Filing Among Immigrant Communities**

The IRS's efforts to build trust with immigrant taxpayers went beyond pronouncements from government officials. Rather, the agency has enlisted community-based organizations like *amici* to encourage tax compliance, including through tax-filing assistance through the VITA program. The message from the IRS has been an open invitation to join it as a partner in its work to service more taxpayers, including by becoming a VITA site and providing further support to ITIN tax filers. In recruiting and training organizations to provide VITA and other services, the IRS repeatedly emphasized the importance of taxpayer privacy.

VITA is powered by volunteers certified by the IRS. The program encourages participation in the tax system among low- and moderate-income households,

---

[7] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://www.washingtonpost.com/local/social-issues/undocumented-and-paying-taxes-they-seek-a-foothold-in-the-american-dream/2017/03/11/bc6a8760-0436-11e7-ad5b-d22680e18d10_story.html.

persons with disabilities, the elderly, and "limited English-speaking taxpayers," including immigrants.[8] First started in 1969, the VITA program has proven so successful that Congress permanently authorized it in 2019.[9]

The IRS has specifically sought VITA program partners who would be trusted by underrepresented communities, including those with limited English proficiency and immigrants:

> **Become an IRS partner to help in your community**
> Make a difference in your community by partnering with IRS and thousands of nationwide organizations to meet individual taxpayers' needs for tax education and assistance. In these tough economic times, tax benefits can offer stronger financial stability for people and the communities in which they live. They can also serve as the starting point in realizing dreams.[10]

> **Who do you serve?**
> If your organization serves neighborhoods where *English is not spoken as the primary language, you most likely have developed strong ties to your constituents and are a trusted resource for them*. The link you provide between these individuals and community services can include tax preparation, tax education and assistance.[11]

---

[8] *See* IRS, *Free tax return preparation for qualifying taxpayers*, IRS.gov (June 23, 2025), https://www.irs.gov/individuals/free-tax-return-preparation-for-qualifying-taxpayers.

[9] Taxpayer First Act, Pub. L. 116–25, title I, § 1401(a), 133 Stat. 981, 993 (2019).

[10] IRS, *Become an IRS partner to help in your community*, IRS.gov (Apr. 8, 2025), https://www.irs.gov/individuals/become-an-irs-partner-to-help-in-your-community(emphasis added).

[11] IRS, *Non-English speaking or English as a second language*, IRS.gov (Jan. 10, 2025), https://www.irs.gov/individuals/non-english-speaking-or-english-as-a-second-language (emphasis added).

This type of partnership creates a win-win situation for the organization that knows its community members, the community that receives trustworthy services, and the IRS that increases compliance and efficiency thanks to knowledgeable tax-preparers and electronic filing of tax returns. For *amici*, until now, this work showed the government at its best.

The IRS also specifically sought to deepen its VITA partnerships to provide support for taxpayers who would need to use an ITIN. To obtain an ITIN, taxpayers must either mail their passports or other identity documents to the IRS or present them to a Certifying Acceptance Agent ("CAA"), who is trained and screened to provide certified copies of the documents to the IRS. As recently as October 2024, the IRS made a deliberate effort to expand its CAA services:

> The goal is to increase the availability of Individual Tax Identification Number (ITIN) services throughout the nation and within local communities, particularly in communities with high ITIN usage.[12]

*Amici* heeded this call to become CAAs for their communities.

In recruiting assistance from community organizations like *amici*, the IRS repeatedly emphasized the importance of data privacy and inclusive provision of services.[13] IRS personnel conducted annual trainings and were available to offer

---

[12] IRS, *Fact Sheet: Becoming a Certified Acceptance Agent (CAA) for SPEC Partners*, IRS.gov (Oct. 2024), https://www.irs.gov/pub/irs-pdf/p5428.pdf.
[13] IRS, *Privacy, Confidentiality, and Civil Rights – A Public Trust*, Pub. 4299, IRS.gov (Rev. 2-2025) at 9–13, https://www.irs.gov/pub/irs-pdf/p4299.pdf.

guidance and to provide oversight of the VITA sites. It is not unusual for the IRS to conduct audits of VITA sites and to even pose as taxpayers to test the privacy safeguards in any given site. VITA sites, for example, must have their own separate internet connection for e-filing and may not keep any of the taxpayer's documents upon completion of the tax return. *Amici* were also reminded of their obligation, as recipients of federal funding, to comply with Title VI requirements to not deny services to anyone on the grounds of national origin.[14]

*Amici* took the IRS's instructions and their trusted role within their communities seriously. Conscious that individuals rely on them for accurate information, they have invested considerable time and resources educating themselves about privacy laws and controls for taxpayers' information. The active efforts by the IRS to provide tax preparation services for immigrant families, combined with the reassurance that immigration status was irrelevant and that information collected would be kept private except for extreme and limited exceptions, led *amici* to feel that they were providing a service of value.

The IRS benefited from *amici*'s credibility among immigrant and other vulnerable communities. *Amici* repeated countless times that the IRS had strict guidelines for protecting information and that there was a "firewall" between the IRS and other agencies. *Amici* were frank about one prior incident of a rogue

---

[14] *See* 42 U.S.C. § 2000d.

Treasury employee's disclosure of immigrant taxpayers' records. They explained, however, that the IRS was not engaged in immigration enforcement and that the incident itself had prompted the IRS to be even more watchful over the data it received.[15] These reassurances encouraged hundreds of taxpayers in *amici*'s small communities—and millions more across the country—to trust that they could file tax returns without fear.

This has been true until this year. Initial reports of the IRS's willingness to pass information to immigration-enforcement agencies culminated in the MOU which is now before the Court. *Amici* and other trusted community organizations no longer know what to tell immigrant taxpayers.

### 3.     Taxpayers have Relied on these Privacy Promises

*Amici* have heard firsthand from immigrant and other taxpayers how important they find the IRS's privacy protections. Immigrants and refugees, many new to the country, who had often fled dangerous situations in their homeland came to CEDC to learn about the U.S. tax system to ensure that they were following U.S. laws. These immigrants wanted to work toward becoming citizens and bring over the family that they left behind. Because of their experiences in their home countries, many were worried about giving their information to the government.

---

[15] Letter from Gregory F. Jenner, *supra* n.6.

Survivors of domestic violence similarly asked if their abusers could access their or their children's information and were assured of IRS mechanisms to code and protect their information.[16]

Reassured by *amici* and similar organizations' efforts, immigrant community members have filed taxes for many reasons. In a 2014 study, taxpayers reported a sense of civic participation and dignity when filing tax returns.[17] Many are also aware that filing a return is proof of good moral character for future efforts to regularize their immigration status. This held true, even as many do not qualify for the most valuable credits like the earned income tax credit.

Now, immigrant taxpayers have learned that the IRS has adopted a new non-tax priority to pursue immigrants, even if it means betraying the trust they placed in the IRS. Even those taxpayers who are not at risk of deportation now have reason to fear being mistaken or questioned just by virtue of being immigrant taxpayers. *See infra* Part II.E. *Amici* are already seeing these taxpayers shy away from the tax system. Just this filing season, many regular taxpayers chose to not file and ITIN

---

[16] IRS, IRS Moves to Protect Victims of Domestic Violence (Feb. 20, 2001), https://www.taxnotes.com/research/federal/other-documents/irs-news-releases/irs-moves-to-protect-victims-of-domestic-violence/10d8p.

[17] Jennifer Sykes, Katrin Križ, Kathryn Edin, and Sarah Halpern-Meekin, *Dignity and Dreams: What the Earned Income Tax Credit (EITC) Means to Low-Income Families*, 80 Am. Soc. Rev. 243, 257 (2014).

filings were cut almost in half. The IRS's willingness to share data may force immigrant families back into the underground economy.

### C. The MOU Threatens to Undermine the Agency's Own Interests

Beyond the broken promises to immigrant taxpayers and weakened credibility of community organizations like *amici*, the use of IRS resources to support immigration-enforcement agencies undermines the IRS's core mission of tax administration and revenue collection.

Until recently, it would not seem necessary to assert that the IRS exists to collect taxes and enforce the tax laws. *See* 26 U.S.C. § 7803(a)(2)(A) (defining the core duties of the Commissioner of Internal Revenue as to "administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes and tax conventions").[18] The agency's mission statement, as adopted in 2018, under the prior Trump administration, is to "[p]rovide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all."[19] Through at least December 24, 2024, the Internal Revenue Manual reaffirmed this mission and

---

[18] *See* Shayak Sarkar, *Internal Revenue's External Borders*, 112 Cal. L. Rev. 1645, 1667–68 (2024) (describing the agency's revenue-collection purpose and hazards of "mission creep").

[19] IRS., *Inflation Reduction Act Strategic Operating Plan,* Pub. 3744 1 (2023), https://www.irs.gov/pub/irs-pdf/p3744.pdf .

articulated values including honesty and integrity, respect, and inclusion.[20] While neither the mission nor values remain in the publicly available Internal Revenue Manual, they reflect longstanding commitments by the agency.

The information-sharing at issue in this litigation represents a distraction from these core purposes. While Section 6103 imposes a mandatory duty to disclose information in support of *specific* federal criminal investigations, the MOU and public reporting reflect instead a mass and unprecedented information-sharing apparatus.[21] The statute contemplates no such bulk information sharing.[22] Critically, these efforts will require substantial IRS resources to carry out, at the same time as the agency reduces its personnel by 40 percent.[23] Apart from the diversion of resources, distrust generated by the IRS's broken privacy promises threatens the agency's ability to collect revenue. The declines in tax filing that *amici* have already

---

[20] I.R.M. § 1.1.1.4 (07-29-2019).
[21] MOU ¶1.b.-c., JA 114; Makena Kelly, *DOGE Is Planning a Hackathon at the IRS. It Wants Easier Access to Taxpayer Data*, Wired (Apr. 5, 2025, 12:03 PM), https://www.wired.com/story/doge-hackathon-irs-data-palantir/.
[22] *See* 26 U.S.C. § 6103(j), (*l*) (authorizing bulk data sharing with the Census Bureau and Social Security Administration).
[23] *See* Jory Heckman, *IRS Layoff Notices to Employees Delayed by 'Glitches'*, Fed. News Network (Apr. 23, 2025, 12:52 PM), https://federalnewsnetwork.com/workforce/2025/04/irs-layoff-notices-to-employees-delayed-by-glitches/.

begun to see in New Bedford would directly impair the public fisc—reducing federal revenue by billions of dollars each year.[24]

While some damage has already been done to immigrant taxpayers' trust in the IRS, this Court can help to restore that trust through clear protection of taxpayer data.

### D. The MOU Facilitates the Improper Use of Confidential Taxpayer Information For Civil Immigration Enforcement

A plain reading of the MOU makes clear that DHS's purpose in seeking access to personal taxpayer data is to further the administration's goal of mass deportation, irrespective of eligibility for statutory immigration relief. The MOU relies on Executive Order 14161, "Protecting the United States From Foreign Terrorists and Other Security and Public Safety Threats," 90 Fed. Reg. 8451 (Jan. 30, 2025), for its statement that the President directed the DHS Secretary and officials at other agencies to "take immediate steps to identify, exclude, or remove aliens illegally present in the United States." MOU, ¶1.a, JA 114. The phrase "illegally present" under immigration law does not necessarily mean subject to *criminal* prosecution.

---

[24] The Budget Lab, *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance* (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance (estimating between 5.7 and 18.4 billion dollars in the first year); Marco Guzman, Instit. on Tax'n & Econ. Pol'y, *IRS Cooperation with ICE Will Damage Public Trust, Putting Tax Revenues in Jeopardy, Institute on Taxation and Economic Policy* (Apr. 10, 2025) https://itep.org/irs-cooperation-with-ice-will-damage-public-trust-putting-tax-revenues-in-jeopardy/ (estimating between 8.6 and 51.8 billion dollars per year).

Unlawful presence may render one removable but is not, standing alone, a criminal infraction. While it is undoubtedly a severe penalty to be removed from the United States under the Immigration and Nationality Act (INA) (*see Padilla v. Kentucky*, 559 U.S. 356, 365-66 (2010)), it is well established that "[r]emoval is a civil, not criminal, matter." *Arizona v. United States*, 567 U.S. 387, 396 (2012). Accordingly, removal proceedings lack the procedural protections afforded in criminal trials. *See INS v. Lopez Mendoza*, 468 U.S. 1032, 1041-50 (1984) (exclusionary rule does not apply in civil removal proceeding); *De La Cruz v. Garland*, 86 F.4th 1236, 1240-41 (9th Cir. 2023) (*Miranda* rights do not apply in immigration cases because they are civil, not criminal, proceedings).

Under the MOU and pursuant to the statute, DHS/ICE may only request IRS information for the purpose of criminal investigations. MOU ¶3, JA 115 ("The purpose of this MOU is to establish the procedures and requirements for ICE's submission of valid IRC § 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes."). There is no exception to taxpayer privacy provisions allowing for the disclosure of taxpayer data for civil immigration enforcement. The MOU only specifically mentions the criminal provisions of Section 1253(a)(1) (failure to depart after a removal order). Additional criminal statutes could theoretically include the misdemeanor crimes of improper entry

(8 U.S.C. § 1325) or failure to register as a noncitizen under a recently implemented regulation issued by the administration without notice and comment (8 U.S.C. § 1306; *see* 90 Fed. Reg. 11793 (Mar. 12, 2025)). But under no circumstances could the information lawfully be shared to investigate noncitizens for the purpose of commencing removal proceedings. Yet the idea that DHS/ICE intends to use this mass data sharing only to investigate possible violations of criminal statutes strains credulity.

Even the District Court judge expressed skepticism that the information sharing would be cabined to criminal enforcement, noting that because the statute only requires an "investigation," DHS/ICE could easily decide not to pursue criminal prosecution and instead use the information for purposes of removal. Addendum, Tr. at 46:7-10 (The Court noting that an agency higher up could say "we're not going to waste our time on this, you worked up that case really well, and you've got all the documents and are ready to go, but no, let's just send them out of the country before they have a chance to challenge this."). DHS/ICE requests for taxpayer information under the MOU must be considered within the current context of exploding immigration enforcement. The government is setting immigration arrest quotas of

3,000 people per day.[25] DHS/ICE must go to extraordinary lengths to reach those quotas and has already shown a willingness to misuse the criminal process to effectuate civil removals.[26] It also has blurred the lines between civil and criminal enforcement authority as part of its push for mass deportations. A federal magistrate judge in the Southern District of Texas recently denied the government's request for a civil administrative warrant known as a "Blackie's" warrant when its true purpose was to arrest noncitizen workers at a business, finding that it did not meet the standard for a criminal arrest warrant under Federal Rule of Criminal Procedure 41(d)(1).[27] The government is also wielding its criminal arrest power explicitly to circumvent state and local policies that prevent cooperation with ICE relating to civil immigration enforcement.[28] Just six months into the new administration, these

---

[25] Hamed Aleaziz, *Under Pressure from the White House, ICE Seeks New Ways to Ramp Up Arrests*, N.Y. Times (June 13, 2025) ("Former officials said the Trump administration push for the agency to detain record numbers of undocumented immigrants increases the chance of mistakes.")

[26] *See* Jose Olivares, The Guardian, *Ice used 'false pretenses' for warrant to hunt for Columbia students, lawyers say* (May 16, 2025, 2:29 PM), *available at* https://www.theguardian.com/us-news/2025/may/16/ice-warrant-false-pretenses-columbia-students.

[27] *In re Sealed Search Warrant Application*, No. CV 3:25-MC-05067, --- F. Supp. 3d ---, 2025 WL 1499054, at *4 (S.D. Tex. May 27, 2025) ("What is interesting about the Government's request here is that it seeks an administrative warrant . . . Perhaps the Government thinks that, with an administrative warrant, it can get around the particularity requirements of a Rule 41 warrant. It cannot.").

[28] *See* Dep't of Justice, *Operation Guardian Angel Launched to Neutralize California's Sanctuary State Policies that Protect Criminal Illegal Aliens* (May 19. 2025), https://www.justice.gov/usao-cdca/pr/operation-guardian-angel-launched-

examples underscore that DHS/ICE is weaponizing federal criminal law to effectuate mass deportation.

The IRS has no institutional expertise or capacity to confirm that the information DHS/ICE seeks for potentially millions of taxpayers is for bona fide criminal investigative purposes and will not eventually migrate to the civil enforcement functions of DHS/ICE. The potential scale of such a broad information sharing program threatens to overwhelm the core functions of the IRS and convert the agency into an arm of DHS/ICE. The increasing criminalization of immigration offenses and the administration's priorities for enforcement of even low-level offenses[29] will undermine the purpose of the IRS and compromise the voluntary compliance required for the proper functioning of the agency.

---

neutralize-californias-sanctuary-state-policies (explaining that "[t]he operation will file complaints and arrest warrants to allow federal law enforcement to take as many defendants as possible into custody from state jails.").

[29] DHS's new enforcement priorities include failure to update one's address. U.S. Dep't Homeland Security, *Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally: DHS Will Use Every Available Tool to Compel Illegal Aliens to Self-Deport*, (Feb. 25, 2025), https://www.dhs.gov/news/2025/02/25/secretary-noem-announces-agency-will-enforce-laws-penalize-aliens-country-illegally.

**E. If This Court Permits Information-Sharing, The IRS and ICE are likely to Make Errors that Subject Taxpayers to Dire Consequences**

Consistent with news reports of ICE's ambitious plans for this information sharing, the MOU creates a framework for ICE to make requests for information about large numbers of taxpayers. Such an approach would be a radical shift from existing practice under the (i)(2) exception, introducing substantial risk of errors.[30] Particular risk exists for people whose surnames do not meet a narrow set of "standard" forms or those with complicated immigration histories. In the context of immigration enforcement, such errors can have grave consequences, especially where ICE believes that a final removal order is in place.

Public reporting has indicated that ICE intends to seek information on hundreds of thousands, or even millions, of taxpayers through this MOU.[31] That is orders of magnitude larger than the number of requests IRS has historically processed each year under (i)(2).[32] Amid such a radical ramp-up, it would be

---

[30] *See* N.Y. Times, *Under Pressure from the White House . . .* (noting the heightened risk of mistakes with increased enforcement), *supra* n.25.
[31] Jacob Bogage and Jeff Stein, *IRS nears deal with ICE to share addresses of suspected undocumented immigrants*, Wash. Post (Mar. 22, 2025), https://www.washingtonpost.com/us-policy/2025/03/22/ice-irs-immigrants-deport/ ("The move toward information-sharing comes as President Donald Trump pushes his administration to use every resource to conduct what he hopes will be the largest mass deportation of immigrants in U.S. history.").
[32] *See* N.Y. Times, *Under Pressure from the White House . . .*, *supra* n.25.

essential to ensure strong safeguards against identification errors. Yet nothing in the publicly available MOU indicates such safeguards exist.

### 1. The MOU will Likely Lead to Errors Based on Name Misidentification

Misidentification errors are more likely among communities that speak languages other than English and their descendants. For example, Spanish and Portuguese naming conventions often provide for two surnames; government databases may be inconsistent with respect to which surname is identified. [33] Similarly, names that originate in other writing systems, such as Arabic, Cyrillic, or Chinese may be transliterated inconsistently in various locations. At an extreme, the same Chinese name is often pronounced entirely differently in Mandarin and Cantonese, leading to inconsistent transliterated records for people who speak both languages. The IRS has historically recognized these naming challenges, as reflected in the detailed instructions for name entry to *amici* and other VITA sites. [34]

People with more common names, particularly names that are common in immigrant communities, are also at risk. [35] For example, there may be multiple people named

---

[33] *See* IRS Pub. 4012, VITA/TCE Volunteer Research Guide, Entering the Last Name Correctly, B-19,-20 (Rev. Oct. 2024), https://www.irs.gov/pub/irs-access/p4012_accessible.pdf.

[34] *Id*.

[35] Such mistakes occurred even before the current pressure to rapidly detain and remove people. *See* Greg Allen, *ICE Detained the Wrong Peter Brown*, Nat'l Pub. Radio (Dec. 18, 2018), https://www.npr.org/2018/12/18/677780624/ice-detained-the-wrong-peter-brown.

Jose Garcia, Anoop Singh, or Ming Li, even in one neighborhood. This could lead ICE to obtain information on the wrong individual.

### 2. The MOU will Likely Lead to Errors Based on Incomplete Immigration History

Immigration law is not solely concerned with the enforcement and removal of noncitizens; it also includes the responsibility to recognize legal benefits and ensure respect for the country's obligations under international humanitarian law. For a decade, the CEDC has employed DOJ Accredited Representatives to provide assistance on immigration-law issues. Working with many immigrant taxpayers, *amici* are well aware of the complexity of our immigration system and are concerned that immigrants who may have legal status or potentially available immigration relief will be swept up, wrongfully detained and deported without due process.

The MOU introduction begins by referencing the administration's goal to "take immediate steps to identify, exclude, or remove aliens illegally present in the United States." MOU ¶1.a., JA 114. However, a removal order does not prevent USCIS from granting a status that can prevent the execution of the removal order, or even lead the removal case to be reopened. For example, certain immigrants with removal orders may still be entitled to lawfully remain in the United States because of Temporary Protected Status, Withholding of Removal, or protection under the Convention Against Torture. Some people with final removal orders reopen their proceedings and apply for asylum. Others may be granted administrative relief and

subsequently reopen proceedings to obtain a U-visa (for qualifying individuals who are cooperating with law enforcement in criminal investigations), Special Immigrant Juvenile Status, VAWA relief (under the Violence Against Women Act, for certain victims of domestic violence), or a T-visa (for victims of human trafficking).

Individuals may have been ordered removed *in absentia* but still qualify for relief upon showing compelling reasons to reopen their proceedings. An immigrant with a removal order may have subsequently married a U.S. citizen and could apply to reopen their case.

Already, in the past few months, immigration enforcement has moved quickly and made mistakes. The risks of a misdirected investigation are particularly egregious where ICE is pursuing people who have final orders of removal. The case of Kilmar Abrego-Garcia illustrates the high risk. Mr. Abrego-Garcia had an order of removal but was also granted Withholding of Removal which prohibits the government from executing the removal order because he would "more likely than not" face persecution upon repatriation. *See* 8 U.S.C. § 1231(b)(3). Nonetheless, he was put on a plane to El Salvador—the very country to which the government was prohibited from removing him. [36] DHS continues vigorous efforts to deport

---

[36] Laura Romero, *ICE admits to an 'administrative error' after Maryland man sent to El Salvador prison*, ABC News (Apr. 1, 2025, 12:53 AM), https://abcnews.go.com/Politics/ice-admits-administrative-error-after-maryland-man-el/story?id=120359991.

noncitizens with final orders of removals to third countries, without the procedural protections to which they are entitled to contest such removal. [37] This reality underscores the danger of permitting unfettered DHS access to sensitive personal data of noncitizens. Despite the requirement that information disclosed under subsection (i)(2) be used only for the investigation of and preparation for federal criminal proceedings, it would be difficult to catch a mistake or misuse of the information before it is too late.

## III.   CONCLUSION

Sharing IRS data with immigration-enforcement agencies comes at much too high a cost. The loss of trust will hurt everyone, not just the group whose data it once promised to protect. Immigrant taxpayers will make a reasonable choice to stay away, undermining tax collection and administration. The choice between filing a tax return and a risk of deportation for oneself or a family member is not a very hard choice. Although as of the preliminary injunction motion hearing the IRS had not shared information, the news reporting that the IRS would no longer safeguard

---

[37] *See D.V.D. v. U.S. Dep't of Homeland Sec.,* No. CV 25-10676-BEM, 2025 WL 1142968, at *19 (D. Mass. Apr. 18, 2025), *appeal filed* (1st Cir. Apr. 22, 2025) (finding DHS has "a policy or practice of executing third-country removals without providing notice and a meaningful opportunity to present fear-based claims").

information has harmed *amici's* reputation of credibility and trust. *Amici* strongly

urge this Court to stop the IRS from making this mistake.

Dated: July 7, 2025

Respectfully submitted,

*/s/* Leslie K. Dellon
Leslie K. Dellon (Bar No. 27795)
Michelle R. Lapointe (Bar No. 54940)
American Immigration Council
PMB2026
2001 L Street NW, Suite 500
Washington DC 20036
Telephone: 202-507-7530 (Dellon)
ldellon@immcouncil.org
mlapointe@immcouncil.org
Attorneys for *Amici Curiae*
*Cambridge Economic Opportunity*
*Committee, Inc. and Community*
*Economic Development Center of*
*Southeastern Massachusetts*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this *amici* brief complies with the length limitations because it contains 5,609 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), which is within the 6,500 word limit (half of the maximum length authorized for a principal brief), set by Fed. R. App. P. 29(a)(5) and 32(a)(7)(B).

I further certify that this *amici* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately-spaced typeface in Microsoft Office 365 Word using the 14-point Times New Roman font.

Dated: July 7, 2025

*/s/* Leslie K. Dellon
Leslie K. Dellon (Bar No. 27795)
202-507-7530
ldellon@immcouncil.org

## CERTIFICATE OF SERVICE

I certify that on July 7, 2025, I filed a Brief by *Amici Curiae*

Cambridge Economic Opportunity Committee, Inc. and Community Economic

Development Center of Southeastern Massachusetts in Support of Appellants and

Reversal, with the ECF system that will provide notice and copies to the parties'

counsel of record.

*/s/* Leslie K. Dellon
Leslie K. Dellon (Bar No. 27795)
202-507-7530
ldellon@immcouncil.org

**ADDENDUM**
**TRANSCRIPT OF MOTION HEARING**
**CENTRO de TRABAJADORES UNIDOS, et al. v.**
**SCOTT BESSENT, in his capacity as Secretary of the Treasury, et al.,**
**No. 25-cv-677**
**U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**APRIL 16, 2025**

Cover Page and Appearances                    For identification only
Transcript pages 1-2


Transcript page 46                                          For lines 7-10

```
1              BEFORE THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3    CENTRO DE TRABAJADORES UNIDOS, .
     et al.,                       .  Case Number 25-cv-677
4                                  .
              Plaintiffs,          .
5                                  .
         vs.                       .
6                                  .
     SCOTT BESSENT, in his capacity .
7    as Secretary of the Treasury, .  Washington, D.C.
     et al.,                       .  April 16, 2025
8                                  .  10:37 a.m.
              Defendants.          .
9    - - - - - - - - - - - - - - - -

10

11               TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE DABNEY L. FRIEDRICH
12               UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the Plaintiffs:        NANDAN JOSHI, ESQ.
                                MICHAEL KIRKPATRICK, ESQ.
16                              Public Citizen Litigation Group
                                1600 20th Street Northwest
17                              Washington, D.C. 20009

18                              ALAN MORRISON, ESQ.
                                George Washington University
19                                 Law School
                                2000 H Street Northwest
20                              Washington, D.C. 20052

21                              KEVIN HERRERA, ESQ.
                                Raise the Floor Alliance
22                              1 North Lasalle
                                Suite 1275
23                              Chicago, Illinois 60602

24

25                   -- continued --
```

```
 1    APPEARANCES (CONTINUED):

 2    For the Defendants:           JOSEPH SERGI, ESQ.
                                    ANDREW WEISBERG, ESQ.
 3                                  U.S. Department of Justice
                                    555 Fourth Street Northwest
 4                                  Washington, D.C. 20001

 5

 6

 7    Official Court Reporter:      SARA A. WICK, RPR, CRR
                                    333 Constitution Avenue Northwest
 8                                  Room 4704-B
                                    Washington, D.C. 20001
 9                                  202-354-3284

10
      Proceedings recorded by stenotype shorthand.
11    Transcript produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     removals?

2             MR. SERGI:  Because at the time, Your Honor, they make

3     the request, they have to believe in good faith that the

4     investigation is moving forward.

5             So there's a lot of safeguards in 6103.

6             THE COURT:  The individual agent may believe that, but

7     a higher up may say no, we're not going to waste our time on

8     this, you worked up that case really well, and you've got all

9     the documents and are ready to go, but no, let's just send them

10    out of the country before they have a chance to challenge this.

11            MR. SERGI:  That could be true for any 6103 request

12    that falls under this exception.  I don't know that we should

13    have a -- unless someone were to aspire bad intent, that's the

14    same decision every prosecutor makes.  And so I don't know that

15    Congress would have not put investigation.  They would have made

16    it more forceful if they didn't intend for information to be

17    handed over under (i)(2).

18            THE COURT:  What about the plaintiffs' argument that I

19    do have to assume the violation to assess standing?

20            MR. SERGI:  You're saying for standing.  Well, Your

21    Honor, I think I don't even have to reach that, because for the

22    associative standing, none of the declarations they've submitted

23    of any of their members have said that they're subject to a

24    removal order.  As a matter of fact, some of them specifically

25    say they have Social Security numbers now, which would lead me