# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CENTRO DE TRABAJADORES UNIDOS, IMMIGRANT SOLIDARITY
DUPAGE, SOMOS UN PUEBLO UNIDO, INCLUSIVE ACTION FOR THE
CITY,

*Plaintiffs-Appellants,*

v.

SCOTT BESSENT, in his capacity as Secretary of the Treasury, INTERNAL
REVENUE SERVICE, WILLIAM H. LONG II, in his official capacity as
Commissioner of Internal Revenue, DEPARTMENT OF HOMELAND
SECURITY, KRISTI NOEM, in her official capacity as Secretary of Homeland
Security, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and
TODD LYONS, in his official capacity as Acting Director of U.S. Immigration
and Customs Enforcement,

*Defendants-Appellees.*

## BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER
## FOUNDATION IN SUPPORT OF APPELLANTS AND REVERSAL

Hannah Zhao
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Tel: (415) 436-9333
Fax: (415) 436-9993
zhao@eff.org

*Attorneys for Amicus Curiae*
*Electronic Frontier Foundation*

July 7, 2025

**CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES AND STATUTES**

Pursuant to D.C. Circuit Rules 26.1and 28(a)(1) and Fed. R. App. P. 26.1 the undersigned counsel certifies as follows:

**A.     Parties and Amici**

Appellants, who were plaintiffs in the District Court, are Centro De Trabajadores Unidos, Immigrant Solidarity Dupage, Somos Un Pueblo Unido, and Inclusive Action for the City. Appellees, who were defendants in the District Court, are Scott Bessent, in his capacity as Secretary of the Treasury; Internal Revenue Service; William H. Long II, in his official capacity as Commissioner of Internal Revenue; Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Immigration and Customs Enforcement; and Todd Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement.

The Electronic Frontier Foundation (EFF) did not participate as amicus curiae in the District Court. Amici in the District Court were Cambridge Economic Opportunity Committee, Community Economic Development Center of Southeastern Massachusetts, and 105 Members of Congress.

The Electronic Frontier Foundation filed a notice of intent to participate in this appeal as amicus curiae on June 27, 2025.

**B.    Rulings Under Review**

On May 12, 2025, United States District Judge Dabney L. Friedrich issued a memorandum opinion and order denying Plaintiffs–Appellants' motion for preliminary injunction. Centro de Trabajadores Unidos, et al. v Bessent et al. No. 25-cv-0677 (D.D.C. May 12, 2025), EFC No. 67. The May 12, 2025 opinion is not published in the federal reporter but is available at 2025 WL 1380420 and is attached to Appellants' Notice of Appeal as well as the Joint Appendix, beginning at JA 95.

**C.    Related Cases**

The appealed ruling has not previously been before this Court or any other court. There are no related cases pending before this Court or any other court of which counsel is aware.


July 7, 2025                                  */s/ Hannah Zhao*
                                              Hannah Zhao

                                              *Attorneys for Amicus Curiae*
                                              *Electronic Frontier Foundation*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to D.C. Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1, amicus submits the following corporate disclosure statement: Amicus Electronic Frontier Foundation ("EFF") is a donor-funded, nonprofit civil liberties organization. EFF has no parent corporation, and does not issue stock.

 */s/ Hannah Zhao*
Hannah Zhao

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES AND STATUTES.................................................................i

CORPORATE DISCLOSURE STATEMENT .............................................iii

TABLE OF AUTHORITIES .........................................................vi

GLOSSARY OF ABBREVIATIONS ............................................ix

STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE AND SOURCE OF AUTHORITY TO FILE......................10

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ...........................................................11

SUMMARY OF ARGUMENT ..................................................11

ARGUMENT .................................................................14

I. Sharing of Information Pursuant to the MOU Contravenes the Plain Intent of 26 U.S.C. § 6103 (i)(2). .............................14

II. Any Potential Ambiguity In the Statute Can Be Resolved By Reference to Its Historical Context Which Dictates A Narrow Reading.......................................................15

    A. Section 6103(i)(2) can be seen as ambiguous ..................15

    B. Congress intended Section § 6103 to ensure that tax returns and return information would be confidential by default and any exceptions read narrowly..................17

        1. Congress intended § 6103 to curtail the sharing of information between agencies and any exception should be read narrowly ..........................18

        2. Other laws passed during this time demonstrate a similar intent of restricting governmental access to properly collected information .............................19

III. Bulk Disclosure of Address Data from IRS to ICE Will Foreseeably Result in Mistakes that Harm Innocent Americans.................................................................22

iv

    A.    Record Linkage Issues Between the IRS and ICE
         Will Foreseeably Lead to Dangerous Mistakes ................ 24

    B.    A Broad Interpretation of § 6103 Creates Tensions with
         the Goals of the Privacy Act ............................................ 26

CERTIFICATE OF SERVICE ....................................................... 28

CERTIFICATE OF COMPLIANCE ............................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acheson v. Furusho,*
    212 F.2d 284 (9th Cir. 1954) ....................................................................14

*Action on Smoking & Health v. C.A.B.,*
    699 F.2d 1209 (D.C. Cir. 1983) ...............................................................19

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
    No. CV ELH-25-0596, 2025 WL 1206246 (D. Md. Apr. 17, 2025) ...........22

*Art & Antique Dealers League of Am., Inc. v. Seggos,*
    121 F.4th 423 (2d Cir. 2024) ....................................................................17

*Church of Scientology of Cal. v. IRS,*
    484 U.S. 9 (1987) ......................................................................................19

*Comm'r v. Clark,*
    489 U.S. 726 (1989) ..................................................................................15

\* *Elec. Priv. Info. Ctr. v. Internal Revenue Serv.,*
    910 F.3d 1232 (D.C. Cir. 2018) .................................................12, 18, 19

*Fruehauf Corp. v. Internal Revenue Serv.,*
    566 F.2d 574 (6th Cir. 1977) ....................................................................17

*King v. Burwell,*
    576 U.S. 473 (2015) ..................................................................................16

*Londrigan v. Fed. Bureau of Investigation,*
    670 F.2d 1164 (D.C. Cir. 1981) ...............................................................20

*Montclair v. Ramsdell,*
    107 U.S. 147 (1883) ..................................................................................16

\* *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................................23

*United States v. Barfield*,
　No. 18-CR-403, 2019 WL 5212642 (N.D. Ill. Oct. 15, 2019) ....................15

*United States v. Martinez*,
　870 F.3d 1163 (9th Cir. 2017) .......................................................17

*United States v. Miller*,
　425 U.S. 435 (1976)....................................................................21

**Statutes**

12 U.S.C. §§ 3401 et seq. (1978) .......................................................21

5 U.S.C. §552a (e)(10) ...................................................................26

Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896 (1974)..............................20, 21, 22

U.S. Sen. Comm. on Gov't Operations et al., *Legislative History of the
　Privacy Act of 1974, S. 3418 (Public Law 93-579)* .......................................20

**Other Authorities**

118 Cong. Rec. S11298–11315 (daily ed. July 20, 1972)...................................22

120 Cong. Rec. S5166 (daily ed. April 3, 1974).................................................22

Andrew Duehren, *Top I.R.S. Officials Said to Resign After Deal to Give ICE
　Migrants' Data* .................................................................14, 19, 23

Douglas Martin, *Johnnie M. Walters, I.R.S. Chief Who Resisted Nixon's
　Pressure, Dies at 94*, N.Y. Times, June 26, 2014.........................................19

Erica Beecher-Monas, *Lost in Translation: Statistical Inference in Court*,
　46 Ariz. St. L.J. 1057 (2014) .......................................................17

H.R. 16088, 92d Cong., 2d Sess. (July 27, 1972) .............................................22

Ivan P. Fellegi and Alan B. Sunter, *Theory for Record Linkage*, 64 J. of the
　Am. Statistical Ass'n 1183-1210 (1969) .......................................................25

J .E .Johndrow et al., *Theoretical Limits of Microclustering for Record
　Linkage*, 105 Biometrika 431–446 (2018)....................................................25

Maria Sacchetti and Jacob Bogage, *'One million.' The private goal driving Trump's push for mass deportations.*, Wash. Post, Apr. 12, 2025 .......................................................................24

Office of Tax Policy, *Report to The Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions* 3, Dep't of the Treasury (Oct. 2020).................................................................19

Privacy Act, H.R. 16373, 93rd Cong. (1974)......................................13

Remarks of Benjamin R. Civiletti, Attorney General of the United States, *Watergate Legislation in Retrospect*, Department of Justice (April 25, 1980) .........................................................................13

Right to Financial Privacy Act, H.R. 14279, 95th Cong, (1978).......................13

S. 3828, 92d Cong., 2d Sess. (July 21, 1972) .....................................22

Suzanne Gamboa and Fredlyn Pierre Louis, *As Trump pledges mass deportation, he's creating more undocumented people*, NBC News, June 19, 2025 ......................................................................24

Thomas Herzog et al., *Data Quality and Record Linkage Techniques* (2007) ................................25

U.S. Dep't of the Census, *Frequently Occurring Surnames from the Census 2000* (2000).................................................................26

U.S. Dept. of Justice, *Overview of the Privacy Act of 1974* 1 (2020 Ed.) ..........21

*Authorities upon which we chiefly rely are marked with asterisks

# GLOSSARY OF ABBREVIATIONS

EFF          Electronic Frontier Foundation

IRS          Internal Revenue Service

DHS         Department of Homeland Security

ICE          Immigration and Customs Enforcement

APA         Administrative Procedure Act

RFPA       Right to Financial Privacy Act

## STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE
## AND SOURCE OF AUTHORITY TO FILE

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization that has worked for 35 years to protect privacy, innovation, and free expression in the digital world. EFF and its more than 33,000 dues-paying members have a strong interest in assisting courts and policymakers in recognizing the role that technology plays in protecting, or reducing, people's privacy.

Pursuant to District of Columbia Circuit Rule 29(b), Electronic Frontier Foundation certifies that all parties have consented to the filing of this amicus brief.

Pursuant to District of Columbia Circuit Rule 29(b), EFF certifies that this separate amicus brief is necessary because this amicus offers the Court an additional perspective on two issues. First, recognizing that § 6103 can be read as ambiguous, EFF argues that the provision's historical context favors a narrow interpretation of disclosure provisions. Second, EFF explains why allowing bulk disclosure of taxpayer information is particularly harmful because, due to record linkage errors, it will foreseeably lead to an increase in mistaken and dangerous ICE enforcement actions against taxpayers.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), EFF states that no party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief. No person other than amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

EFF agrees with Appellants that § 6103 of the Internal Revenue Code does not authorize disclosure of taxpayer-provided address information as set forth in the Memorandum of Understanding (MOU) between the Internal Revenue Service (IRS) of the U.S. Department of the Treasury and U.S. Immigration and Customs Enforcement (ICE) of the Department of Homeland Security (DHS), therefore, the MOU violates the Administrative Procedure Act (APA). *See e.g.* Appellants' Opening Brief at 30-43.

We write for two additional reasons. *First*, recognizing that the Court may interpret the statutory text as ambiguous, amici urge the Court to construe the statute in light of its full historical context and the legislative history, which point toward protecting privacy and away from allowing sharing to ICE in the absence of a court order. Congress substantially amended § 6103 in the wake of the Watergate scandal, after "the Nixon administration compiled a list of political

enemies and ordered the IRS to harass them." *Elec. Priv. Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1235 (D.C. Cir. 2018). To limit future risk of abuse of executive agency power, and to ensure that information that taxpayers gave to the IRS in order to pay their taxes was not misused, Congress strengthened the privacy protections of § 6103, creating a general rule of confidentiality and allowing disclosure only in specific and narrow circumstances. *Id.*

That effort was part of a package of sweeping reforms intended to safeguard the privacy of the people by limiting governmental collection of information and restricting governmental access and sharing of properly collected information, including the 1974 Privacy Act and the 1978 Right to Financial Privacy Act. *See* Remarks of Benjamin R. Civiletti, Attorney General of the United States, *Watergate Legislation in Retrospect*, at 2, Department of Justice (April 25, 1980) (available at https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/04-25-1980.pdf). These laws, passed with overwhelming bipartisan support, recognized the various dangers posed by unfettered governmental access to the vast amount of lawfully collected information. *See* Privacy Act, H.R. 16373, 93rd Cong. (1974); Right to Financial Privacy Act, H.R. 14279, 95th Cong, (1978).

The potential ambiguity comes from § 6103(i)(2)'s language allowing sharing whenever an investigation "may result" in criminal proceedings, which, if read broadly, creates an exception that is ambiguous—since it requires an

interpretation of what could happen in the future. If read as broadly as the District Court did here, this exemption swallows the privacy-protective rule that Congress created in 1974. Given the historical context, and decades of subsequent agency promises to protect taxpayer confidentiality and taxpayer reliance on those promises, the Administration's abrupt decision to re-interpret § 6103 to allow sharing with ICE whenever a potential "criminal proceeding" can be posited, is a textbook example of an arbitrary and capricious action even if the statute can be read to be ambiguous.

*Second*, to the extent it authorizes bulk disclosure, the MOU is even more dangerous. Data scientists have long recognized that attempts to corroborate partially identifying data collected in one database with partially identifiable data collected in another inevitably leads to errors. Those errors result from such mundane issues as outdated information, data entry errors, and taxpayers or tax preparer submission of incorrect names or addresses.

If public reports are correct, and officials intend to share information regarding 700,000 or even 7 million taxpayers,[1] the errors will multiply, leading to the mistaken targeting, detention, deportation, and potentially even physical harm to regular taxpayers. Unless and until agencies adequately mitigate those

---

[1] *See* Am. Compl. 36; Andrew Duehren, *Top I.R.S. Officials Said to Resign After Deal to Give ICE Migrants' Data*, page A1, available at https://www.nytimes.com/2025/04/08/us/politics/irs-ice-tax-data-deal.html.

risks—which is quite difficult and time consuming—the MOU is arbitrary and capricious, as well as inconsistent with both the privacy and security-protective purpose of the Internal Revenue Code amendments and the Privacy Act more broadly.

## ARGUMENT

### I. Sharing of Information Pursuant to the MOU Contravenes the Plain Intent of 26 U.S.C. § 6103 (i)(2).

It is the duty of courts to read statutes "to give effect to the intent of Congress." *Acheson v. Furusho*, 212 F.2d 284, 295 (9th Cir. 1954). "Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole," courts must "look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail." *Id.*

As set forth in Appellants' Opening Brief, the text of the statute makes the legislative intent abundantly clear. Op. Br. at 30-42. Information properly collected by agencies for a specific purpose must be guarded from the other parts of the government to prevent abuse of that information. The District Court's interpretation of § 6103(i)(2)'s carefully circumscribed disclosure limits to instead authorize mass personal information sharing from IRS to ICE undermines that

legislative intent. *Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("in construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision").

## II.   Any Potential Ambiguity In the Statute Can Be Resolved By Reference to Its Historical Context Which Dictates A Narrow Reading

Even if the Court reads the statute to be ambiguous, its historical context suggests that any exceptions to disclosure must be interpreted narrowly.

### A.   Section 6103(i)(2) can be seen as ambiguous

In finding that the MOU was not a violation of § 6103(i)(2), the District Court relied in part on § 6103(i)(2)(A)(ii), which allows the sharing of information in "any investigation which may result" in a criminal proceeding. May 12, 2025 Op. 9 (JA 104).

The phrase "may result" is arguably ambiguous. Subsection (A) requires the sharing of information for criminal enforcement proceedings, §6103(i)(2)(A)(i), (iii), or "any investigation which may result" in a criminal enforcement proceeding, §6103(i)(2)(A)(ii). The phrase "may result" renders § 6103(i)(2)(A)(ii) ambiguous because it expresses a potentiality—indicating that something might or could occur—but not a requirement. *See United States v. Barfield*, No. 18-CR-403, 2019 WL 5212642, at *5 (N.D. Ill. Oct. 15, 2019) ("The

word 'may' by its nature is not the language of a guarantee or a promise but rather suggests that a circumstance could potentially come about if certain conditions are met.").

When statutory language employs "may" to express potentiality, it creates fundamental interpretive ambiguity that requires the agency, here the IRS, in deciding whether to share information with ICE, and subsequently the courts, to make difficult judgments about probability and causation from the standpoint of an initial decision about sharing. This is something that they are ill-equipped to do.[2] Indeed, any investigation "may result" in criminal proceedings if there are facts found to suggest a violation of law, making § 6103(i)(2)(A)(ii) no requirement at all. *See King v. Burwell*, 576 U.S. 473, 502 (2015) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883) (an interpretation of statutory language that "leaves [a] limiting phrase . . . with no operative effect at all . . . is a stark violation of the elementary principle that requires an interpreter 'to give effect, if possible, to every clause and word of a statute.'"). To give this provision meaning, the IRS first, and then the courts, would need to individually determine the likelihood that a criminal proceeding will result that will meet this provision's threshold requirement of "may result."

---

[2] *See generally*, Erica Beecher-Monas, *Lost in Translation: Statistical Inference in Court*, 46 Ariz. St. L.J. 1057 (2014) (discussing the various ways that courts have difficulty with evaluating likelihood and probabilities).

**B.** **Congress intended Section § 6103 to ensure that tax returns and return information would be confidential by default and any exceptions read narrowly**

An ambiguous statute should be interpreted in light of its historical and legislative context. *See, e.g. Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 432 (2d Cir. 2024); *United States v. Martinez*, 870 F.3d 1163, 1167 (9th Cir. 2017).

Here, that context is abundantly clear. Motivated by the Watergate and COINTELPRO scandals, Congress passed several legislative reforms designed to, *inter alia*, silo properly collected information. The express purpose of the Tax Reform Act, in particular, was to establish the fundamental principle that tax returns and return information are confidential and may not be disclosed unless specifically authorized by carefully limited exceptions. *Fruehauf Corp. v. Internal Revenue Serv.*, 566 F.2d 574, 577 (6th Cir. 1977) ("Section 6103 of the Internal Revenue Code was extensively amended . . . to establish the general rule that returns and return information shall be confidential and not subject to disclosure, with carefully delineated exceptions.") (internal quotes omitted).

Given this historical context and legislative intent, even if it can be read to be ambiguous, § 6103(i)(2) must be read to sharply limit sharing data from the IRS to ICE, not to broadly authorize it.

#### 1. *Congress intended § 6103 to curtail the sharing of information between agencies and any exception should be read narrowly*

The Internal Revenue Code was originally compiled in 1939. However, the confidentiality protections in the earlier versions were relatively weak and provided limited safeguards against government disclosure of taxpayer information.[3] In the early 1970s, President Richard Nixon sought to take advantage of that weakness and turn the tax system into a tool of political harassment and retaliation through onerous tax auditing. *See Elec. Priv. Info. Ctr.*, 910 F.3d at 1235. Then as now, IRS officials resisted those efforts.[4] For example, IRS Director Johnnie Walters refused to investigate the entities on the President's enemies list.[5]

After the news of the Watergate scandal broke and the extent of President Nixon's political spying and retaliation was brought to light, Congress responded by enacting a wave of legislative reforms to safeguard individual privacy and prevent the sharing of information between federal agencies. One such effort was

---

[3] Office of Tax Policy, *Report to The Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions* 3, Dep't of the Treasury (Oct. 2020), *available at* https://home.treasury.gov/system/files/131/Report-Taxpayer-Confidentiality-2010.pdf.

[4] *See* Andrew Duehren, *supra* n1.

[5] *See* Douglas Martin, *Johnnie M. Walters, I.R.S. Chief Who Resisted Nixon's Pressure, Dies at 94*, N.Y. Times, June 26, 2014, *available at* https://www.nytimes.com/2014/06/26/us/politics/johnnie-m-walters-ex-irs-chief-dies-at-94.html

the Tax Reform Act of 1976 to protect taxpayer privacy. *See Elec. Priv. Info. Ctr.,* 910 F.3d at 1235. ("The [Watergate] scandal prompted the Congress to enact sweeping legislation to protect taxpayer privacy"). The changes to the statute significantly strengthened the confidentiality of federal tax returns and return information and were driven by concerns about potential misuse of tax information, especially by parts of the executive branch other than the IRS. *See Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 16 (1987) ("One of the major purposes in revising § 6103 was to tighten the restrictions on the use of return information by entities other than [the IRS]").

This background, showing Congress's strong desire to protect taxpayer privacy, dictates that IRS's authority to disclose information under § 6103(i)(2) should be read especially narrowly. *Cf. Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1213 (D.C. Cir. 1983) (relying on "historical context," including Congress's "general desire to regulate" the aviation industry, to find that the Federal Aviation Act granted the Civil Aviation Board broad authority to regulate).

### 2. *Other laws passed during this time demonstrate a similar intent of restricting governmental access to properly collected information*

The Tax Reform Act of 1976 was not the only law evincing Congress's deep concern about executive abuses threatening individual privacy. Responding

to shocking revelations that the Nixon Administration had created "White House enemies' lists," misused existing government personality profiles, and spied on government employees,[6] Congress passed the Privacy Act of 1974. Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896 (1974). It saw the Privacy Act as necessary "to restore trust in government and to address what at the time was seen as an existential threat to American democracy."[7]

As part of responding to these concerns, Congress recognized that the "privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies," and that the federal government's increasing use of digital databases full of personal records "greatly magnified the harm to individual privacy." Privacy Act, Pub. L. No. 93-579, § 2(a)(1), (2), (4). These databases created "an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies that the citizen would never know of, let alone have an opportunity to rebut or correct." *Londrigan v. Fed. Bureau of Investigation*, 670 F.2d 1164, 1169 (D.C. Cir. 1981).

---

[6] *See* U.S. Sen. Comm. on Gov't Operations et al., *Legislative History of the Privacy Act of 1974, S. 3418 (Public Law 93-579) source book on privacy* 301 (1976), *available at* https://www.justice.gov/d9/privacy_source_book.pdf.
[7] *See* U.S. Dept. of Justice, *Overview of the Privacy Act of 1974* 1 (2020 Ed.), *available at* https://www.justice.gov/Overview_2020/dl?inline.

Accordingly, the Privacy Act sharply limited the power of executive branch agencies to share information they collect and required them to adopt high levels of security and protection against both internal and external threats, proclaiming that "[t]he right to privacy is a personal and fundamental right protected by the Constitution of the United States." Privacy Act, Pub. L. No. 93-579, § 2(a)(4).

At the same time, Congress was developing legislation to protect financial privacy. *See, e.g.*, S. 3828, 92d Cong., 2d Sess. (July 21, 1972); H.R. 16088, 92d Cong., 2d Sess. (July 27, 1972); 118 Cong. Rec. S11298–11315 (daily ed. July 20, 1972) (Sen. Mathias introducing S. 3828). In 1976, the Supreme Court held in *United States v. Miller*, 425 U.S. 435 (1976), that an individual had no reasonable expectation of privacy in their own financial records held by a financial institution, giving the government free reign to access this information. That ruling catalyzed the final passage of the Right to Financial Privacy Act of 1978 (RFPA) which created a statutory right to financial privacy and limited with disclosure of financial information by financial institutions to the government. 12 U.S.C. §§ 3401 et seq. (1978). According to Sen. Charles Mathias, one of the principal architects of the RFPA, its purpose was to limit governmental access to data because "basic individual rights and liberties can be trampled by abuse of the information," as was seen during the Nixon Administration. 120 Cong. Rec. S5166 (daily ed. April 3, 1974) (statement of Sen. Mathias).

As these reforms demonstrate, when it created § 6103, Congress was focused on limiting the access of governmental agencies to properly obtained information that was not collected by that agency. Those concerns have only grown over time. As one court recently observed, "[t]he increasing use of computers and sophisticated information technology, while essential to the efficient operations of the government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information[.]" *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. CV ELH-25-0596, 2025 WL 1206246, at *56 (D. Md. Apr. 17, 2025) (quoting Privacy Act, Pub. L. No, 93-579, § 2(a)(2)).

### III. Bulk Disclosure of Address Data from IRS to ICE Will Foreseeably Result in Mistakes that Harm Innocent Americans.

According to credible news reports ICE has asked IRS to provide identifying records for at least 700,000 individuals. Am. Compl. 36. But the number could be significantly higher: ICE officials confirmed that they "recently told their I.R.S. counterparts that they would hope to use tax information to help deport as many as seven million people."[8] In other places, the government has

---

[8] *See* Andrew Duehren, supra n1.

made a self-proclaimed deportation goal of at least one million people a year.[9] At any of these scales, data will be shared in bulk and issues between IRS and ICE databases called "record linkage" errors will inevitably occur.

If an agency has failed to consider an important aspect of a contemplated action—then the action was not "the product of reasoned decisionmaking" and must be set aside. *See Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 53 (D.D.C. 2025) ("An agency action is arbitrary and capricious 'if the agency has . . . entirely failed to consider an important aspect of the problem'" (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). Here, the MOU does not distinguish, and therefore does not rule out, bulk disclosures from singular requests, nor does it provide for any protections against the inevitable problems due to record linkage. Yet bulk disclosure of names and addresses—especially where IRS grants ICE direct access to its systems or any arrangement that shares multiple names and addresses at the same time—is not only privacy invasive, but also fraught with risk to untargeted third parties who have done nothing wrong. If ICE and the IRS do not

---

[9] *See* Maria Sacchetti and Jacob Bogage, *'One million.' The private goal driving Trump's push for mass deportations.*, Wash. Post, Apr. 12, 2025, *available at* https://www.washingtonpost.com/immigration/2025/04/12/one-million-deportations-goal/; *see also* Suzanne Gamboa and Fredlyn Pierre Louis, *As Trump pledges mass deportation, he's creating more undocumented people*, NBC News, June 19, 2025, *available at* https://www.nbcnews.com/news/us-news/trump-deportation-undocumented-immigrants-policy-change-rcna213356.

take significant steps to mitigate that risk—which they likely cannot do on the expedited timeframe that the government has announced for use of this data—then bulk disclosure would be in tension with Congress's general intent as evidenced in the Privacy Act.

### A. Record Linkage Issues Between the IRS and ICE Will Foreseeably Lead to Dangerous Mistakes.

For decades, data analysts and statisticians both inside and outside the government have warned that "record linkage," which is corroborating partially identifying data in one database with partially identifiable data from another, inevitably leads to errors.[10]

Those errors occur in any record linkage situation, including data rot, where information in one database is out of date because someone moved or changed their name – something that happens frequently due, for example, to marriage and adoption. In addition, information in databases may be incorrect due to normal data entry errors, such as a typo in a name or address. Still other problems occur

---

[10] *See* Ivan P. Fellegi and Alan B. Sunter, *Theory for Record Linkage*, 64 J. of the Am. Statistical Ass'n 1183-1210 (1969), *available at* https://doi.org/10.1080/ 01621459.1969.10501049; *see also* Thomas Herzog et al., *Data Quality and Record Linkage Techniques* (2007), *available at* https://link.springer.com/book/ 10.1007/0-387-69505-2; J .E .Johndrow et al., *Theoretical Limits of Microclustering for Record Linkage*, 105 Biometrika 431–446 (2018), *available at* https://doi.org/10.1093/biomet/asy003 (noting the difficulties in correctly correlating incomplete identification information from one database to another).

because so many people in the U.S. share names like John Smith, Andrew Garcia, or Alex Rodriguez.[11] All of these problems necessarily exist with any two data sets of names and addresses, but will be multiplied by bulk data comparisons due to the sheer volume of information. These problems create risks not just for the targets of investigations, but to other people whose names and addresses are wrongly identified.

Bulk disclosure of immigrants names and addresses from IRS to ICE also reasonably creates additional risks. First, as immigrants, the targeted individuals may be less likely to be fluent in English, which could lead to more data entry and inadvertent submission errors. Second, these individuals may be less likely to be homeowners with permanent addresses and more likely to move, leading to data rot. On top of that, those targeted by ICE and facing the threat of deportation or criminal prosecution may be more likely to change addresses or provide incorrect information than those who are not.

As a result, the name and address information provided by ICE to the IRS and the information provided back to ICE from the IRS will necessarily result in mistaken identifications. Without significant additional vetting and careful

---

[11] *See* U.S. Dep't of the Census, *Frequently Occurring Surnames from the Census 2000* (2000) *available at* https://www.census.gov/topics/population/genealogy/data/2000_surnames.html (Smith is 1st, Garcia is 10th, and Rodriguez is 11th most frequently occurring last names).

investigation, all of which will take significant time and iteration and none of which is required by the MOU, those mistakes will lead to more instances of mistaken ICE actions against innocent taxpayers. These can cause serious harm to lawful residents and citizens, including incorrect targeting for ICE raids, arrests, and detentions. They can even lead to wrongful deportation or physical harm. Mistaken or wrongful ICE enforcement actions can cause significant emotional and physical harm to taxpayers.

### B.    A Broad Interpretation of § 6103 Creates Tensions with the Goals of the Privacy Act

A broad interpretation that predictably allows many mistaken enforcement actions also creates tension with the contemporaneously passed Privacy Act, which expressly requires agencies to take steps to secure the personal data that they collect about people and use it in ways to minimize security risks to them. Specifically, 5 U.S.C. §552a (e)(10) requires the agency "to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."

Quite clearly, an ICE raid or detention based on foreseeable mistakes arising from the sharing of bulk data between ICE and IRS data is the sort of harm

that the Privacy Act seeks to prevent. This court should avoid an interpretation of § 6103 that runs counter to the protections of the Privacy Act for individuals, especially where, as here, individuals have no choice but to have their names and addresses personally included in IRS databases.

While such risks exist even with individual address sharing, the likelihood increases with the number of records shared. Because of well-known and well-studied problems with record linkage, at a minimum, this Court should recognize those foreseeable harms and refrain from interpreting § 6103 to allow either bulk transfers or direct access to IRS systems by ICE.

July 7, 2025                                    Respectfully submitted,

                                                */s/ Hannah Zhao*
                                                Hannah Zhao

                                                Electronic Frontier Foundation
                                                815 Eddy Street
                                                San Francisco, CA 94109-7701
                                                Tel: (415) 436-9333
                                                Fax: (415) 436-9993
                                                zhao@eff.org

                                                *Attorneys for Amicus Curiae*
                                                *Electronic Frontier Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2025 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Hannah Zhao*
Hannah Zhao

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(G)(1)**

I hereby certify as follows:

1.     The undersign certifies under Rule 32(g)(1) that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(b). The brief is printed in proportionally spaced 14-point type, and the brief has 3,938 words according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and with the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 365 in 14-point Times New Roman font.

July 7, 2025                          */s/ Hannah Zhao*
                                      Hannah Zhao

                                      *Attorneys for Amicus Curiae*
                                      *Electronic Frontier Foundation*