ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5181

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

CENTRO DE TRABAJADORES UNIDOS, et al.,

*Plaintiffs-Appellants,*

v.

SCOTT BESSENT, et al,

*Defendants-Appellees.*

_____

On Appeal from the United States
District Court for the District of Columbia
(Hon. Dabney L. Friedrich), No. 1:25-cv-00677-DLF

_____

**BRIEF OF *AMICI CURIAE*
NINETY-THREE MEMBERS OF CONGRESS
IN SUPPORT OF PLAINTIFFS-APPELLANTS URGING REVERSAL**

Gerson H. Smoger　　　　Leah M. Nicholls
SMOGER & ASSOCIATES, P.C.　(D.C. Bar No. 982730)
4228 Hallmark Drive　　　PUBLIC JUSTICE
Dallas, TX 75229　　　　1620 L St. NW, Ste. 630
(510) 531-4529　　　　　Washington, D.C. 20036
Smogerlaw@gmail.com　　(202) 797-8600
　　　　　　　　　　　lnicholls@publicjustice.net

*Attorneys for Amici Curiae Ninety-Three Members of Congress*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Except for the following, all parties, intervenors, and amici appearing before the district court, and in this Court, are listed in the Brief for Appellant. In addition, the Electronic Frontier Foundation and the Cambridge Economic Opportunity Committee, Inc., along with the Community Economic Development Center of Southeastern Massachusetts, filed amicus briefs in support of the Appellants.

Reference to the ruling under review is in the Brief for Appellants.

This case has not previously been before this Court or any other court other than the district court from which this appeal was taken. The undersigned are not aware of any other case that is related to this case.

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ...............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ...............................................................................5

I.     BOTH CONGRESS AND THE IRS HAVE LONG VIEWED THE CONFIDENTIALITY OF TAX INFORMATION AS SACROSANCT........................................................................5

II.     INDIVIDUAL TAX IDENTIFICATION NUMBERS WERE CREATED SO THAT IMMIGRANTS AND OTHERS COULD PAY TAXES OWED TO THE GOVERNMENT .................................7

III.     THE MOU DOES NOT COMPORT WITH CONGRESSIONAL INTENT ...........................................................11

    A.     The District Court Decision Contradicts the Statute's Plain Language and Lends Support to the Improper Application of § 6103(i)(2)........................................16

    B.     The Administration's MOU Defies Practical Reality and Will Likely Harm Taxpayers ....................................19

    C.     The District Court's Decision Undermines the Confidentiality of Tax Returns Contrary to Congressional Intent ................................................................23

    D.     Congress Has Considered and Rejected Amendments to Allow ICE to Obtain Information from the IRS, Reaffirming that Such Information Should Not Be Shared with ICE ..............................................................24

CONCLUSION .............................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*American Bus Ass'n v. Slater*,
  231 F.3d 1 (D.C. Cir. 2000) ............................................................... 17

*Corona Fruits & Veggies, Inc. v. Frozsun Foods, Inc.*,
  143 Cal. App. 4th 319 (Cal. Ct. App. 2006) ....................................... 22

*Freytag v. Commissioner*,
  501 U.S. 868 (1991) .......................................................................... 17

*Reid v. Angelone*,
  369 F.3d 363 (4th Cir. 2004) ............................................................ 17

*United States v. Menasche*,
  348 U.S. 528 (1955) .......................................................................... 17

**Statutes and Proposed Statues**

26 U.S.C. § 1 ........................................................................................ 7

26 U.S.C. § 6012 .................................................................................. 7

26 U.S.C. § 6103 ........................................... 1–7, 11–14, 16–20, 24–26

26 U.S.C. § 6109(i) ............................................................................... 7

26 U.S.C. § 6651 .................................................................................. 7

26 U.S.C. § 7213(a) ............................................................................. 7

26 U.S.C. § 7216 .................................................................................. 7

26 U.S.C. § 7701(b) ............................................................................. 3

Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div.
  Q, 129 Stat. 2242 (2015) ................................................................. 10

Comprehensive Immigration Reform Act of 2006, S. 2611, 109th
  Cong. § 301 (2006) ..................................................................... 24, 25

Fostering Undergraduate Talent by Unlocking Resources for Education (FUTURE) Act, Pub. L. No. 116-91, § 3, 133 Stat. 1188 (2019) ..................................................................................12

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1411, 124 Stat. 119 (2010) ..............................................12

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 356 (1982) ..............................................................19

Tax Reform Act, Pub. L. No. 94-455, 90 Stat. 1520 (1976) ...........................2, 5, 6

Victims of Terrorism Tax Relief Act of 2001, Pub. L. No. 107-134, § 201, 115 Stat. 2427 (2001) ..............................................12

**Court Rules**

Circuit Rule 28(a)(1)(A) ............................................................1

Fed. R. App. P. 29(a)(4)(E).........................................................1

**Other Authorities**

Amendment to S. 2611, S. Amdt. 4147, 109th Cong. (2006) (amendment of Sen. Ben Nelson).........................................25

Amendment to S. 2611, S. Amdt. 4177, 109th Cong. (2006) (amendment of Sen. Chuck Grassley) ................................25

Andrew Duehren & Eileen Sullivan, *I.R.S. Prepares to Help Find Immigrants Targeted for Deportation*, N.Y. Times (Mar. 22, 2025), https://www.nytimes.com/2025/03/22/us/politics/irs-ice-immigrants-deportation.html ..............................................14

Andrew Duehren, *Top I.R.S. Officials Said to Resign After Deal to Give ICE Migrants' Data*, N.Y. Times (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/us/politics/irs-ice-tax-data-deal.html.......................................................................15

David L. Word, et al., *Demographic Aspects of Surnames from Census 2000*, U.S. Census Bureau (June 16, 2022), https://www2.census.gov/topics/genealogy/2000surnames/surnames.pdf ................................................................22

Dep't of Just., Exec. Off. for U.S. Att'ys, *United States Attorneys' Annual Statistical Report, Fiscal Year 2023* 16 (2023), https://www.justice.gov/usao/media/1343726/dl?inline ....................................20

Disclosures of Return Information Reflected on Returns to Officers and Employees of the Department of Commerce, Including the Bureau of the Census, for Certain Statistical Purposes and Related Activities, 89 Fed. Reg. 93,172 (Nov. 26, 2024)................................................14

Exec. Order No. 14,161, 90 Fed. Reg. 8451 (Jan. 20, 2025)...................................14

Francine Cronshaw, *Spanish personal names*, 25 The Indexer 5 (Oct. 2007), *https://www.theindexer.org/wp-content/uploads/2020/07/25-4-cp3_005.pdf* ........................................................22

Gordon C. Milbourn, III, U.S. Dept. of Treasury, Treasury Inspector Gen. for Tax Admin., *The Internal Revenue Service's Individual Taxpayer Identification Number Creates Significant Challenges for Tax Administration* (Jan. 8, 2004) ......................................................13

Internal Revenue Servs., *Internal Revenue Manual* (Aug. 3, 2023) ........................7

Internal Revenue Serv., Off. of Chief Couns., *Disclosure Litigation Reference Book* (Apr. 2000) .................................................................6

Jacob Bogage, *DHS officials ask IRS to use tax data to locate up to 7 million immigrants*, Wash. Post (Apr. 5, 2025), https://www.washingtonpost.com/business/2025/04/05/irs-tax-data-immigration-enforcement/ ........................................................15

Jacob Bogage & Jeff Stein, *IRS nears deal with ICE to share addresses of suspected undocumented immigrants*, Wash. Post (Mar. 22, 2025), https://www.washingtonpost.com/us-policy/2025/03/22/ice-irs-immigrants-deport/.............................................14, 15

Jacob Bogage, Jeff Stein, Maria Sacchetti & Lisa Rein, *DHS asks IRS for addresses of people believed to be in U.S. illegally*, Wash. Post (Feb. 28, 2025), https://www.washingtonpost.com/business/2025/02/28/immigration-enforcement-trump-administration-irs/ ................................................................14

Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://www.washingtonpost.com/local/social-issues/undocumented-and-paying-taxes-they-seek-a-foothold-in-the-american-dream/2017/03/11/bc6a8760-0436-11e7-ad5b-d22680e18d10_story.html...................................................................10

Rebecca Beitsch, *IRS, DHS reach deal on information sharing on migrants*, The Hill (Apr. 8, 2025), https://thehill.com/homenews/administration/5238271-irs-dhs-immigration-enforcement/ ..............................15

*Report of the S. Comm. on Finance*, S. Rep. No. 94-938 (1976) ..........................5, 6

Richard Rubin & Michelle Hackman, *IRS Nears Deal to Share Data for Immigration Enforcement*, Wall St. J. (Mar. 22, 2025), https://www.wsj.com/politics/policy/irs-nears-deal-to-share-data-for-immigration-enforcement ...........................................................................14

*Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse: Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm. on Ways & Means*, 108th Cong. 12 (Mar. 10, 2004)..........................................9–11

Staff of Joint Comm. on Tax'n 109th Cong., *Present Law and Background Relating to Tax Issues Associated with Immigration Reform* (July 17, 2006) ........................................................................13, 24, 25

Taxpayer Advocate Serv., *Some Legitimate Taxpayers Did Not Receive a Tax Year 2020 Refund Because They Did Not Respond to an IRS Letter Requesting Identity* (2024), https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2024/12/ARC24_ResearchReport.pdf ....................................22

Taxpayer Identifying Numbers (TINs), 61 Fed. Reg. 26,788 (May 29, 1996) ..............................................................................................................7–10

*Taxpayer Bill of Rights 8: The Right to Confidentiality*, Internal Revenue Servs. (Jan. 23, 2025), https://www.irs.gov/newsroom/taxpayer-bill-of-rights-8.....................................6

*Tax Payments by Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/ ........................................................................................8

*The Potential Impact of IRS-ICE Data Sharing on Tax Compliance*, The Budget Lab (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance ........................................................................9

*Topic no. 857, Individual taxpayer identification number (ITIN)*, Internal Revenue Servs. (Nov. 7, 2024), https://www.irs.gov/taxtopics/tc857 ..............................................................23

U.S. Dep't of the Treasury, Off. of Tax Pol'y, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, Vol. I: Study of General Provisions* (Oct. 2000) ..............................6

*Volunteer Income Tax Assistance (VITA) sites with ITIN services*, Internal Revenue Servs. (May 12, 2025), https://www.irs.gov/tin/itin/volunteer-income-tax-assistance-vita-sites-with-itin-services ........................................................................8

*What's in a Name*, U.S. Census Bureau (Dec. 15, 2016), https://www.census.gov/newsroom/blogs/random-samplings/2016/12/what_s_in_a_name.html ....................................................23

## INTEREST OF *AMICI CURIAE*[1]

Proposed *Amici* are Ninety-Three Members of Congress.[2] These Members are well-acquainted with the legislative framework Congress enacted to protect federal revenue and the privacy of taxpayers. *Amici* seek to ensure that this carefully designed framework for taxpayer privacy is protected consistent with statutory intent.

Pursuant to 26 U.S.C. § 6103, Congress has chosen to limit intrusions on the privacy of taxpayer information to tightly defined exceptions for specific purposes. *Amici* are concerned that the executive branch now seeks to override Congress's carefully considered information-sharing regime without first seeking Congressional approval. Indeed, Congress has considered and rejected several immigration-related amendments to § 6103, choosing instead to address immigration enforcement through other mechanisms.

*Amici* submit this brief to demonstrate how the Administration's actions encroach upon powers reserved by the Constitution for Congress and contravene Congress's longstanding intention to give primacy to collecting federal tax revenues

---

[1]    Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting this brief. The parties have consented to the filing of this brief.

[2]    A full list of *amici curiae* appears in the Appendix.

by preserving the confidentiality of tax returns. The confidentiality protections established by § 6103 apply to all taxpayers, regardless of immigration status. If the Memorandum of Understanding ("MOU") is permitted to stand as argued and interpreted by the court below, it would threaten fundamental expectations for taxpayer privacy and adversely impact revenue for the federal government. It could also expose taxpayers to a breach of the confidentiality of tax information and raise the possibility of grave error for individuals misidentified by U.S. Immigration and Customs Enforcement ("ICE"), which would be likely to chill participation in the tax system and impact our constituents.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 1976, Congress enacted the Tax Reform Act, Pub. L. No. 94-455, 90 Stat. 1520 (1976), 26 U.S.C. § 6103, to make clear that taxpayer information would be kept confidential absent a specific statutory exception. Pursuant to this framework, the Internal Revenue Service ("IRS") consistently has maintained—including in testimony to Congress and decades of public representations—that it does not share taxpayer information for immigration enforcement nor for any purpose not specifically authorized by § 6103.

To further the IRS's tax collection mission, Congress and the IRS created regulatory and taxpayer compliance systems to encourage all taxpayers, including those considered "resident or non-resident aliens" under the tax code, to pay taxes

in accordance with federal law. *See* 26 U.S.C. §§ 7701(b)(1)(A), (b)(3). For this reason, Individual Taxpayer Identification Numbers ("ITINs") are issued to individuals who are ineligible to obtain Social Security Numbers ("SSNs").

In exchange for voluntary tax compliance, the government publicly and frequently has assured taxpayers that their information would be kept private, including with respect to immigration enforcement. Acting in reliance on this understanding, undocumented taxpayers voluntarily have paid billions of dollars in federal, state, and local taxes every year, including to benefit programs they are excluded from, such as Social Security.

In support of the unprecedented MOU now signed between the IRS and ICE, the Administration argues that § 6103(i)(2) permits very broad taxpayer data-sharing, including in large batches, at a scale never before imagined. This would allow the IRS to receive tax information for hundreds of thousands of taxpayers based on a mere assertion by the government that they are now under criminal investigation. Supported by the court below, the Administration's novel interpretation of § 6103(i)(2) defies both the statute and historical practice in at least four ways, detailed in Section III below.

First, the lower court misreads the text of § 6103(i)(2). The statute requires requestors to provide "the" specific address, name and taxable period to the IRS rather than merely "a" name and address when taxpayer information is requested. It

also ignores the fact that when Congress has chosen to allow IRS data for location purposes, it has expressly drafted this into the text of § 6103 exceptions.

Second, the MOU is a dangerous and pretextual attempt at immigration enforcement untethered to the statute. Criminal prosecution at the scale proposed would vastly exceed ICE's capacity. Rather than seeking information for legitimate criminal investigations, the administration's MOU is a poorly disguised end-run around privacy protections, which are limited to specific surgical exceptions passed by Congress. Further, given this massive data sweep, thousands of similarly named individuals risk having their most sensitive taxpayer data shared or being wrongfully identified as subjects of criminal investigations.

Third, eviscerating privacy protections would countermand the underlying purpose of the ITIN program, which was designed to advance the IRS's mission: tax collection for our national treasury.

Finally, although Congress has amended § 6103 many times and even considered amendments to broaden § 6103's exceptions to accomplish far more narrow immigration enforcement goals, Congress repeatedly chose not to enact any data-sharing immigration measure. In short, Congress recognized that § 6103 limited the IRS's ability to share data with ICE and chose not to allow what ICE now attempts to do.

**ARGUMENT**

I. **BOTH CONGRESS AND THE IRS HAVE LONG VIEWED THE CONFIDENTIALITY OF TAX INFORMATION AS SACROSANCT**

Beginning with the Tax Reform Act of 1976, Congress has maintained strict limitations on the disclosure of taxpayer information under 26 U.S.C. § 6103. The law establishes that tax returns and return information "shall be confidential," subject only to limited exceptions specifically authorized by statute. 26 U.S.C. § 6103(a). The legislative history underscores that any exceptions should be read narrowly, in light of the need to protect public trust and raise revenues through a system of self-compliance. To this end, § 6103 makes it clear that only Congress can create exceptions to its general principle of confidentiality.

In debates on the Act, concerns about balancing privacy with tax compliance were carefully considered. The Report of the Senate Committee on Finance noted significant concerns about whether "breaches of the expectation of privacy" would seriously impair "the effectiveness of our . . . Federal tax system." S. Rep. No. 94-938, at 317 (1976).[3] Congress chose to prioritize taxpayer privacy: "The committee decided . . . the American citizen . . . was entitled to . . . the same degree of privacy as [for] private papers maintained in his home." *Id*. at 328. Any exceptions to confidentiality, therefore, must be specifically authorized by statute:

---

[3]     Available at https://www.finance.senate.gov/imo/media/doc/tax6.pdf.

Although present law describes income tax returns as "public records," open to inspections under regulations approved by the President, or under Presidential order, the committee felt that returns and return information should generally be treated as confidential and not subject to disclosure except in those limited situations delineated in the newly amended section 6103.

*Id.* at 318.

Because Congress feared the "impact of … disclosure upon the continuation of compliance with our country's voluntary assessment system," *id.*, it decided to "eliminate[] Executive discretion" over privacy and disclosure:

By the mid-1970's, there was increased Congressional and public concern about the widespread use of tax information by government agencies for purposes unrelated to tax administration. This concern culminated with a total revision of section 6103 in the Tax Reform Act of 1976. There, Congress *eliminated Executive discretion* regarding what information could be disclosed to which Federal and state agencies and established a new statutory scheme under which tax information was confidential and not subject to disclosure *except to the extent explicitly provided by the Code.*

U.S. Dep't of the Treasury, Off. of Tax Pol'y, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, Vol. I: Study of General Provisions* 3 (Oct. 2000) (emphasis added); *see also* Internal Revenue Serv., Off. of Chief Couns., *Disclosure Litigation Reference Book* 1–11 (Apr. 2000) (describing the legislative debate over the Tax Reform Act: "In short, Congress undertook direct responsibility for determining the types and manner of permissible disclosures").

This promise of confidentiality has been represented repeatedly by the IRS to the public. *See, e.g.*, *Taxpayer Bill of Rights 8: The Right to Confidentiality*, Internal

Revenue Servs. (May 29, 2025), https://www.irs.gov/newsroom/taxpayer-bill-of-rights-8 ("Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law.").

Congress also enacted numerous statutes that set out criminal penalties for unauthorized disclosure. S*ee, e.g.*, 26 U.S.C. § 7213(a)(1) (U.S. officer); 26 U.S.C. § 7213(a)(2) (state employees); 26 U.S.C. § 7213(a)(4) (unlawful solicitation); and 26 U.S.C. § 7216 (preparers). Penalties apply as well to any unauthorized disclosure by IRS employees. *See* Internal Revenue Servs., *Internal Revenue Manual*, § 11.3.1.1.1 (Aug. 3, 2023) ("IRS Manual"); *id.* at § 11.3.1.4 (Aug. 13, 2018). Thus, assurances of confidentiality are mandated by Congress's legal and statutory framework, as set forth in § 6103, as well as IRS documents and representations to the public.

## II. INDIVIDUAL TAX IDENTIFICATION NUMBERS WERE CREATED SO THAT IMMIGRANTS AND OTHERS COULD PAY TAXES OWED TO THE GOVERNMENT

Any individual who earns taxable income in the United States must pay federal taxes and file tax returns, subject to monetary penalties. 26 U.S.C. §§ 1, 6012, 6651. Following Congressional authorization, 26 U.S.C. § 6109(i), in 1996 the IRS initiated the ITIN program for tax administration purposes. This created a system of 9-digit numbers for those who are ineligible for an SSN but are required to file tax returns. *See* Taxpayer Identifying Numbers ("TINs"), 61 Fed. Reg. 26,788 (May 29,

1996) ("TINs Regulation"). The IRS rulemaking was clear that "no inference" with regard to immigration status would result from an application for or use of an ITIN. TINs Regulation at 26,789.

For decades, federal funding supported outreach and tax clinics for ITIN filers, alongside payment portals that assist all taxpayers. *Volunteer Income Tax Assistance (VITA) sites with ITIN services*, Internal Revenue Servs. (May 12, 2025), https://www.irs.gov/tin/itin/volunteer-income-tax-assistance-vita-sites-with-itin-services. The program generates substantial income for the U.S. Treasury, totaling billions of dollars annually.

Despite their ineligibility for most federal benefits, "undocumented immigrants paid $19.5 billion in federal income taxes alone in 2022, and $96.7 billion total in U.S. taxes, including $59.4 billion in payments to the federal government and $37.3 billion in payments to states and localities." *Tax Payments by Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/.

Separately, the Yale Budget Lab recently estimated the costs of the effects of the MOU on compliance with tax obligations for just undocumented workers in 2023, finding that "unauthorized immigrants paid $66 billion in federal income & payroll taxes," and that under the MOU, there could be a "0.5% loss in federal income and payroll tax revenue on average, or $25 billion in 2026 (central range of

8

$12-39 billion) and $313 billion ($147-479 billion) over 2026–35." *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance*, The Budget Lab (Apr. 8, 2025), [https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance](https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance).[4]

In creating the ITIN program, the IRS had "extensive discussions" with both the Immigration and Naturalization Service ("INS"), the predecessor to ICE, and the Social Security Administration, ultimately concluding that the IRS would issue ITINs, rather than the INS, to ensure the number was used solely for tax administration. TINs Regulation at 26,789 (noting that the Social Security Administration, INS, and State Department "concur that the IRS is the appropriate initiator of a numbering system dedicated solely for tax purposes").

In 2004, Commissioner Mark Everson, who was appointed by President George W. Bush and had served as deputy commissioner of the INS, warned about the "chilling effect" of the type of disclosure of IRS information that ICE is seeking here. *See Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse*: *Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm. on Ways & Means*, 108th Cong. 12 (Mar. 10, 2004) ("SSN and ITIN Hearing"):

---

[4]      The researchers note "there is considerable uncertainty around this estimate as it is hard to gauge how taxpayer behavior will adjust and the extent to which adjustment will be feasible." Budget Lab.

> [T]he Service believes at this time that any sharing of confidential taxpayer information, directly or indirectly, with immigration authorities would have a chilling effect on efforts to bring ITIN holders, and potential ITIN holders, into the U.S. tax system. Such an initiative would deprive the Federal Government of tax revenue by discouraging . . . workers in the U.S. from participating in the tax system when the Code requires them to pay tax on their U.S. earnings.

*Id*. at 12. Indeed, the agency repeatedly assured Congress and the public that its focus was collecting revenue, rather than immigration enforcement, noting in the regulation that "[h]aving the IRS as the sole issuer of ITINs will facilitate the general public's acceptance of the fact that the assignment of an ITIN creates no inference regarding . . . immigration status." TINs Regulation at 26,789.

In 2015, Congress directly addressed ITINs as part of its PATH Act, authorizing their continued use for tax collection. Pub. L. No. 114-113, div. Q, 129 Stat. 2242, 3078 (2015). Notably, this law did not alter ITIN disclosure policies. In 2017, during the first Trump Administration, IRS officials stated: "The IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs. . . . There is no authorization . . . to share tax data with ICE." Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://www.washingtonpost.com/local/social-issues/undocumented-and-paying-taxes-they-seek-a-foothold-in-the-american-dream/2017/03/11/bc6a8760-0436-11e7-ad5b-d22680e18d10_story.html.

Thus, Congress has consistently separated tax collection from immigration enforcement because it feared that using taxpayers' personal information for immigration enforcement would deter tax filing—thereby risking the loss of billions in tax revenue and funding for Social Security and Medicare. In short, assuring privacy for ITIN and all other taxpayers has been viewed by Congress as an essential way to ensure that IRS resources are focused on the collection of tax revenue.

## III.   THE MOU DOES NOT COMPORT WITH CONGRESSIONAL INTENT

The law requires a specific congressionally authorized exception to § 6103 before disclosure of IRS taxpayer information is permitted. For good reason, Congress has never passed an exception authorizing the broad sharing of IRS records and information with immigration enforcement authorities. As Commissioner Everson testified in 2004:

> What may be beneficial from the perspective of immigration law or policy, may not be beneficial from the perspective of tax law and tax administration. . . . The Service must necessarily continue to fulfill its obligations to administer the tax laws to taxpayers who are not legally employed in our country, but who owe taxes because they, in fact, earned income here. . . . The IRS desires to facilitate these individuals' entry and continuing participation in our tax system, and to lessening impediments to their participation. Fourth, . . . [t]he provisions of section 6103 protect the confidentiality of taxpayer information, and broadly restrict the sharing of taxpayer information by the IRS with employers or with other government agencies, except under narrow circumstances.

SSN and ITIN Hearing at 10.

To be sure, Congress has authorized exceptions to § 6103 when circumstances necessitated them. Following 9/11, Congress passed the Victims of Terrorism Tax Relief Act of 2001, Pub. L. No. 107-134, § 201, 115 Stat. 2427, 2443 (2001), amending the tax code's confidentiality rules to aid law enforcement against terrorism by allowing the IRS to share information in terrorism cases.

In 2010, Congress authorized the IRS to disclose batch tax return information to determine eligibility for health insurance affordability programs in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1411, 124 Stat. 119, 225 (2010). *See* 26 U.S.C. § 6103 (l)(21); *see also* the Fostering Undergraduate Talent by Unlocking Resources for Education (FUTURE) Act, Pub. L. No. 116-91, § 3, 133 Stat. 1188, 1189 (2019), § 6103(I)(13) (authorizing disclosure to education officials).

But even a statute with a "notwithstanding any other law" clause does not override the tax code's confidentiality rules unless it expressly amends § 6103. For example, when an immigration enforcement law specifically required the IRS Commissioner to share names and addresses of undocumented individuals, because the law did not specifically amend § 6103, it failed to effectuate such a requirement:

> Consistent with tenets of statutory construction, it has been a long-standing interpretation of the IRS that, unless a provision of law outside the Code explicitly overrides section 6103 by specifically identifying it, a statute of general application (*i.e.*, "notwithstanding any other law") does not override the restrictions of section 6103 on the disclosure of returns and return information. The Illegal Immigration

> Reform and Immigration Responsibility Act of 1996 requires the Commissioner of Social Security to report to the Attorney General the names and addresses of aliens who are not eligible for employment but who had Social Security earnings. *The provision does not specifically override section 6103[.]*

Staff of Joint Comm. on Tax'n 109th Cong., Present Law and Background Relating to Tax Issues Associated with Immigration Reform 11–12 (July 17, 2006) ("Joint Committee Report") (internal citations omitted and emphasis added).

Significantly, Congress has never passed a specific statutory exception allowing the IRS to share data related to immigration enforcement. This severely restricts the IRS from sharing information with ICE. As IRS officials wrote in response to the Treasury Inspector General's Office's annual report to Congress in 2003:

> The Service has no legal authority with respect to the enforcement of immigration and Social Security Administration laws. Moreover, the Service is broadly restricted under Section 6103[.]

Gordon C. Milbourn III, Treasury Inspector Gen. for Tax Admin., *The Internal Revenue Service's Individual Taxpayer Identification Number Creates Significant Challenges for Tax Administration*, App'x X, 2 https://famguardian. org/PublishedAuthors/Govt/TIGTA/2004-30-023.pdf (Jan. 8, 2004). This was underscored in a 2024 IRS Federal Register notice on disclosure, which noted that "[t]here is no provision in the United States Code that authorizes the disclosure or redisclosure of returns or return information for enforcement of immigration laws."

Disclosures of Return Information Reflected on Returns to Officers and Employees of the Department of Commerce, Including the Bureau of the Census, for Certain Statistical Purposes and Related Activities, 89 Fed. Reg. 93,172, 93,174 (Nov. 26, 2024).

Yet, the court below provided a mechanism for the Administration to broaden the use of § 6103(i)(2)—which was designed by Congress to provide limited authority for certain types of tax information to be made available for criminal investigations intended to lead to actual prosecutions rather than bulk data-sharing of address information to be used for immigration enforcement. The Administration attempts to ground its authority in Executive Order No. 14161, which broadly calls for aggressive immigration enforcement, buttressing the assertion of authority with a statement that everyone potentially subject to a removal order is now "under criminal investigation" by ICE. MOU ¶ 1.a. (JA 114). This would include, according to news reports, between 700,000 and up to 7 million taxpayers.[5] DHS officials have

---

[5]     *See, e.g.*, Jacob Bogage, Jeff Stein, Maria Sacchetti & Lisa Rein, *DHS asks IRS for addresses of people believed to be in U.S. illegally*, Wash. Post (Feb. 28, 2025), https://www.washingtonpost.com/business/2025/02/28/immigration-enforcement-trump-administration-irs/; Jacob Bogage & Jeff Stein, *IRS nears deal with ICE to share addresses of suspected undocumented immigrants*, Wash. Post (Mar. 22, 2025), https://www.washingtonpost.com/us-policy/2025/03/22/ice-irs-immigrants-deport/; Richard Rubin & Michelle Hackman, *IRS Nears Deal to Share Data for Immigration Enforcement*, Wall St. J. (Mar. 22, 2025), https://www.wsj.com/politics/policy/irs-nears-deal-to-share-data-for-immigration-enforcement; Andrew Duehren & Eileen Sullivan, *I.R.S. Prepares to Help Find Immigrants Targeted for Deportation*, N.Y. Times (Mar. 22, 2025),

publicly described the MOU as "essential to identify who is in our country . . . so [that DHS] can neutralize them." Rebecca Beitsch, *IRS, DHS reach deal on information sharing on migrants*, The Hill (Apr. 8, 2025), https://thehill.com/homenews/ administration/5238271-irs-dhs-immigration-enforcement/.

In reaction, the Chief Risk Officer, Chief Privacy Officer and Acting Commissioner of the IRS resigned rather than consent to the MOU.[6] A former IRS official stated: "It is a complete betrayal of 30 years of the government telling immigrants to file their taxes'" Jacob Bogage & Jeff Stein, *IRS nears deal with ICE to share addresses of suspected undocumented immigrants*, Wash. Post (Mar. 22, 2025), https://www.washingtonpost.com/us-policy/2025/03/22/ice-irs-immigrants-deport/.

As is discussed below, the court's denial of the preliminary injunction fails to take account of the following four significant and material flaws in the MOU.

---

https://www.nytimes.com/2025/03/22/us/politics/irs-ice-immigrants-deportation.html; Jacob Bogage, *DHS officials ask IRS to use tax data to locate up to 7 million immigrants*, Wash. Post (Apr. 5, 2025), https://www.washingtonpost.com/business/2025/04/05/irs-tax-data-immigration-enforcement/.

[6]    Andrew Duehren, *Top I.R.S. Officials Said to Resign After Deal to Give ICE Migrants' Data*, N.Y. Times (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/us/politics/irs-ice-tax-data-deal.html.

**A. The District Court Decision Contradicts the Statute's Plain Language and Lends Support to the Improper Application of § 6103(i)(2)**

The purpose of subsection (i)(2) is to facilitate specific inquiries into clearly identifiable individuals who are the subject of an investigation designed for the purpose of aiding in eventual criminal prosecution. To appropriately identify the precise taxpayer "with respect to whom the return information relates," under § 6103(i)(2)(B), a requestor must first provide, *inter alia*, "(i) the name and address of the taxpayer with respect to whom the requested return information relates; (ii) the taxable period or periods to which such return information relates."

Disclosing taxpayer return information based merely on *a* name and *an* address—even where *the* name or address fails to match an identified tax year—is contradicted, rather than supported, by the statute's plain text. The law explicitly requires a requesting agency to provide "*the* name and address," § 6013(i)(2)(B) (emphasis added), as well as the matching relevant tax periods, of the taxpayer whose information is sought *before* the IRS is authorized to provide any information. Congress crafted this carefully: It ensures that a match of all three data points would be required as the positive identification needed for a statutorily authorized disclosure.

Significantly, § 6103(i)(2) never authorizes disclosure of taxpayer information for the mere purpose of providing a taxpayer's address, but this is precisely what the MOU seeks. JA 105–06 ("The Memorandum also explains that

16

its purpose is to establish procedures enabling 'requests for addresses of persons[.]'"). Although the court below acknowledged that the Internal Revenue Manual 11.3.28.4(5) states, "[r]equests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address," the decision provides a basis for ICE to argue that it may obtain taxpayer information "as long as the agency has **a** name and **an** address for a taxpayer." JA 106 n.3, 108 (emphasis added).

The decision also fails to specify that the name, address and tax year match prior to disclosure, as the statute requires. The Internal Revenue Manual[7] reflects the statutory requirements Congress designed both to authenticate the identity of taxpayers whose information would be disclosed and to prevent fishing expeditions that threaten the statutory scheme's prioritization of confidentiality.[8] In the statute, Congress used the definite article "the"[9] rather than "a," which indicates a specific requirement to match these three critical data points (name, address, and tax year),

---

[7]     *See* also other interpretive documents from the IRS that are described in Appellants' Brief at pp. 32–33.

[8]     *See* JA 87 (noting that, because "one prerequisite for a proper request" is providing "the name and address of the taxpayer," the purpose of section 6103(i)(2) is to provide "information other than the taxpayer's current address").

[9]     All of the words used in a legislative act are to be given force and meaning. "It is our duty 'to give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche*, 348 U.S. 528, 538–39 (1955); *American Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000); *see also Reid v. Angelone*, 369 F.3d 363, 367 (4th Cir. 2004) ("Because Congress used the definite article 'the,' we conclude that . . . there is only one order subject to the requirements."); *Freytag v. Commissioner*, 501 U.S. 868, 902 (1991) (Scalia, J., concurring).

rather than permitting an approximate or probabilistic identification of an individual whose data are shared.

These three data points are necessary, because when a taxpayer's identification number normally used by the IRS (*e.g.*, an SSN or ITIN) is not provided, other accurate information sufficient to make a specific identification *is* required before the IRS is authorized by Congress to provide responsive information under (i)(2) that exposes private taxpayer information to use by law enforcement. Additionally, the court's decision, which emphasizes only a name and address, appears to set aside the clear statutory requirement that the tax year match the name and address provided by the requestor, reading it out of the law.

Further, the decision incorrectly dismisses the fact that when Congress has sought to authorize the mere disclosure of an address, it can and has done so, such as in § 6103(i)(5) (authorizing access through a court order to location information for a fugitive). *See* Appellants' Br. at p. 25–27. Multiple provisions under § 6103(m) also authorize sharing address information with other federal agencies for specific reasons and with specific guardrails in each circumstance.[10]

_____

[10] These include: §§ 6103(2)(A) (address disclosure to a federal agency to collect federal claims); (3) (mailing address disclosure to agency to inform individuals of occupational exposures); (4)(A) (mailing address disclosure to Department of Education regarding student loan defaulters); (5)(A) (address disclosure to Department of Health and Human Services regarding student loan defaulters); (6)(A) (address disclosure to blood donor service to locate individuals

But Congress has never authorized any textual exception to § 6103 that is remotely close to the use contemplated in the MOU, which contradicts the statute's express requirements and explicitly describes an unauthorized purpose. Indeed, Congress knows how to craft legal exceptions, including for addresses and batch data sharing. It did not do so here.

## B. The Administration's MOU Defies Practical Reality and Will Likely Harm Taxpayers

Section 6103(i)(2)(B) additionally requires that the requestor provide "(iii) the statutory authority under which the [criminal] proceeding or investigation . . . is being conducted; and (iv) the specific reason or reasons why such disclosure is or may be relevant to such proceeding or investigation." Thus, to obtain information under § 6103(i)(2), ICE must maintain that it is legitimately engaged in a non-tax criminal investigation of each case for which it seeks disclosure. Moreover, § 6103(i)(2)(A) requires that any disclosure be made "to officers and employees of [an agency who are] personally and directly engaged in" investigating or preparing the case and that it be "solely for the use of such officers and employees."

Instead, the court below, in interpreting the MOU, frames § 6103(i)(2) in a way that it has never been framed since it was first enacted in 1982. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 356 (1982). In fact,

---

of health risks); and (7) (address disclosure to the Social Security Administration to mail statements).

until now it has never even been suggested that it could be broadly applied by ICE or any other administrative agency to an entire class of individuals.

The sheer number of files now argued to be subject to request underscores that this is an end-run around statutory requirements. In 2023, the total for every type of DHS criminal case filed was 23,954 (of which 6,624 were filed by ICE). Dep't of Just., Exec. Off. for U.S. Att'ys, *United States Attorneys' Annual Statistical Report, Fiscal Year 2023* 16 (2023), https://www.justice.gov/usao/media/1343726/dl?inline. During the same year, ICE cases resulted in 7,806 guilty dispositions for individual defendants. *Id*. Therefore, prosecuting 700,000 "criminal" cases would be more than a 100-fold increase in the *total* criminal cases brought by ICE—rather than just for this type of case. *Id*. Such investigations would require ICE to divert all of its resources, and millions more dollars, from prosecuting serious criminal violations and to prosecute and imprison individuals on criminal immigration charges, such as overstaying a removal order, rather than deporting them—the opposite of the MOU's stated purpose. *See, e.g.*, Transcript of Hearing on Preliminary Injunction at 45–46 (Apr. 16, 2025) (1:25-cv-00677-DLF). Even if facially plausible, such an operation would vastly exceed ICE's investigative and prosecutorial capacity. On the other hand, if ICE does not intend to bring many of these prosecutions, then this is merely a pretextual attempt at immigration enforcement untethered to the statute.

It is also entirely plausible that U.S. citizens who share a name sought by ICE could be swept up, detained without redress, and deported in error as the MOU risks rampant unauthorized disclosures. This is because both the MOU and the decision beg the core question of authenticating the taxpayer's identity, while the MOU and the court below fail to provide meaningful guidance as to how the IRS can reconcile its statutory obligation to authenticate a taxpayer's identity prior to releasing this highly sensitive information.[11] In the likely event that a name is reflected on an IRS file that happens to match sometime across many years of IRS records with an address provided by ICE, the district court appears to suggest that the IRS must disclose the information—and even that the IRS lacks discretion to decline to comply "so long as the agency has complied with the statutory prerequisites." JA 109. However, the IRS's obligation, understood correctly under the text of the statute, is that a data match across the three statutory predicates is required to make sure that information about a specific tax year for a clearly identified individual is being requested.

---

[11] Under the MOU, ICE submits "requests for address information" to the IRS that include "[t]he name and address of the taxpayer." MOU § 6 (JA 116). Next, the IRS is to "[r]eview each request for completeness and validity." MOU § 5 (JA 115). If a request is complete and valid, IRS must "[s]earch for the last known address for each individual in the request." *Id*. Finally, "[f]or each individual the IRS is able to identify from the information provided by ICE," the IRS must provide the "last known address for that individual"; and "[f]or each individual the IRS cannot identify from the information provided by ICE," it must "indicate 'no match' in the response." *Id.*

Congress has long been aware that using an approach that lacks a match across the three specific statutory criteria would likely produce results riddled with inaccuracies. In its record-keeping, IRS databases generally rely on singular identities ("TINs"), while its name fields on tax filings allow only two names and do not accommodate long or multi-part surnames, which can produce mismatches or processing errors for taxpayers, particularly those with more than two names, as many immigrants have. *See, e.g.*, *Corona Fruits & Veggies, Inc. v. Frozsun Foods, Inc.*, 143 Cal. App. 4th 319, 324 (Cal. Ct. App. 2006) ("'In most Latin American countries, the surname is formed by listing first the father's name, then the mother's name."); Francine Cronshaw, *Spanish personal names*, 25 The Indexer 5 (Oct. 2007), *https://www.theindexer.org/wp-content/uploads/2020/07/25-4-cp3_005.pdf*. For this reason, both courts and federal regulatory agencies have long rejected minimal-identifier matching as both unreliable and legally insufficient to correctly identify the right individuals.[12]

In fact, many names are quite common. Several of the 1,000 most popular last names are what researchers concluded were "strongly 'Hispanic' last names," like

---

[12] IRS records for millions of taxpayers also can remain in limbo. "Each year, a few million refund returns trigger an IRS fraud filter, and these returns are set aside while the IRS awaits verification of the taxpayer's identity." Taxpayer Advocate Serv., *Some Legitimate Taxpayers Did Not Receive a Tax Year 2020 Refund Because They Did Not Respond to an IRS Letter Requesting Identity* 200 (2024), https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2024/12/ARC24_ ResearchReport.pdf.

Garcia, Rodriguez, Martinez, Hernandez, Lopez, and Gonzalez. David L. Word, et al., *Demographic Aspects of Surnames from Census 2000*, U.S. Census Bureau (June 16, 2022), https://www2.census.gov/topics/genealogy/2000surnames/surnames.pdf. Among minority populations, the prevalence of common surnames can be quite concentrated. In 2016, a Census official noted that "[t]wenty-six surnames cover a quarter of the Hispanic population, and 16 percent of Hispanic people reported one of the top 10 Hispanic names. The pattern is similar for Asians." *What's in a Name*, U.S. Census Bureau (Dec. 15, 2016), https://www.census.gov/newsroom/blogs/random-samplings/2016/12/what_s_in_a_name.html. At the scale at issue here, the result would very likely be unauthorized disclosure of the records of thousands of similarly named individuals, subjecting them to investigation or the risk of wrongful arrest and detention, while putting IRS officers at risk of making unauthorized disclosures.

## C. The District Court's Decision Undermines the Confidentiality of Tax Returns Contrary to Congressional Intent

The decision by the court below undermines the confidentiality of all tax returns, including those filed by individuals with SSNs. For decades, the IRS explicitly has promised ITIN holders that filing taxes creates "no inference regarding immigration status" and that their data would remain confidential and specifically would not be shared for immigration purposes. *Topic no. 857, Individual taxpayer identification number (ITIN)*, Internal Revenue Servs. (Nov. 7, 2024),

https://www.irs.gov/taxtopics/tc857. To accept the court's reading of § 6103(i)(2), one must conclude that Congress and the IRS over these many years deliberately misled millions of taxpayers about the confidentiality of their information while secretly maintaining a mechanism for immigration authorities to access their data. This interpretation would render the ITIN program's core privacy assurances meaningless, transforming what Congress designed as revenue collection into an immigration enforcement tool.

**D. Congress Has Considered and Rejected Amendments to Allow ICE to Obtain Information from the IRS, Reaffirming that Such Information Should Not Be Shared with ICE**

This Administration was not the first to consider whether to broaden tax privacy principles to aid immigration enforcement. The legislative history of attempts to amend § 6103 to permit information sharing with DHS makes clear that the consistent choice of Congress has been to allow the IRS to fulfill its mission to collect taxes by explicitly choosing taxpayer privacy over the exigencies of immigration enforcement.

Congress repeatedly considered amendments to allow limited information sharing by the IRS for immigration enforcement but rejected them each time. For instance, the Comprehensive Immigration Reform Act of 2006 proposed to amend 26 U.S.C. § 6103 by allowing limited information sharing with the Department of Homeland Security. Comprehensive Immigration Reform Act of 2006, S. 2611,

109th Cong. § 301 (2006) ("S. 2611"). But the Joint Committee on Taxation questioned "whether the potential benefits to Department of Homeland Security workplace enforcement outweigh the adverse effects on taxpayer compliance and privacy that would result from the disclosures of return information." Joint Committee Report at 1. While S. 2611 passed the Senate, it failed in the House.

An amendment to a proposed bill put forward by Sen. Ben Nelson would have directly altered § 6103(i) by adding the following paragraph:

> Disclosure of information relating to violations of federal immigration law: (A) Upon receipt by the Secretary of the Treasury of a written request, by the Secretary of Homeland Security or Commissioner of Social Security, the Secretary of the Treasury shall disclose return information to officers and employees of the Department of Homeland Security and the Social Security Administration who are personally and directly engaged in: (i) preparation for any judicial or administrative civil or criminal enforcement proceeding against an alien under the Immigration and Nationality Act (8 U.S.C. 1101 *et seq*. . . . (ii) preparation for a civil or criminal enforcement proceeding against a citizen or national of the United States . . . or (iii) any investigation which may result in the proceedings . . . above.

Amendment to S. 2611, S. Amdt. 4147, 109th Cong. (2006) (amendment of Sen. Ben Nelson). No action was taken on the amendment.

In the debate over S. 2611, an amendment proposed by Sen. Chuck Grassley took a narrower approach, proposing to allow the DHS to obtain certain information from the SSA upon written request. Amendment to S. 2611, S. Amdt. 4177, 109th Cong. (2006) (amendment of Sen. Chuck Grassley). The amendment passed in the Senate but failed to pass in the House.

25

In sum, Congress has repeatedly concluded that these proposed amendments would chill tax compliance for taxpayers. Since § 6103(i)(2) was enacted, no legislation explicitly mandating IRS-ICE data sharing has ever been passed by Congress. And, as these failed attempts demonstrate, Congress has long understood it is the legislature's exclusive role to create exceptions that could authorize data sharing between the IRS and ICE. Congress has consistently chosen not to risk undermining the voluntary compliance system that is the foundation of federal revenue collection. The MOU intrudes on this prerogative. It would reverse Congress's deliberate design of limited, specific exceptions to confidentiality protections and threaten dire consequences for both taxpayers and the integrity of our tax system more generally.

## CONCLUSION

This Court should reverse the district court's denial of the preliminary injunction with instructions to grant the motion for a preliminary injunction.

July 7, 2025

Respectfully submitted,

*/s/ Leah M. Nicholls*
Leah M. Nicholls (DC Bar No. 982730)
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

Gerson H. Smoger\*
SMOGER & ASSOCIATES, P.C.
4228 Hallmark Drive
Dallas, TX 75229
(510) 531-4529
Smogerlaw@gmail.com

\* Motion for *pro hac vice* admission forthcoming

*Counsel for Amici Curiae Ninety-Three Members of Congress*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with all the applicable requirements of Fed. R. App. P. 29 and 32, and that it contains 6,146 words.

I acknowledge that my brief may be stricken if it fails to comply with any of the applicable requirements.

*/s/ Leah M. Nicholls*
Leah M. Nicholls

*Counsel for Amici Curiae*
*Ninety-Three Members of Congress*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I caused a copy of the foregoing Brief to be sent via the Court's CM/ECF system to counsel of record who have entered an appearance in this case.

/s/ Leah M. Nicholls
Leah M. Nicholls

*Counsel for Amici Curiae*
*Ninety-Three Members of Congress*

# APPENDIX: *AMICI CURIAE*

## MEMBERS OF THE U.S. SENATE (4)

**Sheldon Whitehouse**
Senator from Rhode Island

**Alejandro Padilla**
Senator from California

**Catherine Cortez Masto**
Senator from Nevada

**Elizabeth Warren**
Senator from Massachusetts

## MEMBERS OF THE U.S. HOUSE OF REPRESENTATIVES (89)

**Adriano Espaillat**
Representative of New York

**Salud O. Carbajal**
Representative of California

**Gabe Amo**
Representative of Rhode Island

**André Carson**
Representative of Indiana

**Yassamin Ansari**
Representative of Arizona

**Troy Carter**
Representative of Louisiana

**Becca Balint**
Representative of Vermont

**Greg Casar**
Representative of Texas

**Nanette Barragán**
Representative of California

**Sean Casten**
Representative of Illinois

**Joyce Beatty**
Representative of Ohio

**Kathy Castor**
Representative of Florida

**Suzanne Bonamici**
Representative of Oregon

**Joaquin Castro**
Representative of Texas

**Shontel M. Brown**
Representative of Ohio

**Emanuel Cleaver, II**
Representative of Missouri

**Julia Brownley**
Representative of California

**J. Luis Correa**
Representative of California

**Jim Costa**
Representative of California

**Joe David Courtney**
Representative of Connecticut

**Jasmine F. Crockett**
Representative of Texas

**Danny K. Davis**
Representative of Illinois

**Madeleine Dean**
Representative of Pennsylvania

**Diana DeGette**
Representative of Colorado

**Maxine Dexter**
Representative of Oregon

**Lloyd Doggett**
Representative of Texas

**Sarah Elfreth**
Representative of Maryland

**Veronica Escobar**
Representative of Texas

**Cleo Fields**
Representative of Louisiana

**Lizzie Fletcher**
Representative of Texas

**Bill Foster**
Representative of Illinois

**Laura S. Friedman**
Representative of California

**Maxwell Alejandro Frost**
Representative of Florida

**John Garamendi**
Representative of California

**Sylvia R. Garcia**
Representative of Texas

**Jesús G. "Chuy" García**
Representative of Illinois

**Jimmy Gomez**
Representative of California

**Maggie Goodlander**
Representative of New Hampshire

**Pablo Jose Hernandez**
Representative of Puerto Rico

**Steven A. Horsford**
Representative of Nevada

**Jared Huffman**
Representative of California

**Glenn F. Ivey**
Representative of Maryland

**Sara Jacobs**
Representative of California

**Pramila Jayapal**
Representative of Washington

**Henry C. ("Hank") Johnson, Jr.**
Representative of Georgia

**Sydney Kamlager-Dove**
Representative of California

**Ro Khanna**
Representative of California

**John B. Larson**
Representative of Connecticut

**Teresa Leger Fernandez**
Representative of New Mexico

**Mike Levin**
Representative of California

**Sam Liccardo**
Representative of California

**Stephen F. Lynch**
Representative of Massachusetts

**Betty Louise McCollum**
Representative of Minnesota

**James P. McGovern**
Representative of Massachusetts

**LaMonica McIver**
Representative of New Jersey

**Robert J. Menendez**
Representative of New Jersey

**Kweisi Mfume**
Representative of Maryland

**Dave Min**
Representative of California

**Seth Moulton**
Representative of Massachusetts

**Eleanor Holmes Norton**
Representative of the District of
Columbia

**Alexandria Ocasio-Cortez**
Representative of New York

**Ilhan Omar**
Representative of Minnesota

**Frank Pallone**
Representative of New Jersey

**Nancy Pelosi**
Representative of California

**Brittany Pettersen**
Representative of Colorado

**Chellie Pingree**
Representative of Maine

**Nellie Pou**
Representative of New Jersey

**Mike Quigley**
Representative of Illinois

**Delia C. Ramirez**
Representative of Illinois

**Jamie Raskin**
Representative of Maryland

**Luz M. Rivas**
Representative of California

**Andrea Salinas**
Representative of Oregon

**Linda T. Sánchez**
Representative of California

**Jan Schakowsky**
Representative of Illinois

**Brad Sherman**
Representative of California

**Lateefah Simon**
Representative of California

**Melanie Stansbury**
Representative of New Mexico

**Shri Thanedar**
Representative of Michigan

**Bennie G. Thompson**
Representative of Mississippi

**Rashida Tlaib**
Representative of Michigan

**Norma J. Torres**
Representative of California

**Ritchie Torres**
Representative of New York

**Juan Vargas**
Representative of California

**Nydia M. Velázquez**
Representative of New York

**Debbie Wasserman Schultz**
Representative of Florida

**Maxine Waters**
Representative of California

**Bonnie Watson Coleman**
Representative of New Jersey

**Nikema Williams**
Representative of Georgia

**Frederica S. Wilson**
Representative of Florida