ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5181

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CENTRO DE TRABAJADORES UNIDOS, *et al.*,

*Plaintiffs-Appellants*

v.

SCOTT BESSENT, *et al.*,

*Defendants-Appellees*

---

On Appeal from the United States
District Court for the District of Columbia
No. 1:25-cv-00677-DLF, Hon. Dabney L. Friedrich presiding

---

**BRIEF OF *AMICUS CURIAE*
FEDERATION FOR AMERICAN IMMIGRATION REFORM IN
SUPPORT OF DEFENDANTS-APPELLEES AND IN SUPPORT OF
AFFIRMANCE**

---

Andrew L. Schlafly
939 Old Chester Rd.
Far Hills, NJ 07931
908-719-8608
908-934-9207 (fax)

Attorney for *Amicus Curiae*
Federation for American Immigration Reform

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Cir. R. 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and *Amici*

The parties, intervenors, and *amici* appearing before the district court, and in this Court, are listed in the Brief for the Appellees, with the addition of this brief by the Federation for American Immigration Reform (FAIR), which filed its notice of intent to participate in this appeal as *amicus curiae* on July 31, 2025.

### B. Rulings Under Review.

The ruling under review is referenced in the Brief for the Appellees.

### C. Related Cases.

The appealed decision has not previously been before this Court or any other court, and the undersigned counsel is not aware of any related cases pending before this Court or any other court, pursuant to Cir. R. 28(a)(1)(C).

Dated:  August 11, 2025          /s/ Andrew L. Schlafly
                                 *Counsel for Amicus Curiae*
                                 Federation for American Immigration Reform

i

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Federation for American Immigration Reform is a non-profit corporation that has no parent corporations, and no publicly held corporation owns 10% or more of any of its stock.

Dated:  August 11, 2025          /s/ Andrew L. Schlafly
                                 *Counsel for Amicus Curiae*
                                 Federation for American Immigration Reform

# TABLE OF CONTENTS

Page

Certificate as to Parties, Rulings, and Related Cases ................................................. i

Corporate Disclosure Statement .......................................................................... ii

Table of Contents ............................................................................................ iii

Table of Authorities ........................................................................................ iv

Glossary of Abbreviations ................................................................................ vii

Identity, Interest and Authority to File ................................................................ 1

Summary of Argument ...................................................................................... 2

Argument ...................................................................................................... 4

I.    Plaintiffs Lack Article III and Prudential Standing to Challenge Inter-Agency Sharing of Data ............................................................................ 5

    A.    *Clapper* Precludes Jurisdiction Here .......................................................... 5

    B.    Plaintiff Somos Lacks Article III and Prudential Standing to Challenge the MOU ........................................................................ 10

    C.    Plaintiffs Lack Standing on Their APA Claim ............................................. 12

II.   The Unclean Hands of Illegality Preclude Granting the Equitable Relief of a Preliminary Injunction ........................................................................ 15

III.  The Concern about Potential Mistakes, as Raised by the *Amicus* Briefs in Support of Plaintiffs, Reinforces the Need to Allow Inter-Agency Sharing of Data Rather than Enjoining It ...................................................... 18

IV.   The Concerns Raised by *Amici* EFF and Members of Congress are too Speculative to Justify a Preliminary Injunction that Would Impede Law Enforcement Efforts ............................................................................ 22

    A.    The Arguments Presented by *Amicus* EFF are too Speculative .............. 22

    B.    The Arguments Presented by *Amicus* Members of Congress Based on Reliance and Conjecture are Likewise Unpersuasive ........................ 25

Conclusion .................................................................................................... 27

Certificate Of Compliance ................................................................................ 28

## TABLE OF AUTHORITIES

**Cases**                                                                         **Pages**

*Allen v. Wright*, 468 U.S. 737 (1984) ....................................................11

*Amnesty Int'l United States v. Clapper*, 638 F.3d 118 (2d Cir. 2011) ......................7

*Bein* v. *Heath*, 6 How. 228 (1848) .........................................................15

*Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766 (9th Cir. 1986) ...........................25

*Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677 (DLF),
    2025 U.S. Dist. LEXIS 90993 (D.D.C. May 12, 2025)........................10, 12, 14

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (2006) ................22

\* *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)........................... iii, 2, 5, 6, 7, 8

*Combs v. Snyder*, 101 F. Supp. 531 (1951) , *aff'd*, 342 U.S. 939 (1952)...............17

*Corona Fruits & Veggies, Inc. v. Frozsun Foods, Inc.*,
    143 Cal. App. 4th 319, 48 Cal. Rptr. 3d 868 (2006)  ......................................26

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)....................................................6

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)........................................6

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977) ...........................................4

*Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39 (D.D.C. 2025)................22

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004)  ................................11

*Elec. Priv. Info. Ctr. v. Internal Revenue Serv.*,
    910 F.3d 1232 (D.C. Cir. 2018).........................................................24

*Frank v. Gaos*, 586 U.S. 485 (2019) .......................................................6

*Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co.*,
    146 F.2d 165 (8th Cir. 1945).............................................................16

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
    528 U.S. 167 (2000).......................................................................6

*Garcia-Mir v. Meese*, 788 F.2d 1446 (11th Cir. 1986).........................................14

*Gerhart v. Lake Cty.*, 637 F.3d 1013 (9th Cir. 2011) .............................................14

\* Authorities upon which we chiefly rely are marked with asterisks.

*Helvering v. Gowran*, 302 U.S. 238 (1937)..................................................4

*Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ............................14

*In re Swine Flu Immunization Prods. Liab. Litig.*,
    880 F.2d 1439 (D.C. Cir. 1989) ...................................................4

*Indu Rawat v. Commissioner*, 108 F.4th 891 (D.C. Cir. 2024) ...............................25

*Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383 (1944)......................................16

*Judicial Watch, Inc. v. Deutsche Bank, A.G.*, 9 F. App'x 14 (D.C. Cir. 2001) ........4

*Los Angeles v. Lyons*, 461 U.S. 95 (1983) ............................................22

*Maxfield v. United States Postal Service*, 752 F.2d 433 (9th Cir. 1984)................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................22

*People v. Howard*, 162 Cal. App. 3d 8, 208 Cal. Rptr. 353 (1984) .......................20

*Polo N. Country Club, Inc. v. Wells Fargo Bank, N.A.*,
    No. 9:16-cv-80432-WPD, 2016 U.S. Dist. LEXIS 206126
    (S.D. Fla. June 23, 2016) ...................................................26

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945) ...................................................15, 17

*Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*,
    298 F. Supp. 3d 1304 (N.D. Cal. 2018)..........................................14

*Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018), *rev'd in part on other grounds sub nom.*,
    *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)................................................... 14-15

*S.A. v. Trump*, 363 F. Supp. 3d 1048, 1087 (N.D. Cal. 2018)................................15

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943)................................................4

*Shondel v. McDermott*, 775 F.2d 859 (7th Cir. 1985) ....................................... 15-16

*Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U.S. 26 (1976) ................6

*United States v. Connolly*, 2018 U.S. Dist. LEXIS 84146
    (S.D.N.Y. May 15, 2018) ...................................................18

*Warth v. Seldin*, 422 U.S. 490 (1975)................................................11

*Wilcox v. Comm'r of the Internal Revenue*, 848 F.2d 1007 (9th Cir. 1988)............25

## Constitution, Statutes and Rule

U.S. CONST. Art. II, § 3 ...........................................................................6

26 U.S.C. § 3402 ...................................................................................25

26 U.S.C. § 6103 ...................................................................................10

26 U.S.C. § 6103(i)(2)(C) .......................................................................4

FED. R. APP. P. 29(a)(4)(E) ....................................................................1

## Other Authorities

FAIR, "How Many Illegal Aliens Are in the United States? 2025 Update"
(March 7, 2025)
https://www.fairus.org/issue/how-many-illegal-aliens-are-united-states-
2025-update ..............................................................................................8

Nicole Grigg, "Arizona woman files lawsuit against feds after mistaken
identity arrest," *ABC15 Arizona* (June 10, 2025)
https://www.abc15.com/news/local-news/investigations/arizona-
woman-files-lawsuit-against-feds-after-mistaken-identity-arrest .....................19

ICE Newsroom, "ICE, federal partners assaulted during largest worksite
enforcement operation in Nebraska under Trump administration"
(June 11, 2025)
https://www.ice.gov/news/releases/ice-federal-partners-assaulted-during-
largest-worksite-enforcement-operation-nebraska ............................................21

J. Jeffries, "Legality, Vagueness, and the Construction of Penal Statutes,"
71 Va. L. Rev. 189 (1985) .......................................................................13

U.S. Customs and Border Protection, "CBP Releases May 2025 Monthly
Update" (June 17, 2025)
https://www.cbp.gov/newsroom/national-media-release/cbp-releases-may-
2025-monthly-update ..............................................................................9

Jiachuan Wu, et al., "U.S. deportation tracker: Counting arrests,
deportations," *NBC News* (updated July 20, 2025)
https://www.nbcnews.com/data-graphics/us-immigration-tracker-follow-
arrests-detentions-border-crossings-rcna189148 ...............................................9

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Cambridge Br. | The *amicus* brief filed in support of Plaintiffs-Appellants by the Cambridge Economic Opportunity Committee, Inc. and Community Economic Development Center of Southeastern Massachusetts on July 7, 2025. |
| Congress Br. | The *amicus* brief filed in support of Plaintiffs-Appellants by Ninety-Three Members of Congress on July 7, 2025. |
| CBP | Customs and Border Protection (also abbreviated as USBP) |
| DACA | Deferred Action for Childhood Arrivals |
| DHS | Department of Homeland Security |
| EFF | Electronic Frontier Foundation |
| EFF Br. | The *amicus* brief filed in support of Plaintiffs-Appellants by the Electronic Frontier Foundation on July 7, 2025. |
| FAIR | Federation for American Immigration Reform |
| ICE | Immigration and Customs Enforcement |
| IRS | Internal Revenue Service |
| MOU | Memorandum of Understanding between the IRS in the Treasury Department and DHS (JA113-27) |
| USBP | U.S. Customs and Border Protection (also abbreviated as CBP) |

iv

## IDENTITY, INTEREST AND AUTHORITY TO FILE[1]

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a nonprofit corporation that was founded in 1979 and has its principal place of business in Washington, D.C. The mission of FAIR is to inform the public about the effects of both unlawful and lawful immigration, and to defend the interests of Americans by limiting overall immigration, enhancing border security, and ending illegal immigration. In short, FAIR seeks to protect all Americans against the substantial harms caused by unlawful immigration.

FAIR has been involved in more 100 legal cases since 1980, either as a party or as *amicus curiae*, including multiple cases in the federal district and appellate courts in the District of Columbia. FAIR consistently defends American interests in court against illegal migration into the United States.

The decision in this case will likely have a national impact on the tools available to the executive branch of the federal government in dealing efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States. *Amicus* FAIR has direct and vital interests in

---

[1]  All parties have consented to the filing here of an *amicus* brief by the Federation for American Immigration Reform. Pursuant to FED. R. APP. P. 29(a)(4)(E), undersigned counsel certifies that: no counsel for a party authored this brief in any respect; and no party, party's counsel, person or entity – other than *Amicus*, its members, and its counsel – contributed monetarily to this brief's preparation or submission.

defending the executive branch's authority to address the current illegal alien
crisis.

### SUMMARY OF ARGUMENT

Plaintiffs lack standing under controlling Supreme Court precedent to
complain about the sharing of data by the IRS of taxpayer identifying information
to assist in investigating violations of federal law. DHS has reasonably determined
that this information would assist it in locating and removing illegal aliens, who by
their continued presence in the United States are violating federal law. As
organizations and not as individuals facing imminent harm from this data-sharing,
Plaintiffs lack the standing that is necessary to support jurisdiction.

In *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), as here, plaintiffs
lacked standing to sue about purely speculative future harm. The required nexus
between the challenged conduct and any imminent harm was lacking both there
and here, thereby negating Article III jurisdiction. In addition, prudential standing
is lacking here due to how judicial intervention now would be premature and
unnecessary to protect individual rights. If and when an individual is ever harmed
by Defendants' alleged conduct, the affected individual will then be able to raise it
as a defense or seek an appropriate remedy. At this time the executive branch is
better suited to address the issues raised in this lawsuit, rather than the judiciary

handling this matter prematurely in the abstract. This appeal by Plaintiffs, as

organizations, should be denied with instructions to dismiss the lawsuit below.

As to the substantive merits, Plaintiffs are challenging a Memorandum of

Understanding (MOU) between Defendants DHS and IRS which expressly states

as its purpose to "take immediate steps to identify, exclude, or remove aliens

illegally present in the United States." (MOU ¶1.a, JA 114) The entire focus of

Defendants' actions is thereby on individuals who are violating federal law by

remaining illegally in the United States. The well-established doctrine of unclean

hands precludes the requested equitable relief because it would aid in this

illegality.

Three *amicus* briefs filed in support of Plaintiffs all assert a similar argument

about a risk of mistaken identification resulting from the sharing of data by IRS

with DHS under the MOU. But their argument cuts in favor of allowing the sharing

of data, not against it. Mistaken arrests, which are inevitable in all of law

enforcement, are more likely to increase due to a withholding of data rather than a

sharing of it. Moreover, the consequences of mistaken arrests are not as dire as

*Amici* portray, and can be easily rectified.

The *amicus* briefs filed by the Electronic Frontier Foundation and Ninety-

Three Members of Congress rely heavily on conjectural arguments that are

misplaced in this appeal from a denial of a preliminary injunction. Withholding

this IRS taxpayer identity data from DHS and ICE would force them to operate in the dark, less informed about these illegal aliens and where they are located in the United States. The sharing of these data for law enforcement purposes is allowed by 26 U.S.C. § 6103(i)(2)(C). If ICE is denied this information, then their job is made more difficult in apprehending dangerous suspects and sending them back to their country of origin. Neither Plaintiffs nor their *Amici* assert a Fourth Amendment or any other constitutional violation in sharing these data, and a mere disagreement by Plaintiffs with the executive branch's interpretation of this statutory provision is insufficient to enjoin inter-agency access to this information.

## ARGUMENT

The denial of the requested preliminary injunction below was correct for multiple reasons, and affirmance can be on any grounds. In the review of the decision of the district court, "it must be affirmed if the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason.'" *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (quoting *Helvering v. Gowran*, 302 U.S. 238, 245 (1937)). "[T]his court can affirm the district court judgment on the basis of any grounds which support it." *Judicial Watch, Inc. v. Deutsche Bank, A.G.*, 9 F. App'x 14, 15 (D.C. Cir. 2001) (cleaned up, citing *In re Swine Flu Immunization Prods. Liab. Litig.*, 880 F.2d 1439, 1444 (D.C. Cir. 1989), and *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 419 (1977), inner quotations omitted).

For the reasons explained below, not all of which are in the district court's decision but are nevertheless valid grounds for affirmance, this appeal should be denied for lack of jurisdiction and this lawsuit should thereby be dismissed, or the denial below of the motion for a preliminary injunction should be affirmed.

## I.     Plaintiffs Lack Article III and Prudential Standing to Challenge Inter-Agency Sharing of Data.

Plaintiffs seek landmark relief as mere private organizations demanding a court order to block an inter-agency sharing of data by the federal government. Notably, no constitutional violation is asserted by Plaintiffs, nor have Defendants infringed on any constitutional rights.

### A.     *Clapper* Precludes Jurisdiction Here.

Plaintiffs' claims are weaker than the claims dismissed by the Supreme Court for lack of standing in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). Plaintiffs assert a violation of the Administrative Procedure Act (APA) based on a Memorandum of Understanding (MOU) agreed to by Defendants IRS and DHS, but without Plaintiffs proving any evidence that this MOU would specifically harm any of their members. Defendants' MOU is merely to share data that they already lawfully have, and it is not known whether or how the IRS data may be used with respect to any of Plaintiffs' members. Plaintiffs merely have an interpretation of a federal statutory provision about data-sharing that is different from the view of the

executive branch authorized by the Constitution to faithfully execute the laws. U.S.

CONST. Art. II, § 3.

There is a threshold duty to ascertain here whether subject matter

jurisdiction exists, both in the district court and here on appeal. "We have an

obligation to assure ourselves of litigants' standing under Article III." *Frank v.*

*Gaos*, 586 U.S. 485, 492 (2019) (quoting *DaimlerChrysler Corp. v. Cuno*, 547

U.S. 332, 340 (2006), quoting *Friends of the Earth, Inc. v. Laidlaw Environmental*

*Services (TOC), Inc.*, 528 U.S. 167, 180 (2000); internal quotation marks omitted).

"[F]ederal courts lack jurisdiction if no named plaintiff has standing." *Gaos*, 586

U.S. at 492 (citing *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U.S. 26,

40, n. 20 (1976)). Invoking a principle likewise applicable here, the Supreme Court

remanded *Gaos* on the standing question because "[w]e 'are a court of review, not

of first view.'" *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).

This lawsuit was brought not by any individuals facing imminent injury, but

by organizations that assert standing based on speculation about potential future

harm to members, as in *Clapper* where the Supreme Court found a lack of

standing. Procedural similarities between *Clapper* and this case here are striking.

There, as here, plaintiffs (or their membership) lacked any threatened imminent

harm, and instead relied on plaintiffs' "speculative chain of possibilities [which]

does not establish that injury based on potential future surveillance is certainly

impending or is fairly traceable to" the cited statute. *Clapper*, 568 U.S. at 414. The Supreme Court in *Clapper* reversed the Second Circuit's finding of standing and ordered dismissal of that case, as this Court should hold here.

Two aspects of the Supreme Court holding against standing in *Clapper* are particularly controlling here. First, there is a similar "speculative chain of possibilities" here which lacks the requirement of a "certainly impending" injury that is traceable to Defendants' conduct. *Id.* Plaintiffs allege an action may be taken against one of their members by Defendants, but cannot connect the dots between such action, if it does occur, and the alleged data-sharing among Defendants which is made possible by the MOU. The Supreme Court expressly rejected a finding of standing by the Second Circuit based on "a reasonable fear of *future* harmful government conduct." *Clapper*, 568 U.S. 398, 416 (quoting and reversing *Amnesty Int'l United States v. Clapper*, 638 F.3d 118, 138 (2d Cir. 2011), emphasis in original). There, as here, a reasonable fear of future government action is insufficient to establish standing in a federal lawsuit. If and when the government takes any action against a member of a Plaintiff, that member will then have full legal recourse to challenge the legality of such governmental conduct at that time.

Second, independent decision-making within the government, before there is any cognizable harm to a member of Plaintiffs, breaks the chain of causation

necessary to establish standing. "We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. While there have been highly publicized deportations of criminal aliens, those reports are statistically miniscule amid a population of illegal aliens estimated to exceed 18 million people:

> As of March 2025, FAIR estimates that approximately 18.6 million illegal aliens reside in the United States. This is 11 percent higher than our June 2023 illegal alien population estimate of 16.8 million. Since our December 2020 estimate, the illegal alien population in the United States has grown by 4.1 million …. The surge in illegal immigration was so large that the U.S. Census Bureau announced just three months ago it has changed its methodology for estimating the foreign-born population to account for it.

FAIR, "How Many Illegal Aliens Are in the United States? 2025 Update" (March 7, 2025) (footnote omitted).[2]

The surge in recent years is confirmed by many widely-publicized photographs and stories of the influx of illegal aliens from Latin American over the southern border from 2021 through 2024, and by official government statistics released by the U.S. Customs and Border Protection (USBP):

> In May 2025, the Border Patrol encountered 8,725 illegal aliens crossing the southwest border between ports of entry. This was a 93% decrease from May 2024 when USBP encountered 117,905 aliens.

---

[2] https://www.fairus.org/issue/how-many-illegal-aliens-are-united-states-2025-update (viewed Aug. 7, 2025).

U.S. Customs and Border Protection, "CBP Releases May 2025 Monthly Update" (June 17, 2025).[3]

Fewer than 1% of the illegal aliens have been deported or detained by the Trump Administration, according to data tracked by *NBC News*. Jiachuan Wu, *et al.*, "U.S. deportation tracker: Counting arrests, deportations," *NBC News* (updated July 20, 2025) ("tracking immigration enforcement using ICE data both public and internal as well as data from the U.S. Customs and Border Protection agency," and showing that deportations are averaging only about 15,000 per month, which is less than 1/10th of 1% of the illegal alien population).[4] Many of these deported individuals were recently captured crossing into the United States illegally, or arrested for committing another crime while here. The likelihood of an unlawfully present alien, who is otherwise law-abiding (other than his illegal status), being detained or deported is exceedingly small, and far too miniscule to meet the imminent-likely standard required to establish standing, much less obtain a preliminary injunction.

The court below correctly found that Plaintiffs lack standing "to pursue their claim that the agencies will share information for *civil* enforcement purposes, in

---

[3] https://www.cbp.gov/newsroom/national-media-release/cbp-releases-may-2025-monthly-update (viewed Aug. 3, 2025).

[4] https://www.nbcnews.com/data-graphics/us-immigration-tracker-follow-arrests-detentions-border-crossings-rcna189148 (viewed Aug. 6, 2025).

violation of [26 U.S.C.] § 6103." *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677 (DLF), 2025 U.S. Dist. LEXIS 90993, at *13 (D.D.C. May 12, 2025) (emphasis in original). But the court below erred in finding standing by Plaintiffs "Centro, Immigrant Solidarity, and Somos … to challenge the agencies' agreement to share information as arbitrary and capricious, and Somos alone … to challenge the agreement as in excess of the IRS's statutory authority." *Id.* As explained below, under precedents by the Supreme Court and this Court, the lower court specifically erred in finding standing by these associations to challenge inter-agency access to data within the executive branch as embodied in the MOU.

## B. Plaintiff Somos Lacks Article III and Prudential Standing to Challenge the MOU.

Addressing first the finding below that Somos alone has standing to challenge the MOU as being beyond the IRS's power, the sole basis for that is a declaration submitted by Somos that "its members have provided information to the IRS and are currently subject to final removal orders." *Centro de Trabajadores Unidos*, 2025 U.S. Dist. LEXIS 90993, at *9. None of the other Plaintiff associations even submitted that.

This is simply too slender a reed on which to rest standing for the Plaintiffs' breathtaking attempt to enjoin the executive branch from sharing address information among two of its agencies, for the benefit of thousands of law enforcement efforts. Plaintiff Somos's unremarkable assertions that some of its

members are currently subject to final removal orders, while having also provided information to the IRS, tells the Court nothing about whether Defendants will actually use any data obtained from the IRS against a member of Plaintiff Somos. If there were ever any improper use of these data against a member of Plaintiff Somos, then that member would be in the best position to challenge that use at that time and, if necessary, to seek to enjoin any action based on it and exclude from evidence the fruits of any illegality.

Moreover, even if this Court were to find Article III standing on such a meager basis, prudential standing should be denied with respect to this claim by Plaintiff Ramos. "[P]rudential standing … embodies 'judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The justification for prudential standing applies with particular force to this lawsuit against inter-agency data access, under the Supreme Court's reasoning in *Newdow*:

> "Without such limitations – closely related to Art. III concerns but essentially matters of judicial self-governance – the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."

*Newdow*, 542 U.S. at 12 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

The above holding in the high-profile *Newdow* case applies even more forcefully to this case. The data-sharing arrangement challenged here has "wide

11

public significance" and "judicial intervention may be unnecessary to protect individual rights," and thus prudential standing should be denied to Plaintiff Ramos, which is the only Plaintiff found below to have standing on the statutory claim about IRS authority. The "abstract questions" raised by Plaintiff Ramos about inter-agency data access are for a political branch to resolve rather than the judicial branch.

Without any standing by Plaintiff Ramos, no viable claim remains as to whether the IRS exceeds its authority under the statute to provide these data to another federal agency for law enforcement-related purposes.

### C.    Plaintiffs Lack Standing on Their APA Claim.

Plaintiffs assert a claim based on the APA, by arguing that the MOU is arbitrary and capricious. But Plaintiffs need to establish both Article III and prudential standing to proceed on that claim here, and they have failed to do so.

The district court found standing for the APA claim because "plaintiffs offer declarations that their members relied on the IRS's past assurances that tax information would not be shared for immigration enforcement purposes" and "now fear that they will be harmed for relying on those assurances and for filing their taxes as obligated." *Centro de Trabajadores Unidos,* 2025 U.S. Dist. LEXIS 90993, at *12.

The flaw in the district court's reasoning is that there are no legitimate "reliance interests" in merely complying with the legal requirement of filing tax returns. Plaintiffs are not asserting a Fourth Amendment right against any unreasonable seizure of their members' personal information. Instead, Plaintiffs are merely asserting a reliance interest on behalf of members for complying with some of their legal obligations, when no such reliance interest is cognizable under law. Professor John Jeffries rejected an analogous suggestion of a reliance interest by wrongdoers in an interpretation of a penal statute:

> [a wrongdoer] would not, in my view, have established the kind of reliance interest that society would be obliged to respect. Rather it seems that a person who embarks on obviously wrongful conduct takes his chances on just how seriously the rest of society may view the matter. … This is not to say, of course, that society has no obligation to treat wrongdoers fairly, but only that fairness, at least in any sense even roughly congruent with our penal law, does not turn on the wrongdoer's own conception of the legal consequences of his act.

J. Jeffries, "Legality, Vagueness, and the Construction of Penal Statutes," 71 Va. L. Rev. 189, 231 (1985).

Moreover, individual participation by members of Plaintiffs is necessary to assess their assertion of reliance on representations by the IRS about the confidentiality of their names and addresses on their income tax returns. Asserting standing based on a personal reliance by an individual on a representation by a Defendant cries out for individual participation in the lawsuit by those asserting

13

such reliance. Cross-examination is essential to test the veracity of this type of

allegation. But the need for this individual participation, including an opportunity

to cross-examine the individuals who supposedly relied, negates associational

standing. As quoted by the district court, one of the three essential requirements for

associational standing is that "neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." *Centro de

Trabajadores Unidos*, 2025 U.S. Dist. LEXIS 90993, at *7 (quoting *Hunt v. Wa.

State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Moreover, even if the government charitably concealed this name and

address information in the past from other agencies, "[a]n agency's past practice of

generally granting a government benefit is also insufficient to establish a legal

entitlement." *Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*,

298 F. Supp. 3d 1304, 1311 (N.D. Cal. 2018) (citing *Gerhart v. Lake Cty.*, 637

F.3d 1013, 1020 (9th Cir. 2011)). *See also Garcia-Mir v. Meese*, 788 F.2d 1446,

1451 (11th Cir. 1986) (fact that government may have generously granted

discretionary parole in the past does not give rise to an entitlement to

parole); *Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*, 908

F.3d 476, 515 (9th Cir. 2018) ("[A] 99% renewal rate under DACA provides no

evidence that the government shared an understanding that the DACA program

would continue existing indefinitely to provide such renewals."), *rev'd in part on*

14

other grounds sub nom., *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020); *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1087 (N.D. Cal. 2018) (holding that DHS's termination of a parole program for illegal aliens "does not violate the APA for failure to take into account 'serious reliance interests'") (quoting plaintiffs' argument).

## II.  The Unclean Hands of Illegality Preclude Granting the Equitable Relief of a Preliminary Injunction.

Plaintiffs base their lawsuit on protecting the illegal presence of individuals in the United States, contrary to the "equitable maxim that he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (inner quotations omitted). The Supreme Court explained:

> This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity."

*Id.* (quoting *Bein* v. *Heath*, 6 How. 228, 247 (1848)).

"An obviously sensible application of this principle is to withhold an equitable remedy that would encourage, or reward (and thereby encourage), illegal activity, as where the injunction would aid in consummating a crime ...." *Shondel*

15

*v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985) (citing *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383 (1944)). As the Seventh Circuit elaborated, "[a] common modern application of 'unclean hands' is to intellectual-property cases in which an injunction is sought in aid of unlawful activity," and it is refused "on the ground that awarding it would assist in a violation of the antitrust laws." *Id.* (citing *Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co.*, 146 F.2d 165 (8th Cir. 1945)). Motions for injunctions that would protect misrepresentation are likewise denied based on unclean hands by the movant. *Id.*

When a plaintiff, or in this lawsuit members of a plaintiff upon whom associational standing is based, is seeking equitable relief that would aid an ongoing violation of federal law, the doctrine of unclean hands precludes the request. The Supreme Court has emphasized that this is not a relative test comparing wrongdoing by a plaintiff against wrongdoing by a defendant, but rather is a requirement that the plaintiff be clean of improper related conduct regardless of how unclean the defendant may be:

> [Plaintiff] Automotive has not displayed that standard of conduct requisite to the maintenance of this suit in equity. That the actions of [Defendants] may have been more reprehensible is immaterial. The public policy against the assertion and enforcement of patent claims infected with fraud and perjury is too great to be overridden by such a consideration. [Plaintiff] Automotive knew of and suspected the perjury and failed to act so as to uproot it and destroy its effects. Instead, Automotive acted affirmatively to magnify and increase those effects. Such inequitable conduct impregnated Automotive's entire

16

cause of action and justified dismissal by resort to the unclean hands
doctrine.

*Precision Instrument Mfg.*, 324 U.S. at 819.

Shorn to its essence, Plaintiffs seek a preliminary injunction here against an
inter-agency access to data so that members of Plaintiffs can remain illegally in the
United States without being located by law enforcement. In other words, the
requested preliminary injunction would aid in the illegal continued presence by
individuals in this country. This is quintessentially a request for equitable relief to
assist in wrongdoing, which courts consistently reject under the doctrine of unclean
hands. And because the test for a preliminary injunction includes balancing the
equities as one of its factors, it does not matter if the Defendants assert or argue
unclean hands doctrine as a defense. *See, e.g.*, *Combs v. Snyder*, 101 F. Supp. 531,
532 (D.D.C. 1951), *aff'd*, 342 U.S. 939 (1952) (denying a motion for a preliminary
injunction because "[n]othing is better settled than that it is within the discretion of
a court of equity to deny its aid to one who does not come into court with clean
hands. Few things are clearer than that one who comes seeking protection for
conduct that he concedes to be criminal has unclean hands within the meaning of
this principle").

Admittedly, the illegality of remaining in the United States is rampant, as an
estimated population of 18 million people are currently present in the United States
unlawfully. But in federal court the pervasiveness of similar illegal conduct by

others is not a defense to the application of the law to an individual. *See, e.g.*, *United States v. Connolly*, 2018 U.S. Dist. LEXIS 84146, at *10 (S.D.N.Y. May 15, 2018) ("The Government has long been concerned that defendants would try to mount an 'everybody's doing it' defense, but this court is fully capable of making sure that the jury understands that 'everybody's doing it' is not a defense."). Unclean hands doctrine bars Plaintiffs' requested preliminary injunction.

### III. The Concern about Potential Mistakes, as Raised by the *Amicus* Briefs in Support of Plaintiffs, Reinforces the Need to Allow Inter-Agency Sharing of Data Rather than Enjoining It.

All three *amicus* briefs filed in support of Plaintiffs raised a similar concern of identification mistakes that could result in harm to innocent Americans. (EFF Br. 22-26; Cambridge Br. 21-25; Congress Br. 21) While a risk of misidentification can generally be a valid concern, it cuts in favor of allowing data-sharing among federal agencies as embodied in the MOU, not against it. Moreover, in seeking a preliminary injunction, the movant has to offer more than mere hypothetical consequences and neither Plaintiffs nor their *Amici* have satisfied their burden.

As *Amicus* EFF points out, "data rot" and "normal data entry errors, such as a typo in a name or address" both inevitably cause errors in a government or any other large database about individuals and their addresses. (EFF Br. 24) EFF raises a concern about arrests of "lawful residents and citizens, including incorrect targeting for ICE raids, arrests, and detentions." (*Id.* at 26) *Amicus* Cambridge

18

likewise argues that it is "essential to ensure strong safeguards against identification errors. Yet nothing in the publicly available MOU indicates such safeguards exist." (Cambridge Br. 22) *Amicus* Cambridge concludes that "it would be difficult to catch a mistake or misuse of the information before it is too late." (*Id.* at 25) *Amicus* 93 Members of Congress argue that "U.S. citizens who share a name sought by ICE could be swept up, detained without redress, and deported in error as the MOU risks rampant unauthorized disclosures." (Congress Br. 21)

Indeed, mistaken identification and unjustified arrests do inevitably occur at all levels of law enforcement, and lawsuits are filed to obtain remedies. *See, e.g.*, Nicole Grigg, "Arizona woman files lawsuit against feds after mistaken identity arrest," *ABC15 Arizona* (June 10, 2025) ("U.S. Marshals thought Penny was a wanted fugitive out of Oklahoma … who had violated her parole on a two-decade-old warrant for non-violent crimes. But they were wrong.").[5]

Sharing of data by the IRS of name and address information would reduce these mistakes rather than increase them. In the above example of a mistaken arrest in Arizona, IRS data could have shown that the grandmother falsely arrested at her Arizona address was not the fugitive from Oklahoma for whom the U.S. Marshals were looking. Mistaken arrests result more often from insufficient data, rather than

---

[5] https://www.abc15.com/news/local-news/investigations/arizona-woman-files-lawsuit-against-feds-after-mistaken-identity-arrest (viewed Aug. 3, 2025).

too much information. Moreover, mistaken identification is quickly corrected by rapid fingerprint verification, as a correction was made in this Arizona example. The argument by members of Congress that the sharing of data by the IRS would result in people being "deported in error" is implausible conjecture, and not a valid ground for enjoining this access to data, which would tend to reduce mistakes.

A full remedy is available to anyone wrongly injured by a mistaken arrest or incarceration. *See, e.g.*, *People v. Howard*, 162 Cal. App. 3d 8, 19, 208 Cal. Rptr. 353, 354 (1984) (declining "to validate an arrest made on the basis of data which a law enforcement agency knew or should have known were in error because of inadequate or negligent record-keeping").

Notably missing from the arguments by Plaintiffs and their *Amici* is the immense harm caused by illegal aliens in their theft of identities, about which innocent American victims are unable to obtain any recompense. Also missing is the risk of harm to federal agents when they enforce the law against illegal aliens. The widely publicized ICE raid in Omaha, Nebraska, on June 10, 2025, involved both identity theft (the Internal Revenue Service-Criminal Investigation was a partner) and an assault by an illegal alien of federal agents:

> U.S. Immigration and Customs Enforcement officers and their federal partners were assaulted by an illegal alien while executing a federal search warrant at Glenn Valley Foods into the large-scale employment of aliens without legal work authorization, June 10.

ICE Newsroom, "ICE, federal partners assaulted during largest worksite enforcement operation in Nebraska under Trump administration" (June 11, 2025).[6]

The ICE acting Director Todd Lyons explained further:

> Yesterday, an illegal alien from Honduras brandished a weapon and assaulted federal agents and officers who were doing their job: protecting American citizens, the public and businesses who are being victimized through identity fraud. Let's be clear — this wasn't just someone 'out of status.' This was a violent criminal who attacked law enforcement while they were serving the public, which is why the term 'criminal alien' is a distraction. If you're here illegally, you've already broken the law. When you break the law by coming here illegally and then threaten and assault federal officers on top of that — you're a threat, plain and simple.

*Id.*

During the operation more than 70 illegal aliens were found and detained. Some had active local warrants, prior DUI convictions, and/or been previously deported. Many may now face additional federal charges: fraud and misuse of visas, permits and other documents; assaulting a federal officer; resisting arrest; illegal reentry; and/or misuse of social security numbers. Federal agents should have the benefit of the IRS's name and address data, as allowed by the MOU and upheld by the court below, in order safely to find and detain criminal aliens.

---

[6] https://www.ice.gov/news/releases/ice-federal-partners-assaulted-during-largest-worksite-enforcement-operation-nebraska (viewed August 1, 2025).

**IV.  The Concerns Raised by *Amici* EFF and Members of Congress are too Speculative to Justify a Preliminary Injunction that Would Impede Law Enforcement Efforts.**

In addition to their other flaws, the arguments by the *Amici* EFF and Members of Congress are simply too conjectural to satisfy the burden for granting a motion for a preliminary injunction. Moreover, the argument by the Members of Congress based on reliance is unpersuasive.

**A.    The Arguments Presented by *Amicus* EFF are too Speculative.**

The *amicus* brief filed by EFF in support of Plaintiffs relies on arguments that are too speculative for preliminary injunctive relief. *See, e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The speculative nature of [plaintiff's] claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled."); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298 (2006) ("Such an injury is far too speculative to warrant preliminary injunctive relief.").

EFF misplaces reliance on *Drs. for Am. v. Off. of Pers. Mgmt.*, which does not support it here. 766 F. Supp. 3d 39 (D.D.C. 2025). There the district court concluded that "[a]n agency action is arbitrary and capricious 'if the agency has ... entirely failed to consider an important aspect of the problem.'" *Id.* at 53 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But the foregoing "important aspect of the problem" that EFF

asserts was overlooked by Defendants is the mere possibility of "record linkage," a term mentioned 14 times in EFF's brief and titles in its cited articles. (*See, e.g.*, EFF Br. 10). People having common names might have an increased risk of being victimized by mistaken identity, as EFF suggests. But this abstract possibility is far too conjectural to justify enjoining data access among federal agencies, without any evidence of an extraordinary error rate causing imminent, irreparable harm to a member of Plaintiffs.

*Amicus* EFF argues further that "the MOU does not distinguish, and therefore does not rule out, bulk disclosures from singular requests, nor does it provide for any protections against the inevitable problems due to record linkage," and this is "fraught with risk to untargeted third parties who have done nothing wrong." (EFF Br. 23). But standing is lacking for Plaintiffs with respect to individuals who have done nothing wrong and, regardless, those potential victims would have legal recourse if they were to suffer any harm from future mistaken identities as speculated by EFF. In terms of seeking a preliminary injunction, EFF's argument about potential harm to American citizens who are not members of Plaintiffs is far too conjectural to justify a preliminary injunction in favor of Plaintiffs.

*Amicus* EFF correctly points out that the historical purpose of the decades-old firewall protecting data held by the IRS from being obtained and used by other

23

federal agencies was designed to safeguard against political retaliation by a president to harass his political enemies. (EFF Br. 11-12, 18, 19-20). But nothing of that sort is at issue here. These data sought from the IRS are for the purpose of easily locating and deporting illegal aliens who should not be in the United States, many of whom have engaged in additional criminal activity here. None of the targets of Defendants' data sharing and law enforcement activity is a political rival of President Trump, or someone against whom anyone might retaliate as a political grudge. Instead, Trump is enforcing federal law, as he campaigned for president to do, against aliens who are not American citizens and not eligible to be candidates for any federal office. The IRS information aids in this law enforcement effort and the sharing of it should not be enjoined.

*Amicus* EFF further relies on *Elec. Priv. Info. Ctr. v. Internal Revenue Serv.*, but that decision by this Court merely held that FOIA does not apply to obtain disclosure of a president's tax returns. 910 F.3d 1232 (D.C. Cir. 2018). There this Court answered "no", obviously, to "the question whether a member of the public—here, a nonprofit organization—can use a FOIA request to obtain an unrelated individual's tax records without his consent." *Id.* at 1235. It does not follow from that straightforward decision that there is any legal impediment to one federal agency obtaining names, addresses, and taxpayer identification information, without the financial tax data, as allowed by a federal statute.

**B.**    **The Arguments Presented by *Amicus* Members of Congress Based on Reliance and Conjecture Are Likewise Unpersuasive.**

As for the *amicus* brief filed in support of Plaintiffs by Members of Congress, workers in the United States are obligated by federal law to pay federal income taxes, regardless of their immigration status. *See, e.g.*, *Indu Rawat v. Comm'r*, 108 F.4th 891, 893 (D.C. Cir. 2024) ("As a general matter, and for purposes of this case, nonresident aliens must pay U.S. taxes on income received from sources within the United States ….") (inner quotations omitted); *Wilcox v. Comm'r*, 848 F.2d 1007, 1008 (9th Cir. 1988) ("[P]aying taxes is not voluntary."). These taxes are commonly withheld from the paychecks of workers such that complete non-compliance by a worker, whether an American citizen or an illegal alien, is not even typically possible. *See, e.g.*, *Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766, 770 (9th Cir. 1986) ("Under 26 U.S.C. § 3402, an employer has a mandatory duty to withhold federal income tax from an employee's wages where required by applicable regulations.") (citing *Maxfield v. United States Postal Service*, 752 F.2d 433, 434 (9th Cir. 1984)).

Despite this, *Amicus* Members of Congress makes a reliance argument that overlooks the obligation of aliens in the United States to pay taxes to the federal government:

> In exchange for voluntary tax compliance, the government publicly and frequently has assured taxpayers that their information would be kept private, including with respect to immigration enforcement.

> Acting in reliance on this understanding, undocumented taxpayers voluntarily have paid billions of dollars in federal, state, and local taxes every year, including to benefit programs they are excluded from, such as Social Security.

(Congress Br. 3). This argument by the members of Congress is akin to promissory estoppel in contract law, whereby a promise is enforceable if there was reliance on the promise by the party seeking to enforce it and injustice can be avoided only by enforcement of the promise.

But this argument is flawed because a pre-existing legal obligation negates any promissory estoppel argument based on complying with that pre-existing obligation. "Plaintiff's pre-existing legal obligation … negates the element of promissory estoppel that injustice can be avoided only by enforcement of the promise." *Polo N. Country Club, Inc. v. Wells Fargo Bank, N.A.*, No. 9:16-cv-80432-WPD, 2016 U.S. Dist. LEXIS 206126, at *12 (S.D. Fla. June 23, 2016) (inner quotation and citation omitted).

The members of Congress rely primarily on only one California state court decision (Congress Br. 22), other than a few cases cited merely for a familiar principle of statutory interpretation in a footnote (Congress Br. 17 n.9). In the California case of *Corona Fruits & Veggies, Inc. v. Frozsun Foods, Inc.*, the state appellate court explained that "[i]n most Latin American countries, the surname is formed by listing first the father's name, then the mother's name." 143 Cal. App. 4th 319, 324, 48 Cal. Rptr. 3d 868, 871 (2006) (inner quotations omitted). While

true, this weighs in favor of allowing sharing of data within the executive branch to improve efficiency, avoid mistaken confrontations, and enhance the safety of law enforcement officers. Denying to law enforcement the address records of suspects that are on file with the IRS would have the practical effect of increasing the incidence of mistaken identities and thereby magnifying the risk of an unwarranted and sometimes violent confrontation.

The members of Congress point out that "many names are quite common" among those of Latin American descent (Congress Br. 22), but this reinforces the value of cross-checking federal databases against each other to minimize mistakes. Regardless, conjecture about potential errors resulting from data-sharing cannot satisfy the burden of proof on a movant who seeks to enjoin access by one federal agency to data maintained by another.

## CONCLUSION

This appeal should be denied with instructions to dismiss the case below for lack of standing by Plaintiffs. In the alternative, the decision below denying the motion for a preliminary injunction should be affirmed.

27

Dated: August 11, 2025          Respectfully Submitted,

                          /s/ Andrew L. Schlafly
                          Andrew L. Schlafly
                          Attorney at Law
                          939 Old Chester Rd.
                          Far Hills, NJ 07931
                          aschlafly@aol.com
                          Voice: 908-719-8608
                          Fax: 908-934-9207

                          Attorney for *Amicus Curiae*
                          Federation for American Immigration Reform

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Times New Roman 14-point, proportionately spaced, serif typeface, in Microsoft Word.

2. This brief complies with FED. R. APP. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains a total of 6,465 words, excluding material not counted under Rule 32(f).

Dated: August 11, 2025          Respectfully Submitted,

                          /s/ Andrew L. Schlafly
                          Andrew L. Schlafly
                          Attorney at Law
                          939 Old Chester Rd.
                          Far Hills, NJ 07931
                          aschlafly@aol.com
                          Voice: 908-719-8608
                          Fax: 908-934-9207

                          Attorney for *Amicus Curiae*
                          Federation for American Immigration Reform