# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 3, 2025            Decided February 24, 2026

No. 25-5181

CENTRO DE TRABAJADORES UNIDOS, ET AL.,
APPELLANTS

v.

SCOTT BESSENT, IN HIS CAPACITY AS SECRETARY OF THE
TREASURY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00677)

———

*Nandan M. Joshi* argued the cause for appellants. With him on the briefs were *Kevin L. Herrera*, *Mark H. Birhanu*, *Michael T. Kirkpatrick*, and *Alan B. Morrison*.

*Leslie K. Dellon* and *Michelle R. Lapointe* were on the brief for *amici curiae* Cambridge Economic Opportunity Committee, Inc. and Community Economic Development Center of Southeastern Massachusetts in support of appellants.

*Hannah Zhao* was on the brief for *amicus curiae* Electronic Frontier Foundation in support of appellants.

2

Leah M. Nicholls was on the brief for *amici curiae* Ninety-Three Members of Congress in support of appellants.

*Aaron Henricks*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Michael J. Haungs*, *Jennifer M. Rubin*, and *Geoffrey J. Klimas*, Attorneys.

*Andrew L. Schlafly* was on the brief for *amicus curiae* Federation for American Immigration Reform in support of appellees.

Before: SRINIVASAN, *Chief Judge*, MILLETT, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This appeal emanates from an action filed in the District Court by Centro de Trabajadores Unidos, Immigrant Solidarity DuPage, Somos Un Pueblo Unido, and Inclusive Action for the City (collectively "Appellants"), "seeking declaratory and injunctive relief to prevent the Internal Revenue Service (IRS) from sharing personal tax information with the Department of Homeland Security (DHS) for immigration enforcement purposes." *Centro de Trabajadores Unidos v. Bessent*, 2025 WL 1380420, at *1 (D.D.C. May 12, 2025). Appellants initiated this action shortly after news reporting that Immigration and Customs Enforcement ("ICE") was seeking address information from IRS to aid in locating undocumented immigrants. *See*, *e.g.*, Andrew Duehren, *Homeland Security Officials Push I.R.S. for 700,000 Immigrants' Addresses*, N.Y. TIMES, Feb. 28, 2025, at A26.

3

On March 14, 2025, Appellants moved for a temporary restraining order to block IRS from sharing taxpayers' address information. The District Court denied the motion. Appellants then moved for a preliminary injunction, challenging IRS's contested policy on two grounds. First, Appellants claimed that IRS's policy is contrary to law because 26 U.S.C. § 6103(i)(2) prohibits disclosure of addresses alone. Second, Appellants claimed that IRS had acted arbitrarily and capriciously by changing its interpretation of § 6103(i)(2) without adequate explanation or consideration of reliance interests.

On April 7, while Appellants' motion for a preliminary injunction was pending, IRS and DHS executed a Memorandum of Understanding ("MOU") outlining procedures that will govern requests under § 6103(i)(2) for "addresses of persons subject to criminal investigation." Joint Appendix ("J.A.") 115. Under the MOU, IRS agreed to "[r]eview each [ICE] request for completeness and validity . . . pursuant to . . . § 6103(i)(2)." *Id.* If the statutory requirements are satisfied, IRS will "[s]earch for the last known address for each individual in [the] request" and provide that address to ICE. *Id.* Both IRS and DHS acknowledged that, if ICE's requests were invalid or unsatisfactory in some way, IRS would not disclose the information sought.

In addressing Appellants' motion for a preliminary injunction, the District Court found that at least one Appellant, Somos, had standing to pursue the claims that IRS's contested policy exceeded its statutory authority and was arbitrary and capricious. On the merits, however, the District Court concluded that Appellants were unlikely to succeed on either their contrary-to-law or arbitrary-and-capricious challenges to the MOU. Regarding the contrary-to-law claim, the District Court explained that § 6103(i)(2) unambiguously authorized

4

disclosure of addresses, conditional on satisfaction of the provision's requirements and compliance with its procedures. As to the arbitrary-and-capricious claim, the District Court found that the IRS policy statements on which Appellants relied were nonbinding and lacked legal effect.

Appellants now seek this court's review. They argue that the District Court's likelihood-of-success analysis is wrong on all counts. The government, in turn, argues that Appellants lack standing to pursue their complaint and that the District Court's likelihood-of-success analysis was correct.  For the reasons explained below, we affirm the District Court's denial of Appellants' motion for a preliminary injunction.

As a threshold matter, we reject the government's challenge to Appellants' standing. On a motion for a preliminary injunction, a plaintiff need only be "likely to be able to demonstrate standing at the summary judgment stage." *Elec. Privacy Info. Ctr. ("EPIC") v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019). Here, at least one Appellant, Somos, satisfies this requirement. Standing is not an issue in this case.

We agree with the District Court that, while Somos likely has standing to pursue this action, Appellants are unlikely to succeed on the merits of their claims. *First*, we hold that Appellants are unlikely to succeed on their contrary-to-law claim. Section 6103(i)(2) is clear: upon receipt of a valid request, IRS must disclose "return information" other than "taxpayer return information." 26 U.S.C. § 6103(i)(2). The statute straightforwardly says that addresses can be disclosed if they are not "taxpayer return information." And it explains that, "[f]or purposes of this paragraph, a taxpayer's identity [which includes a taxpayer's mailing address] shall not be treated as

5

taxpayer return information." Addresses are thus *not* "taxpayer return information," so they do not receive any special protection from disclosure under § 6103(i)(2). The simple and dispositive point here is that § 6103(i)(2) authorizes IRS to disclose address information, to specific government officials, for use in nontax criminal investigations, and only in response to a valid request.

*Second*, we hold that Appellants are unlikely to succeed on their arbitrary-and-capricious claim. The MOU is a nonbinding policy statement without legal effect. It is thus not a final agency action reviewable under the Administrative Procedure Act ("APA"). Furthermore, if we find, as we do, that the "best reading" of the statute does not support Appellants' position, then no agency action may countermand the court's judgment. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Indeed, Appellants readily admit that a remand to IRS to further explain its new interpretation would be a "useless formality" given the court's duty to independently interpret the statute. Appellants' Reply Br. 15 (citation omitted).

We do not opine today on the legality of any actions taken by IRS or DHS after they finalized the MOU. The only issue that we decide is whether, on the sparse record before us, Appellants have met their heavy burden to make a clear showing that they are entitled to the preliminary injunctive relief sought. For the reasons indicated, we conclude that Appellants have not.

## I. BACKGROUND

### A.  *The Tax Reform Act*

The Tax Reform Act of 1976 (the "Act") was enacted "in

6

the wake of Watergate and White House efforts to harass those on its 'enemies list.'" *Lake v. Rubin*, 162 F.3d 113, 115 (D.C. Cir. 1998) (citation omitted). Recognizing the value and sensitivity of tax information, one section of the Act, codified at 26 U.S.C. § 6103, sought to "protect the privacy of [this] information and to regulate in minute detail [its] disclosure." *Id.*

Under the Act, the default rule is that "[r]eturns and return information shall be confidential." 26 U.S.C. § 6103(a). "[N]o officer or employee of the United States" or any state may disclose such information. *Id.* However, the Act also contains exceptions to this default rule of confidentiality. For example, limited disclosure is permitted in connection with certain criminal investigations, *id.* § 6103(i)(1)-(2), to respond to terrorist activities or emergency circumstances, *id.* § 6103(i)(3), in judicial or administrative proceedings, *id.* § 6103(i)(4), or to locate fugitives from justice, *id.* § 6103(i)(5).

The exception at issue in this case concerns "[d]isclosure of return information other than taxpayer return information for use in criminal investigations." *Id.* § 6103(i)(2). In relevant part, the Act allows the Secretary of the Treasury to:

disclose return information (other than taxpayer return information) to officers and employees of [a requesting] agency who are personally and directly engaged in—

(i)     preparation for any judicial or administrative proceeding [pertaining to enforcement of nontax criminal statutes],

7

(ii)    any investigation which may result in such a proceeding, or

(iii)   any grand jury proceeding [pertaining to enforcement of nontax criminal statutes],

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

*Id.* § 6103(i)(2)(A). To obtain this information, a government official must submit a request that is in writing and includes the following information:

(i)    the name and address of the taxpayer with respect to whom the requested return information relates;

(ii)   the taxable period or periods to which such return information relates;

(iii)  the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and

(iv)   the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

*Id.* § 6103(i)(2)(B).

Section 6103(i)(2) makes it clear that this procedure can only be used for "return information *other than taxpayer return information*." *Id.* § 6103(i)(2) (emphasis added). Section

8

6103(b) defines the relevant terms, as follows:

- **Return information** is "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, . . . or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a [tax] return . . . ." *Id.* § 6103(b)(2)(A).

- **Taxpayer identity** is the "name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number . . . , or a combination thereof." *Id.* § 6103(b)(6).

- **Taxpayer return information** is "return information . . . which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates." *Id.* § 6103(b)(3).

Crucially, § 6103(i)(2)(C) explains that "[f]or purposes of [§ 6103(i)(2)], a taxpayer's identity *shall not* be treated as taxpayer return information." *Id.* § 6103(i)(2)(C) (emphasis added). Under § 6103(i)(2), then, taxpayer return information does not include taxpayer identity information like a taxpayer's name, address, and taxpayer identification number. And again, § 6103(i)(2) permits the disclosure of all return information *other than taxpayer return information*.

### B. *The IRS-ICE MOU*

Before the events giving rise to this case, IRS has interpreted § 6103(i)(2) to prohibit disclosure of a taxpayer's address when no other information is requested. *See, e.g.,*

9

INTERNAL REVENUE SERV., IRS PUB. 4639, DISCLOSURE & PRIVACY LAW REFERENCE GUIDE 5-4 (2012) ("Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with the section."); INTERNAL REVENUE SERV., INTERNAL REVENUE MANUAL § 11.3.28.4(5) (2025) ("Requests for addresses only are invalid."). In the past, IRS officials have also stated that tax information is not used to aid immigration enforcement. *See, e.g.*, PAMELA J. GARDINER, INTERNAL REVENUE SERV., IRS MEMORANDUM NO. 94505 (1999) ("The IRS requires that IRC Section 6103 be changed before providing . . . information to the [Immigration and Naturalization Service]."); Maria Sacchetti, *Undocumented and Paying Taxes, They Seek a Foothold in the American Dream*, WASH. POST (Mar. 11, 2017) (quoting IRS as stating: "There is no authorization . . . to share tax data with ICE.").

In the spring of 2025, however, news reports emerged that DHS had asked IRS to disclose addresses of some undocumented taxpayers. *See, e.g.*, Jacob Bogage et al., *DHS Asks IRS for Addresses of People Believed to Be in U.S. Illegally*, WASH. POST (Mar. 1, 2025). On April 7, 2025, DHS and IRS entered into an MOU to "establish the procedures and requirements for ICE's submission of valid . . . § 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1)." J.A. 115.

In the MOU, IRS agreed to:

A. Receive requests for address information from ICE.

B. Review each request for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure

10

pursuant to . . . § 6103(i)(2) . . .

C. Search for the last known address for each individual in each request.

D. For each individual the IRS is able to identify from the information provided by ICE, provide the IRS['s] last known address for that individual . . .

E. Send responses to ICE . . .

*Id.* DHS agreed to:

A. Send requests for address information for specifically identified individuals . . .

B. Each request must be made consistent with . . . § 6103(i)(2)(A).

C. Each request will contain the following information with respect to each individual identified in the request:

1. The name and address of the taxpayer.

2. The taxable period or periods as to which the return information (address) they are seeking relates.

3. The specifically designated nontax Federal criminal statute . . . under which an investigation or proceeding regarding the individual is being conducted.

11

4.  The date of the final order of removal and the related case number assigned to each such order.

5.  The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding . . .

6.  Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual . . .

J.A. 116. However, DHS and IRS agreed that "[t]he information exchange contained in [the MOU] will not commence until a separate implementation agreement between the IRS and ICE has been signed and implemented." J.A. 123. That implementation agreement was finalized on April 18, 2025. Appellants' Supplemental Letter at Ex. A (Oct. 6, 2025).

### C. *Procedural History*

Appellants filed this lawsuit on March 7, 2025. Based only on news reporting about potential IRS-ICE information sharing, Appellants first sought a temporary restraining order barring IRS from acting. The District Court denied the motion. Appellants then filed an amended complaint on March 26, 2025 and moved for a preliminary injunction on March 31, 2025, again to prevent IRS from disclosing addresses. In its responsive briefing, the government revealed that DHS and IRS had entered into an MOU setting forth the process for information sharing.

12

The District Court denied Appellants' motion for a preliminary injunction. *Centro de Trabajadores Unidos v. Bessent*, 2025 WL 1380420 (D.D.C. May 12, 2025). The District Court's opinion begins with standing. It finds that Centro, Immigrant Solidarity, and Somos "have associational standing to challenge whether the IRS acted arbitrarily and capriciously," and that Somos "has standing to challenge the lawfulness of the agreement." *Id.* at *3.

The District Court then identified the "narrow legal issue" presented in the case: "Does the [MOU] violate the Internal Revenue Code?" *Id.* at *8. The District Court concluded: "It does not." *Id.* Accordingly, Appellants were unlikely to succeed on the merits of their contrary-to-law claim. Appellants argued that § 6103(i)(2) "does not allow the IRS to provide *only* address information in response to a DHS request," but the District Court explained that this interpretation "does not comport with the text of the statute" because, "[b]y its plain language, the statute mandates that the IRS share a taxpayer's name and address with another agency, as long as its request for information is complete and valid and meets the requirements of § 6103(i)(2)(B)." *Id.* at *6 (cleaned up). The District Court refused to "read additional restrictions into the statute's clear text." *Id.*

In determining that the MOU did not violate § 6103(i)(2), the District Court rejected Appellants' argument that internal IRS publications prohibiting the release of address information should control. "For one," the District Court said, "the manuals do not have the force of law." *Id.* "For another, the Court is not obligated to defer to the IRS's interpretation of the statute" and, in fact, has a "duty . . . to exercise independent judgment in determining its meaning." *Id.* at *6-7 (citing *Loper Bright*, 603 U.S. at 400). The District Court also found unpersuasive

13

Appellants' contention that § 6103(i)(5), the fugitive-location provision, was the "only mechanism for using tax records to locate individuals." *Id.* at *6. Sections 6103(i)(2) and (5) authorize the release of different types of information, the District Court said, thus "establish[ing] separate information sharing mechanisms for different but potentially overlapping purposes." *Id.*

The District Court also decided that Appellants were unlikely to succeed on their arbitrary-and-capricious claim. "[E]ven assuming that the IRS has changed its position," the District Court explained, Appellants failed to "establish[] that the [MOU] constitutes a reviewable change in agency action under the APA." *Id.* at *8. It also viewed "[a]ny substantive change" as "stem[ming] not from the IRS's change in position but from the Administration's decision to use . . . statutorily authorized tools to further criminal investigations." *Id.*

Because Appellants could not show a likelihood of success on either their contrary-to-law or arbitrary-and-capricious claims, the District Court declined to issue a preliminary injunction. Appellants now seek this court's review.

This is not the only pending case challenging the lawfulness of IRS's actions related to disclosure of taxpayer addresses. Three other organizations have sued over the actual implementation of the information-sharing agreements, and on November 21, 2025, a District Court judge stayed address-sharing. *Ctr. for Taxpayer Rights v. Internal Revenue Serv.*, 2025 WL 3251044, at *2 (D.D.C. Nov. 21, 2025). The District Court judge in *Center for Taxpayer Rights* distinguished that case from this one because "*Centro* analyzed the MOU on its face, while [*Center for Taxpayer Rights*] analyzed the MOU as it was applied." *Id.* at *40. The government noticed an appeal

14

of the *Center for Taxpayer Rights* decision on January 6, 2026. Amended Notice of Appeal, Ctr. for Taxpayer Rights v. Internal Revenue Serv., No. 25-0457 (Jan. 6, 2026), Dkt. No. 61.

## II. ANALYSIS

### A. *Standard of Review*

We review a district court's standing decision *de novo*. *Jibril v. Mayorkas*, 20 F.4th 804, 812 (D.C. Cir. 2021).

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "To get a preliminary injunction[,] the movant must show: (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Id.* (quoting *Winter*, 555 U.S. at 20). This court reviews the District Court's "ultimate decision to issue or deny [a preliminary injunction] for abuse of discretion" and "any legal conclusions upon which the [D]istrict [C]ourt relie[d]" *de novo*. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

### B. *Standing*

In this case, we hold that Appellant Somos Un Pueblo Unido likely has associational standing to bring both the contrary-to-law and arbitrary-and-capricious claims on behalf of its members.

15

A "plaintiff must have a 'personal stake' in [a] case—in other words, standing"—for federal courts to exercise their judicial power. *Jibril*, 20 F.4th at 813 (citation omitted). In addition, a "plaintiff must demonstrate standing for each claim that is being pressed." *Id*. Standing has "three elements: injury in fact, causation, and redressability." *Cato Inst. v. Sec. & Exch. Comm'n*, 4 F.4th 91, 94 (D.C. Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Appellants assert associational standing. To support associational standing, an organization must show "(1) at least one of [its] members has standing to sue in her or his own right, (2) the interests [it] seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *EPIC*, 928 F.3d at 101 (citation omitted). Here, the government "contests only whether the [Appellants'] members have standing in their own right," so "[w]e, too, focus our attention there." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 175 (D.C. Cir. 2022).

At the preliminary injunction stage, all Somos must do is show that it is "likely to be able to demonstrate standing at the summary judgment stage." *EPIC*, 928 F.3d at 104. For both claims it advances, Somos clears this bar. At least one Somos member has "standing to sue in her or his own right." *Id.* at 101. Somos's executive director explained in a declaration that Somos has members who "work in the United States although they cannot apply for or receive a Social Security Number." J.A. 49. She is aware of specific members who thus file taxes using a tax identification number. J.A. 50. Some of these members face "outstanding orders of deportation" and are "in immediate danger of having information in their tax filings used against them by immigration enforcement." J.A. 51. If IRS shares addresses with ICE pursuant to the MOU, these

16

members are at a high risk of being targeted for deportation. This possibility of future injury is "imminent and substantial," so it is likely enough to satisfy the injury requirement. *Jibril*, 20 F.4th at 814 (citation omitted).

These Somos members are also likely to be able to establish causation and redressability for both claims. On the contrary-to-law claim, these members' substantial risk of deportation is a direct result of IRS's interpretation of § 6103(i)(2) to authorize disclosure of their addresses to ICE. Barring IRS from sharing addresses "will likely alleviate" the substantial risk of targeting and deportation, because ICE may no longer have access to these Somos members' locations. *Doc Soc'y v. Rubio*, 141 F.4th 1273, 1277 (D.C. Cir. 2025) (citation omitted). As to the arbitrary-and-capricious claim, "[t]he question is not whether [IRS's interpretation of § 6103(i)(2)] caused [these Somos members' injury,] but whether the *change* from the [previous IRS interpretation to the current interpretation] caused [the injury]." *Transp. Workers Union of Am. v. Transp. Sec. Admin.*, 492 F.3d 471, 477 (D.C. Cir. 2007). Under IRS's earlier interpretation, these Somos members would not be at the same risk of deportation.

The government's primary objection to standing is that Somos has not identified any specific members. It is true that, at the merits stage, "when a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 803 (D.C. Cir. 2021) (cleaned up). But this is not the merits stage. As we have explained, the question on a motion for a preliminary injunction is whether Somos is likely to be able to establish standing later in the case. Somos has provided detailed information about multiple members who would have standing to sue, which is enough at this early

17

juncture.

Neither the second nor third prongs of the associational standing test are disputed. Nor could they be. Somos's interest in protecting its members from deportation is central to its mission of "serv[ing] working communities . . . through education and legal support" and "grow[ing] opportunities for its members." J.A. 49. And nothing about either the contrary-to-law or arbitrary-and-capricious claim turns on the particular factual circumstances of any specific taxpayer.

Again, all Appellants need to show at this point is a "substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotations omitted). Somos has done so here. And because Somos has standing, "we need not consider the standing of the other [Appellants]." *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 979 (D.C. Cir. 2016) (citation omitted).

## C. *No Likelihood of Success on the Contrary-to-Law Claim*

The plain language of 26 U.S.C. § 6103(i)(2) defeats Appellants' first claim, *i.e.*, that IRS's agreement to provide taxpayer addresses pursuant to the MOU runs afoul of § 6103(i)(2). In fact, § 6103(i)(2) expressly authorizes disclosure of address information upon receipt of a valid request. Appellants agree that IRS can share addresses along with other information and argue only that IRS cannot disclose address information on its own. There is no such limitation in the statute. Appellants are thus unlikely to succeed on their contrary-to-law challenge to the MOU.

18

### 1. The Text of § 6103(i)(2) Does Not Support Appellants' Position

Appellants' first claim involves a straightforward question of statutory interpretation. This court has an obligation to "exercise [its] own 'independent judgment' . . . 'to determine the best reading of [a] statute'" separate from existing agency interpretations. *Cboe Glob. Mkts., Inc. v. Sec. & Exch. Comm'n*, 155 F.4th 704, 713 (D.C. Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 373, 412). In fulfilling this duty, "we begin with the text." *Gentiva Health Servs. v. Becerra*, 31 F.4th 766, 775 (D.C. Cir. 2022) (citation omitted). "And in construing the text, we look to the ordinary meaning of its key terms." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 948 (D.C. Cir. 2024) (cleaned up).

Here, the relevant statutory text is crystal clear. Upon receipt of a complete request from the proper party, § 6103(i)(2) authorizes IRS to disclose "return information other than taxpayer return information." 26 U.S.C. § 6103(i)(2). Whether addresses may be disclosed depends on whether they are considered "taxpayer return information." Addresses may only be disclosed if they are not "taxpayer return information," and § 6103(i)(2)(C) specifically confirms that they are not. It states: "[f]or purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information." Under § 6103(b)(6), a taxpayer's identity includes a taxpayer's "mailing address." So taxpayer address information, as a form of taxpayer identity information pursuant to § 6103(b)(6), is not considered taxpayer return information under § 6103(i)(2)(C). Addresses are non-taxpayer return information and can thus be disclosed under § 6103(i)(2). There are no special limitations on IRS's handling of addresses, nor does § 6103(i)(2) distinguish

19

between addresses and other non-taxpayer return information. When "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Air Line Pilots Ass'n, Int'l v. Chao*, 889 F.3d 785, 791 (D.C. Cir. 2018) (cleaned up).

We emphasize, however, that § 6103(i)(2) does not contemplate or authorize freewheeling disclosure of sensitive information. It imposes specific requirements for requesting information from IRS, strictly delineating who can make a request, how, and why. A valid request for return information, including addresses, must come from the head of a federal agency, an agency inspector general, or listed Department of Justice officials. 26 U.S.C. § 6103(i)(2)(A). The information may only be disclosed to government "officers and employees" who are "personally and directly engaged" in preparing for a court or administrative proceeding, in an investigation that may result in such a proceeding, or in a grand jury proceeding. *Id.* § 6103(i)(2)(A)(i)-(iii). The proceeding in question must be related to enforcement of a nontax federal criminal statute. *Id.* (referring also to § 6103(i)(1)(A)(i)-(iii)). And the official must submit a request, in writing, that provides IRS with the taxpayer's name and address, the relevant taxable periods, the nontax federal criminal statute at issue, and the "specific reason or reasons why such disclosure is, or may be, relevant." *Id.* § 6103(i)(2)(B). Only if every requirement is satisfied "shall" IRS disclose return information, including address information. *Id.* § 6103(i)(2)(A). Section 6103(i)(2) authorizes disclosure of addresses subject to these limitations and conditional on receipt of a valid request.

20

### 2. The Court Has No Justification for Departing from the Plain Text of the Statute

Section 6103(i)(2)'s text unambiguously authorizes IRS to disclose taxpayer address information when certain requirements are met. This "statutory text alone is enough to resolve this case." *Pereira v. Sessions*, 585 U.S. 198, 209 (2018). Appellants urge us to depart from the text of the statute. We decline the invitation because we find no merit in their arguments.

*First*, § 6103(i)(2) states simply that an official must provide "the name and address of the taxpayer with respect to whom the requested return information relates" as part of a written request. 26 U.S.C. § 6103(i)(2)(B)(i). It does not say "name and *current* address." When a "statutory text is silent," we do not "read into statutes words that aren't there" to impose additional requirements or qualifications that Congress declined to enact. *United States v. Neely*, 124 F.4th 937, 943 (D.C. Cir. 2024) (citation omitted). Contrary to Appellants' contention that an official must furnish a taxpayer's *current* address to make a valid request for information from IRS, § 6103(i)(2) does not specify what address must be included in a written request.

We also reject Appellants' suggestion that allowing disclosure of addresses is absurd because the requestor must already have the address to make a request. Section 6103(i)(2) allows agencies to submit a taxpayer's name and address and request the taxpayer's current mailing address in return. These submitted and requested addresses may be the same, which could be useful in confirming information the requestor already has, but they may also be different, which could be useful in giving the requestor new information. Congress did not add

21

additional requirements, and we will not write any in.

To be clear, not any random address will suffice. The address provided must still be an address known by the requesting agency to be that "of the taxpayer." 26 U.S.C. § 6103(i)(2)(B)(i). In that regard, the government represented in its brief that the statute requires the requesting agency to make a good-faith effort to provide the last-known address reflected in its files for the specific individual whose tax information is requested. *See* Br. for Appellees 38. The government further represented at oral argument that IRS would not respond to a request unless the name and address of the taxpayer was provided. *See* Oral Arg. 59:10-59:26. Recently, government counsel advised that IRS, in fact, had not been acting consistently with those representations. *See* Appellees' Supplemental Letter (Feb. 11, 2026); Declaration of Dottie A. Romo at 5-6, *Ctr. for Taxpayer Rights*, No. 25-0457 (Feb. 11, 2026), Dkt. No. 66-1 (IRS admission that it has disclosed information in response to some requests without valid addresses). Because Centro has brought only a facial challenge to the information-sharing agreements that turns on the plain meaning of statutory text, such compliance issues are not before this court in this case. But we expect that, going forward, IRS will adhere to the representations made before this court regarding the address requirement.

*Second*, § 6103(i)(2) permits disclosure of address information without a court order. In fact, a court order is not mentioned in the provision. Appellants' insistence that a court order is required thus has no support in the statute. Tellingly, a court order *is* required for other exceptions to the general rule of confidentiality. In § 6103(i)(1), for example, a court order is required to obtain return information, *including* taxpayer return information, for use in a criminal investigation. 26 U.S.C.

22

§ 6103(i)(1)(A)-(B). And in § 6103(i)(5), a court order is required to obtain return information, again *including* taxpayer return information, to locate fugitives from justice. *Id.* § 6103(i)(5)(A)-(B). Crucially, both provisions authorize much broader disclosure than § 6103(i)(2) because they allow IRS to share taxpayer return information. Recall that disclosure of taxpayer return information is prohibited under § 6103(i)(2).

Both § 6103(i)(1) and (5) also explain in detail who an order must issue from (a federal district court judge or magistrate judge), how the order may be granted (*ex parte*), who may apply for such an order (a list of federal prosecutors), and upon what grounds a judge may grant the application. *See id.* § 6103(i)(1)(A)-(B); (5)(A)-(B). Section 6103(i)(2) has none of these requirements, and "[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006) (alteration in original) (quoting *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005)). "[O]ur reluctance is even greater when," as is the case here, "Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Id.* (quoting *Jama*, 543 U.S. at 341). We will not impose a court order requirement onto § 6103(i)(2) when Congress contemplated such a requirement, adopted it for other types of disclosure, and chose not to include it in § 6103(i)(2).

Appellants argue that allowing disclosure of addresses under § 6103(i)(2) somehow "circumvent[s]" Congress's requirement that taxpayer return information only be disclosed pursuant to a court order. Br. of Appellants 37. It does not, because as we have already explained, Congress made a specific decision not to consider addresses "taxpayer return information" when used in connection with enforcement of a

23

nontax federal criminal statute. *See* 26 U.S.C. § 6103(i)(2)(C) ("For purposes of this paragraph, a taxpayer's identity [including address] shall not be treated as taxpayer return information."). So while § 6103(i)(1) and (5) require a court order to obtain taxpayer return information, § 6103(i)(2)(C) makes clear that addresses are not taxpayer return information for nontax federal criminal enforcement purposes.

Appellants' insistence that a court order is required also leads them to § 6103(i)(4), which governs "[u]se of . . . disclosed returns and return information in judicial or administrative proceedings." Section 6103(i)(4) requires a court order or finding to use information obtained under some exceptions to the general rule of confidentiality, but it allows "return information (other than taxpayer return information) obtained under" § 6103(i)(2) to be used in court without a court order or finding. *Id.* § 6103(i)(4)(B). Appellants say that, if address information could be disclosed under § 6103(i)(2), as the text clearly states, it could not be used in court because of § 6103(i)(4). "There is no sensible reason why Congress would have created such a[] scheme," Appellants argue. Br. of Appellants 36-37. But a sensible reason seems evident to us. Address information could well be useful in investigating a crime or preparing for a court or grand jury proceeding without actually being used in court. So, as with § 6103(i)(1) and (5), § 6103(i)(4)'s requirement of a court order for disclosure of taxpayer return information in court does not render the plain meaning of § 6103(i)(2) absurd.

*Third*, Appellants urge us to look to legislative history that supports their position. Our simple response is that we do not employ "legislative history to cloud a statutory text that is clear," as § 6103(i)(2) is. *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 383 (D.C. Cir. 2021) (citation omitted). And

24

even if we could consider legislative history, it is inconclusive as to whether addresses may be disclosed under § 6103(i)(2).

We first consider the legislative history Appellants rely on, which does not decisively support their view. For example, Senate Report 95-745, published two years after the Tax Reform Act was first enacted, comments on the 1978 addition of § 6103(i)(2)(C), which now states that a "taxpayer's identity shall not be treated as taxpayer return information" for purposes of § 6103(i)(2). The report explains that, prior to the addition of § 6103(i)(2)(C), there was confusion about whether IRS could provide a taxpayer's name and address along with requested information to help identify the information to the requesting official, as it was "necessary, of course," to do. S. REP. NO. 95-745, at 61 (1978). With § 6103(i)(2)(C), the report clarified, it would be clear that IRS could "transmit . . . the name and address of a taxpayer along with return information . . . pertaining to, but not furnished by or on behalf of, the taxpayer." *Id.* at 63. But while this indicates that IRS is permitted to share addresses when necessary to identify a taxpayer whose other information is relevant to a nontax criminal investigation, it says nothing about whether IRS can disclose an address on its own when the address itself is relevant to the investigation.

Appellants also rely on a 1982 House conference report, which says: "It is intended that taxpayer identity information be treated as taxpayer return information unless return information (other than taxpayer identity information) is requested and disclosed." H. REP. NO. 97-760, at 674 (1982) (Conf. Rep.). While we acknowledge this language about the conference committee's "intended" meaning, it is not sufficient to override the same Congress's adoption of unambiguous statutory text that says the contrary.

25

The legislative history is further clouded by the government's identification of a 1981 Senate report that stated: "The acquisition of current addresses from IRS files [to locate individuals in violation of the Military Selective Service Act] is currently authorized by . . . 6103(i)(2)." Br. for Appellees 45 (alterations in original) (quoting S. REP. NO. 97-58, at 150 (1981)). This suggests at least some members of Congress understood § 6103(i)(2) to allow disclosure of addresses alone for enforcement of nontax federal laws. To be sure, this report was written by the Armed Services Committee, which was not responsible for the Act. But it further suggests that the legislative history in this case is murky at best. Such "inconclusive" and "inconsistent history certainly cannot override plain language" such as that in § 6103(i)(2), *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995), even if this court were to consider legislative history at all. And again, "[i]f [the] statutory language is clear[,] it is both unnecessary and inappropriate to track legislative history." *Grant Thornton, LLP v. Off. of Comptroller of the Currency*, 514 F.3d 1328, 1334 (D.C. Cir. 2008) (citation omitted).

Appellants also suggest that IRS's previous interpretations of § 6103(i)(2) are relevant history that should inform our interpretation. But we are obligated to "construe statutes *de novo*, without deference to the views of agencies entrusted to administer the statutes." *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 n.7 (D.C. Cir. 2024); *see also Loper Bright*, 603 U.S. at 392 ("[A]gency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference."). While agency interpretations may have "persuasive value," *Lissack v. Comm'r of Internal Revenue*, 125 F.4th 245, 259 (D.C. Cir. 2025), we retain a duty to "independently interpret the statute." *Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 266 (D.C. Cir. 2025). We must "begin

26

with the plain text" even if an agency has previously interpreted the statute. *Am. Gas Ass'n v. U.S. Dep't of Energy*, 157 F.4th 476, 487 (D.C. Cir. 2025). What is telling here is that the text of the statute unambiguously authorizes address disclosure.

Even if the text was not as clear as it is, Appellants' relied-upon IRS statements have limited persuasive value. Appellants identify two official IRS publications that they say support their interpretation of § 6103(i)(2). The first, IRS Publication 4639, states that it was "prepared for reference purposes only" and "may not be used or cited as authority for setting or sustaining a legal position." IRS PUB. 4639 at iii. Of the second, the Internal Revenue Manual, "[i]t is well-settled" in this circuit that its provisions "are directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law." *Elec. Privacy Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1244-45 (D.C. Cir. 2018) (citation omitted).

The internal memoranda that Appellants highlight are also unhelpful. As the government points out, each memorandum actually expresses some ambivalence about how § 6103(i)(2) applies to addresses. *See* J.A. 80 (recommending "a thorough review of the legal and policy issues presented"); J.A. 83 ("[S]upport can be found to justify such disclosures . . . ."); J.A. 84 ("I have been advised that such an interpretation has, in fact, been adopted . . . so as to permit the disclosure of address information . . . ."); J.A. 85 ("[E]ither interpretation can be supported . . . ."); J.A. 88 ("[T]here is no easy, clear-cut answer to the question . . . ."); J.A. 94 ("[T]he legislative history contains some support for disclosure . . . .").

Appellants strain to depict the interpretation of

27

§ 6103(i)(2) as a complicated question when, ultimately, it is a simple one. Section 6103(i)(2) allows IRS to disclose return information *other than* taxpayer return information in response to a valid agency request. Section 6103(i)(2)(C) specifically states that addresses are not subject to the protections for taxpayer return information when sought for use in a nontax federal criminal investigation. Addresses may be disclosed if IRS determines that an agency has made a proper request that complies with § 6103(i)(2)'s other requirements. So Appellants are unlikely to succeed in arguing that the government acted contrary to law when it agreed, in the MOU, to share addresses if ICE properly requested that information.

**D.** *No Likelihood of Success on the Arbitrary-and-Capricious Claim*

Appellants also argue that IRS entered into the MOU arbitrarily and capriciously by changing its interpretation of § 6103(i)(2) without explanation. While Appellants bring this as a separate claim, they assert that, in practical terms, it rises and falls with their contrary-to-law claim. This is so because Appellants readily concede that "if th[is] [c]ourt agrees with the government['s]" interpretation of § 6103(i)(2), "then remand to the IRS for a reasoned explanation would be a 'useless formality.'" Appellants' Reply Br. 15 (citation omitted). Appellants thus appear to withdraw their arbitrary-and-capricious claim if they cannot make out a contrary-to-law claim, as we have just explained is likely.

Even if Appellants had not effectively conceded their arbitrary-and-capricious claim, they are unlikely to succeed on the merits for two reasons. First, the MOU is not a final agency action subject to APA review. Second, as noted above, if the court finds that the statute does not support Appellants'

28

position, then no agency action can countermand the court's judgment.

### 1. The MOU is Not a Reviewable Agency Action

The APA authorizes courts to review only "final agency action[s]." 5 U.S.C. § 704. This requirement is not jurisdictional. *See Flytenow, Inc. v. FAA*, 808 F.3d 882, 888 (D.C. Cir. 2015) ("[I]t is 'now firmly established' that finality under the APA is non-jurisdictional." (citation omitted)). Below, the District Court explained that Appellants' arbitrary-and-capricious claim failed because they "ha[d] not established that the [MOU] constitutes a reviewable change in agency action under the APA." *Centro de Trabajadores Unidos*, 2025 WL 1380420, at *8. As a threshold matter, Appellants did not challenge this determination until they replied. This was too late. *See Fore River Residents Against the Compressor Station v. FERC*, 77 F.4th 882, 889 (D.C. Cir. 2023) ("Arguments raised for the first time in a reply brief are forfeited.").

Even if Appellants had properly raised their challenge, the District Court correctly rejected it. To be final and thus reviewable, an agency action must (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) "determine 'rights or obligations,' or produce 'legal consequences.'" *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "Each prong of *Bennett* 'must be satisfied independently for agency action to be final[.]'" *Sierra Club v. EPA*, 955 F.3d 56, 61 (D.C. Cir. 2020) (alteration in original) (citation omitted).

Even in reply, Appellants agree that the MOU is a policy statement, *see* Appellants' Reply Br. at 12-13 (arguing that the

29

finality rules for "general statement[s] of policy" are the rules "relevant here"), and policy statements "generally do not qualify" for judicial review. *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013). However, we understand that a policy statement can be final under certain circumstances. When evaluating a policy statement's finality, we consider multiple factors, including "(1) the actual legal effect (or lack thereof) of the agency action in question on regulated entities; (2) the agency's characterization of the guidance; and (3) whether the agency has applied the guidance as if it were binding on regulated parties." *Sierra Club*, 955 F.3d at 63 (cleaned up) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)). Most relevant here, we have held that "[a]n agency action does not impose binding duties – and therefore causes no 'legal consequences' – when it 'merely clarifies . . . existing duties' under a statute." *Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, 106 F.4th 1195, 1204 (D.C. Cir. 2024) (quoting *Catawba County v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009) (per curiam)).

Applying this caselaw, we find that the MOU is a nonbinding, nonfinal policy statement that is not reviewable under the APA. The MOU was not the product of notice-and-comment rulemaking, IRS has never characterized it as a "rule," and neither party has argued that IRS relies on the MOU to justify its actions. The MOU merely outlines the process through which ICE can request addresses from IRS. In its own words, it "set[s] forth the procedures, processes, and safeguards to be followed upon the receipt of a request for the disclosure of information subject to [§ 6103(i)(2)]." J.A. 114. Like the agency statements in *Delaware Valley Regional Center*, the MOU merely "explain[s] how [IRS] w[ill] administer" a process established by statute and "ma[k]e[s]

30

explicit . . . existing requirement[s]." 106 F.4th at 1204. These requirements are "[c]onsistent with what is plainly contemplated" by § 6103(i)(2) – in fact, they are taken almost word-for-word from § 6103(i)(2) – and thus simply "clarify existing duties and do not constitute final agency action." *Id.* at 1205 (cleaned up); *see also Catawba Cnty.*, 571 F.3d at 34 (holding that an agency memorandum that "explain[ed] the process [the] EPA suggests for states to follow" and "merely reiterate[d] the statutory requirements" was nonbinding and not final).

Appellants argue for the first time in their Reply Brief that the MOU binds IRS and has "actual legal effect." Appellants' Reply Br. 13 (citation omitted). In support of this claim, Appellants point out that, prior to the MOU, IRS "would have denied a section 6103(i)(2) request from ICE seeking only taxpayer addresses," whereas "[u]nder the new policy," IRS will now grant such requests. *Id.* This does not carry the day because the MOU merely "reflect[s] [IRS's] views on" what § 6103(i)(2) allows it to do. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006). As we explained in *Center for Auto Safety*, "this does not change the character of the [agency document] from a policy statement to a binding rule." *Id.* An agency's statement that "merely expresses its view of what the law requires" is not final, and not reviewable. *Id.* (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004)). And, as we have already explained, the MOU exhibits none of the hallmarks of finality. Instead, it "merely clarifies" IRS's "'existing duties' under a statute" and is thus a nonbinding, nonfinal agency action. *Del. Valley Reg'l Ctr.,* 106 F.4th at 1204 (citation omitted).

31

### 2.  Appellants' Change-of-Position Challenge Is Not Viable Under *Loper Bright* and Its Progeny

Appellants are also unlikely to succeed on their arbitrary-and-capricious claim because, as they concede, remanding to IRS for further explanation would be a "useless formality" given our judgment that 26 U.S.C. § 6103(i)(2) does not support their position. Appellants' Reply Br. 15 (citation omitted). In a case like this, where there is no suggestion that the contested statutory provision "delegates discretionary authority" to the agency, *Loper Bright*, 603 U.S. at 395, the court engages in *de novo* review to determine the meaning of the statute. Once the court determines the meaning of § 6103(i)(2), there is no reason to seek an agency's explanation as to why it may have changed its view on the meaning of the statute. The court's judgment is the final word.

Prior to the Supreme Court's decision in *Loper Bright*, parties could challenge an agency's interpretation of its statutory authority. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under Step One of the *Chevron* doctrine, "[t]he judiciary [was] the final authority on issues of statutory construction and [rejected] administrative constructions which [were] contrary to clear congressional intent." *Id*. at 843 n.9. However, at *Chevron* Step Two, "if the statute [was] silent or ambiguous with respect to the specific issue, the question for the court [was] whether the agency's answer [was] based on a permissible construction of the statute." *Id*. at 843. "If Congress [had] explicitly left a gap for the agency to fill, there [was] an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id*. at 843-44. "Such legislative regulations [were] given controlling weight unless they [were] arbitrary, capricious, or manifestly contrary to the statute." *Id*. at 844.

32

"Sometimes the legislative delegation to an agency on a particular question [was seen to be] implicit rather than explicit." *Id.* "In such a case, a court [could] not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

In the past, in a case like this one, in which the contested statute has a plain and clear meaning, the case would be resolved at *Chevron* Step One. However, "if the statute [was] silent or ambiguous with respect to the specific issue, the question for the court [was] whether the agency's answer [was] based on a permissible construction of the statute." *Id.* at 843. *Chevron* made it clear that "[t]he power of an administrative agency to administer a congressionally created program necessarily require[d] the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Id.* (cleaned up). And "legislative regulations [adopted by agencies were] given controlling weight unless they [were] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. A challenge to an agency's change of position was one type of arbitrary-and-capricious claim at *Chevron* Step Two. *See Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 646 (D.C. Cir. 2020) ("[T]he rule that an agency must display awareness that it is changing position is simply a species of the more general requirement . . . that an agency provide a reasoned explanation for its action." (cleaned up)).

The change-of-position challenge to agency statutory interpretation was rooted in *Chevron*'s view that "[t]here [were] often multiple reasonable interpretations of a statute," and in *Chevron*'s requirement that courts "defer to the agency's selection" among them. *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 754 F.3d 1031, 1044 n.7 (D.C. Cir. 2014). *Chevron* itself was about an agency (the EPA) that "ha[d] from

33

time to time changed its interpretation." 467 U.S. at 863. The Supreme Court explained that agency interpretations occurred "not in a sterile textual vacuum," but rather were informed by the agency's experience "in a technical and complex arena." *Id.*; *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("[T]he agency must consider varying interpretations . . . on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations." (cleaned up)). An agency could move from one permissible interpretation to another, but it had to "provide a 'reasoned analysis' supporting its decision to revise its interpretation." *Ala. Educ. Ass'n v. Chao*, 455 F.3d 386, 392 (D.C. Cir. 2006) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983)); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agencies must "demonstrate . . . that the new policy is permissible under the statute" and that "there are good reasons for it"). If it offered no "reasoned analysis," a reviewing court could reverse, if the agency's interpretation was "manifestly contrary to the statute," *Chevron*, 467 U.S. at 844; *see also Nat. Res. Def. Council v. Thomas*, 805 F.2d 410, 420 (D.C. Cir. 1986), or it could remand the case, instructing the agency to explain why its expertise and understanding of the facts had caused it to move from one permissible interpretation to another, *see, e.g.*, *Ala. Educ. Ass'n*, 455 F.3d at 397.

As applied to agency changes in the interpretation of statutory text, *Loper Bright* upended this foundation for change-of-position challenges. The Court clarified that "agencies have no special competence in resolving statutory ambiguities." *Loper Bright*, 603 U.S. at 400-01. "In an agency case as in any other," the Court explained, "there is a best reading" of the statute, and it "makes no sense to speak of a 'permissible' interpretation that is not the one the court . . .

34

concludes is best." *Id.* at 400. This completely altered *Chevron*'s two-step process for reviewing agency interpretations of statutes. The focus in *Loper Bright* is on the best reading of a statute, and determining the best reading is a role that is reserved for the courts.

Although *Loper Bright* overruled *Chevron*, it did not wholly reject agency expertise or authority. *Loper Bright* makes it clear that, in some cases, a "statute's meaning [is] that the agency is authorized to exercise a degree of discretion." *Id.* at 394. The role of courts is then to "recognize constitutional delegations, fix the boundaries of the delegated authority, and ensure the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (cleaned up). But this is not one of those cases, in which the question is whether the agency has reasonably exercised its discretion, nor does either side suggest that it is. Instead, all parties agree that this case turns on whether 26 U.S.C. § 6103(i)(2) requires IRS to act as it agreed to in the MOU. Again, to answer this question, "agencies have no special competence." *Id.* at 400-01.

In sum, we agree with what Appellants have essentially conceded – *i.e.*, that there is no merit to its claim that IRS's endorsement of the MOU should be viewed as arbitrary and capricious and a violation of the APA because the agency changed its position without ample explanation. No explanation could justify or make lawful the agency's new interpretation of the statute. The agency must act pursuant to the court's best reading of the statute. As the District Court pointed out, § 6103(i)(2) requires IRS to disclose address information in response to a valid request regardless of what happens to the MOU. *See Centro de Trabajadores*, 2025 WL 1380420, at *7-8. So, yes, as Appellants acknowledge, remand would be a "useless formality." Appellants' Reply Br. 15

35

(citation omitted).

### III. CONCLUSION

For the reasons explained above, Appellants are unlikely to succeed on the merits of either the contrary-to-law or arbitrary-and-capricious claim, so there is "no need [for us] to address the other preliminary injunction factors." *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253 (D.C. Cir. 2006). We also decline to reach the government's alternate arguments against issuance of a preliminary injunction, none of which are jurisdictional. The District Court properly denied Appellants' motion for a preliminary injunction.

For the reasons stated above, the judgment of the District Court is affirmed.

*So ordered.*